FILED

**LUIS COSTILLO**
NAME

**C-73437**
PRISON IDENTIFICATION/BOOKING NO.

**P.O. BOX 5002**
ADDRESS OR PLACE OF CONFINEMENT

**CALIPATRIA, CA 92233**

Note:   It is your responsibility to notify the Clerk of Court in writing of any change of address. If represented by an attorney, provide his name, address, telephone and facsimile numbers, and e-mail address.

2008 AUG -4 PM 12: 17

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY CP

Fee Paid

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**LUIS COSTILLO**
FULL NAME (Include name under which you were convicted)

Petitioner,

v.

(530)

**L. SMALL, WARDEN (A)**
NAME OF WARDEN, SUPERINTENDENT, JAILOR OR AUTHORIZED
PERSON HAVING CUSTODY OF PETITIONER

Respondent.

CASE NUMBER:

CV **08 - 5082** VBF (FMO)
To be supplied by the Clerk of the United States District Court

☐ _____ **AMENDED**

**PETITION FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY**
28 U.S.C. § 2254

PLACE/COUNTY OF CONVICTION _____
PREVIOUSLY FILED, RELATED CASES IN THIS DISTRICT COURT
(List by case number)
CV _____
CV _____

## INSTRUCTIONS - PLEASE READ CAREFULLY

1.   To use this form, you must be a person who either is currently serving a sentence under a judgment against you in a California state court, or will be serving a sentence in the future under a judgment against you in a California state court. You are asking for relief from the conviction and/or the sentence. This form is your petition for relief.

2.   In this petition, you may challenge the judgment entered by only one California state court. If you want to challenge the judgment entered by a different California state court, you must file a separate petition.

3.   Make sure the form is typed or neatly handwritten. You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

4.   Answer all the questions. You do not need to cite case law, but you do need to state the federal legal theory and operative facts in support of each ground. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit a legal brief or arguments, you may attach a separate memorandum.

5.   You must include in this petition all the grounds for relief from the conviction and/or sentence that you challenge. And you must state the facts that support each ground. If you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

5.   You must pay a fee of $5.00. If the fee is paid, your petition will be filed. If you cannot afford the fee, you may ask to proceed *in forma pauperis* (as a poor person). To do that, you must fill out and sign the declaration of the last two pages of the form. Also, you must have an authorized officer at the penal institution complete the certificate as to the amount of money and securities on deposit to your credit in any account at the institution. If your prison account exceeds $25.00, you must pay the filing fee.

6.   When you have completed the form, send the original and two copies to the following address:
    Clerk of the United States District Court for the Central District of California
    United States Courthouse
    ATTN: Intake/Docket Section
    312 North Spring Street
    Los Angeles, California 90012

LODGED
CLERK, U.S. DISTRICT COURT
AUG - 1 2008
CENTRAL DISTRICT OF
BY



8/4/2008 1:16:27 PM Receipt #: 110032
Paid by Cashier : DRAYSON
5908-08-085000 TERESA CASTILLO
Amount :

Writ Habeas Corpus(1)
$5.00

M.O.    Payment : PA556 /    5.00
Total Payment :    5.00

015321

PLEASE COMPLETE THE FOLLOWING: *(Check appropriate number)*

This petition concerns:
1. ☐ a conviction and/or sentence.
2. ☐ prison discipline.
3. ☒ a parole problem.
4. ☐ other.

**PETITION**

1.  Venue

    a.  Place of detention  CSP-CALIPATRIA, CALIPATRIA, CALIFORNIA

    b.  Place of conviction and sentence  LOS ANGELES COUNTY

2.  Conviction on which the petition is based *(a separate petition must be filed for each conviction being attacked)*.

    a.  Nature of offenses involved *(include all counts)*:  PETITIONER'S ACCOMPLICE (AND BROTHER, FRANK COSTILLO) WAS KILLED BY POLICE DURING AN ATTEMPTED ROBBERY. FIRST DEGREE, FELONY, MURDER

    b.  Penal or other code section or sections:  CAL.P.C. §187

    c.  Case number:  #A375051

    d.  Date of conviction: SEPTEMBER 20, 1983

    e.  Date of sentence: SEPTEMBER 20, 1983

    f.  Length of sentence on each count: 25 YEARS TO LIFE, PLUS, CONCURRENT SENTENCE

    g.  Plea *(check one)*:

        ☒ Not guilty

        ☐ Guilty

        ☐ Nolo contendere

    h.  Kind of trial *(check one)*:

        ☐ Jury          NOT APPLICABLE (N/A)

        ☐ Judge only

3.  Did you appeal to the California Court of Appeal from the judgment of conviction?     ☐ Yes ☒ No

    If so, give the following information for your appeal *(and attach a copy of the Court of Appeal decision if available)*:

    a.  Case number: _____ N/A _____

    b.  Grounds raised *(list each)*:

        (1) _____ N/A _____

---

(2) _____

(3) _____

(4) _____

(5) _____

(6) _____ N/A _____

c. Date of decision: _____

d. Result _____

_____ N/A _____

4. If you did appeal, did you also file a Petition for Review with the California Supreme Court of the Court of Appeal
decision?   ☐ Yes   ☐ No

If so give the following information *(and attach copies of the Petition for Review and the Supreme Court ruling if available)*:

a. Case number: _____ N/A _____

b. Grounds raised *(list each)*:

(1) _____

(2) _____

(3) _____

(4) _____

(5) _____

(6) _____ N/A _____

c. Date of decision: _____

d. Result _____

_____ N/A _____

5. If you did not appeal:

a. State your reasons ____ ACCEPTED PLEA AGREEMENT _____

_____

_____

_____

_____

b. Did you seek permission to file a late appeal?   ☐ Yes   ☐ No   N/A

6. Have you previously filed any habeas petitions in any state court with respect to this judgment of conviction?
☒ Yes   ☐ No   PAROLE BOARD'S DECISION TO DENY PETITIONER PAROLE

If so, give the following information for each such petition *(use additional pages if necessary, and attach copies of the petitions and the
rulings on the petitions if available)*:

a. (1) Name of court: SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

   (2) Case number: BH004425

   (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: JANUARY 3, 2007

   (4) Grounds raised *(list each)*:

     (a) SEE ATTACHED PETITION (ATT.PET.), p.i, TABLE OF CONTENTS

     (b) _____

     (c) _____

     (d) _____

     (e) _____

     (f) _____

   (5) Date of decision: MAY 29, 07, SEE ATTACHMENT-3, DENIAL ORDER

   (6) Result DENIED

   (7) Was an evidentiary hearing held?    ☐ Yes    ☒ No

b. (1) Name of court: COURT OF APPEAL, STATE CALIFORNIA, 2ND APPELLATE DIST.

   (2) Case number: B205009

   (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

   (4) Grounds raised *(list each)*:

     (a) _____

     (b) SEE, ATT.PET., p.i, TABLE OF CONTENTS

     (c) _____

     (d) _____

     (e) _____

     (f) _____

   (5) Date of decision: _____, SEE, ATTACHMENT-2, DENIAL ORDER

   (6) Result DENIED

   (7) Was an evidentiary hearing held?    ☐ Yes    ☒ No

c. (1) Name of court: THE SUPREME COURT OF CALIFORNIA

   (2) Case number: S160744

   (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

   (4) Grounds raised *(list each)*:

     (a) _____

     (b) SEE, ATT.PET., p.i, TABLE OF CONTENTS

(c) _____

(d) _____

(e) _____

(f) _____SEE, ATT.PET., p.i, TABLE OF CONTENTS_____

(5) Date of decision: _____APRIL 9, 2008_____

(6) Result _____SUMMARY DENIAL, SEE, ATTACHMENT-1_____

_____

(7) Was an evidentiary hearing held?     ☐ Yes   ☒ No

7. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than five grounds. Summarize briefly the facts supporting each ground. For example, if you are claiming ineffective assistance of counsel, you must state facts specifically setting forth what your attorney did or failed to do.

CAUTION:    *Exhaustion Requirement*: In order to proceed in federal court, you must ordinarily first exhaust your state court remedies with respect to each ground on which you are requesting relief from the federal court. This means that, prior to seeking relief from the federal court, you first must present all of your grounds to the California Supreme Court.

a. Ground one: ___SEE. ATT.PET.. p.i. TABLE OF CONTENTS_____

_____

(1) Supporting FACTS: __SEE. ATT.PET.. p.1-11_____

_____

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?         ☐ Yes   ☒ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?   ☒ Yes   ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?       ☐ Yes   ☒ No

b. Ground two: ___SEE. ATT.PET.. p.i. TABLE OF CONTENTS_____

_____

(1) Supporting FACTS: __SEE. ATT.PET.. p.1-11_____

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?         ☐ Yes   ☒ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?   ☒ Yes   ☐ No

---

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY (28 U.S.C § 2254)**

(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☐ Yes    ☒ No

c.  Ground three: _____

_____

(1) Supporting FACTS: _____

_____

_____

**N/A**

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☐ Yes    ☐ No
(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☐ Yes    ☐ No
(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☐ Yes    ☐ No

d.  Ground four: _____**N/A**_____

(1) Supporting FACTS: _____

_____

**N/A**

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☐ Yes    ☐ No
(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☐ Yes    ☐ No
(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☐ Yes    ☐ No

e.  Ground five: _____**N/A**_____

(1) Supporting FACTS: _____

_____

**N/A**

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☐ Yes    ☐ No
(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☐ Yes    ☐ No
(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☐ Yes    ☐ No

8.  If any of the grounds listed in paragraph 7 were not previously presented to the California Supreme Court, state

briefly which grounds were not presented, and give your reasons: _____

_____

_____ N/A _____

9.  Have you previously filed any habeas petitions in any federal court with respect to this judgment of conviction?

☐ Yes    ☐ No

If so, give the following information for each such petition *(use additional pages if necessary, and attach copies of the petitions and*

*the rulings on the petitions if available)*:

a.  (1) Name of court: _____ N/A _____

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

(a)  _____

(b)  _____

(c)  _____

(d)  _____

(e)  _____

(f)  _____ N/A _____

(5) Date of decision: _____ N/A _____

(6) Result _____

_____ N/A _____

(7) Was an evidentiary hearing held?    ☐ Yes   ☐ No                    N/A

b.  (1) Name of court: _____ N/A _____

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

(a)  _____

(b)  _____

(c)  _____

(d)  _____

(e)  _____

(f)  _____ N/A _____

(5) Date of decision: _____

(6) Result _____ N/A _____

(7) Was an evidentiary hearing held?    ☐ Yes  ☐ No        **N/A**

10. Do you have any petitions now pending (i.e., filed but not yet decided) in any state or federal court with respect
    to this judgment of conviction?    ☐ Yes  ☒ No

    If so, give the following information *(and attach a copy of the petition if available)*:

    (1) Name of court: _____ **N/A** _____

    (2) Case number: _____

    (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

    (4) Grounds raised *(list each)*:

        (a)  _____

        (b)  _____

        (c)  _____

        (d)  _____

        (e)  _____

        (f)  _____ **N/A** _____

11. Are you presently represented by counsel?    ☐ Yes  ☒ No

    If so, provide name, address and telephone number: _____

    _____ **N/A** _____

WHEREFORE, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding,

_____

*Signature of Attorney (if any)*

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on _6-8-08_                    *Luis Castillo*
            *Date*                    *Signature of Petitioner*

---

**ATTACHMENT-1**

(CALIFORNIA SUPREME COURT ORDER, DENIAL, 4-9-08)

Court of Appeal, Second Appellate District, Div. 1 - No. B205009
**S160744**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re LUIS CASTILLO on Habeas Corpus

The petition for review is denied.

SUPREME COURT
**FILED**

APR – 9 2008

Frederick K. Ohlrich Clerk

_____
Deputy

_____
Chief Justice

ATTACHMENT-2

(COURT OF APPEAL ORDER, DENIAL,                )

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

In re

    LUIS CASTILLO,

on

Habeas Corpus.

B205009

(L.A.S.C. Nos. A375051, BH004425)

O R D E R

COURT OF APPEAL - SECOND DIST.

F I L E D

JAN 2 5 2008

JOSEPH A. LANE      Clerk

S. LUI

        Deputy Clerk

THE COURT*:

    The petition for writ of habeas corpus, filed January 17, 2008, has been read and considered.

    The petition is denied.

*MALLANO, Acting P. J.         VOGEL, J.         ROTHSCHILD, J.

Luis Castillo
CDC:C-73437
Calipatria State Prison
P.O. Box 5002
Calipatria, CA 92233

Case Number B205009
Division  1

In re LUIS CASTILLO on Habeas Corpus.

**ATTACHMENT-3**
(SUPERIOR COURT ORDER, DENIAL, 5-29-07)

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | | | DEPT 100 |
|---|---|---|---|---|
| Date: | MAY 29, 2007 | | | |
| Honorable: | PETER ESPINOZA | Judge | J. PULIDO | |
| | NONE | Bailiff | NONE | Deputy Clerk |
| | | | | Reporter |

| | |
|---|---|
| BH 004425 | (Parties and Counsel checked if present) |
| In re, | |
| LUIS CASTILLO, | Counsel for Petitioner: |
| Petitioner, | |
| On Habeas Corpus | Counsel for Respondent: |

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

The Court has read and considered petitioner's Writ of Habeas Corpus filed on January 3, 2007. Having independently reviewed the record, giving deference to the broad discretion of the Governor in parole matters, the Court concludes that the record contains "some evidence" to support the Governor's finding that petitioner is unsuitable for parole (Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667 (hereafter *Rosenkrantz*).)

Petitioner was received in the Department of Corrections on September 23, 1983 after a conviction for first-degree murder. He was sentenced to a term of thirty-five years to life. His minimum parole eligibility date was December 20, 2005. He was also convicted of several non-controlling offenses, including eight counts of attempted murder, five counts of assault with a deadly weapon on a peace officer, attempted murder of a peace officer, conspiracy to commit robbery.

The record reflects that on January 10, 1982, petitioner and two crime partners robbed a restaurant at gunpoint. Petitioner shot at the ceiling with a shotgun and robbed customers of money and jewelry. One of the customers was a security guard who was armed with a gun. Petitioner ordered the security guard to lie on the floor with his shotgun pressed to the guard's back while he searched for the gun. Upon finding the guard's gun, petitioner kicked the guard and handcuffed him to the manager at the end of the bar. Both were made to lie on the floor. Police arrived and found petitioner and his partners running across the parking lot to a car driven by petitioner's brother. As they left the parking lot, they fired several shots at the police officers. The police chased the car for approximately 1.5 miles at a high rate of speed before the driver lost control of the vehicle. During the chase, the robbers continued to shoot at the police and their vehicles, as well as a police helicopter that arrived in the area. The police officers returned fire and petitioner's brother was shot and killed during the exchange. Both of petitioner's crime partners were also shot and injured. Petitioner hid in a junkyard until he was discovered by a police dog. He was taken to a hospital and treated for dog bites.

The Board found petitioner unsuitable for parole after a parole consideration hearing held on November 17, 2005. Petitioner was denied parole for two years. The Board concluded that petitioner would pose an unreasonable risk of danger to society and a threat to public safety if released from prison at this time. The Board based its decision on several factors, including the commitment offense.

1

| Minutes Entered |
|---|
| 05-29-07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | MAY 29, 2007 | | | |
|---|---|---|---|---|
| Honorable: | PETER ESPINOZA | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

|  | |
|---|---|
| BH 004425<br>In re,<br>LUIS CASTILLO,<br>Petitioner,<br>On Habeas Corpus | Counsel for Petitioner:<br><br>Counsel for Respondent: |

The Board can properly rely upon the circumstances of the crime in deciding that petitioner is not presently suitable for parole. (*Rosenkrantz, supra*, 29 Cal.4th 616, 683.) The Court finds that there is some evidence to support the Board's parole denial because "the motive for the crime is inexplicable or very trivial in relation to the offense" (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(E).) "To fit the regulatory description, the motive must be materially less significant (or more "trivial") than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinarily present." (*In re Scott* (2004) 119 Cal.App.4th 871, at 893.) In this case, the felony murder took place during the escape from a robbery. The Board was justified in concluding that "the motivation to obtain money" is materially less significant than those which conventionally drive people to commit murder. (*In re Honesto* (2005) 130 Cal.App.4th 81, 95.)

The Board also found that "multiple victims were attacked, injured or killed in the same or separate incidents." (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(A).) Although only one person died during the commission of the crime, petitioner and his crime partners attacked many others. Petitioner injured the security officer at the restaurant when he kicked him while he was on the floor. The robbers also victimized the 125 patrons at the restaurant by robbing them at gunpoint. Additionally, they attacked several police officers by shooting at them and their vehicles as they led the police on a high speed chase.

There is some evidence that petitioner is not suitable for parole due to his previous history of violence. (Cal. Code Regs., tit. 15, §2402, subd. (c)(2).) He was convicted of over twenty counts of robbery with the use of a firearm for committing a series of armed robberies of markets and drug stores between August and October, 1981. During one of these armed robberies, one man was shot in the stomach, resulting in the loss of his intestine and spleen. Although petitioner denies being the shooter in that case, he admits that he was involved in several of the robberies and pled guilty to all. He was sentenced to 23 years and 8 months in prison for these robberies and was out on bail at the time of the commitment offense. The record also reflects that petitioner, on another occasion inflicted serious injury on a victim. (Cal. Code Regs., tit. 15, §2402, subd. (c)(2).) While in prison, petitioner was charged with stabbing another inmate, for which he could have received another 25 year to life sentence. However, he received only a CDC 115. Due to his prior violent and criminal behavior, the Board concluded that petitioner is not yet suitable for parole at this time.

Accordingly, the petition is denied.

The court order is signed and filed this date. The clerk is directed to give notice.

2

| Minutes Entered |
|---|
| 05-29-07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | MAY 29, 2007 | | |
|---|---|---|---|
| Honorable: | PETER ESPINOZA | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH 004425
In re,
LUIS CASTILLO,
             Petitioner,

On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

A true copy of this minute order is sent via U.S. Mail to the following parties:

Luis Castillo
C-73437
Calipatria State Prison
P.O. Box 5002
Calipatria, CA 92233

Department of Justice
Office of the Attorney General of the State of California
Gregory J. Marcot, Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101

THE DOCUMENT TO WHICH THIS CERTIFICATE IS
ATTACHED IS A FULL, TRUE, AND CORRECT COPY
OF THE ORIGINAL ON FILE AND OF RECORD IN
MY OFFICE.

ATTEST _____ JUL 0 2 2007

JOHN A. CLARKE, Executive Officer/Clerk of the
Superior Court of the State of California for the County
of Los Angeles.

By _____ , Deputy

JOSEPH M. PULIDO, S.C.C.
233219



3

| Minutes Entered |
|---|
| 05-29-07 |
| County Clerk |

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA**<br>**COUNTY OF LOS ANGELES**<br>COURTHOUSE ADDRESS:<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA 90012<br>PLAINTIFF/PETITIONER:<br><br>LUIS CASTILLO | Reserved for Clerk's File Stamp<br><br><br><br>JUL 0 2 2007<br><br>John ........................ Clerk<br>By ........................ Deputy<br>Joseph M. Pulido |
| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER:<br>BH004425 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

☐ Order Extending Time        ☑ Order re: Writ of Habeas Corpus
☐ Order to Show Cause         ☐ Order
☐ Order for Informal Response ☐ Order re:
☐ Order for Supplemental Pleading ☐ Copy of Petition for Writ of Habeas Corpus for the
                                   Attorney General

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to the cause. I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

July 2, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _____ Clerk
         Joseph M. Pulido

Luis Castillo
C-73437
Calipatria State Prison
P.O. Box 5002
Calipatria, CA 92233

Department of Justice
Office of the Attorney General of the State of
California
Gregory J. Marcot, Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101

# TABLE OF CONTENTS                                    Page(s)

Table of Authorities.........................................ii-iii

Table of Exhibits...............................................iii

Introduction..................................................1-2

Charges and Procedural History...............................2-5

Facts of the Case.............................................6-7

Parole Hearing History.......................................7-11

The Requirement of Due Process and Standard of Review......11-12

Memorandum of Points and Authorities....................... 13
Constitutional Claims:

## I
BECAUSE PETITIONER WAS DENIED PAROLE PRIMARILY BASED ON HIS COMMITTED OFFENSE WHICH IS NOT PARTICULARLY EGREGIOUS, PETITIONER'S DUE PROCESS WAS VIOLATED

13-30

## II
BECAUSE THE BPH DENIED PETITIONER PAROLE MULTIPLE YEARS, PETITIONER'S PLEA BARGAIN, DUE PROCESS, AND EX POST FACTO PROVISIONS WERE VIOLATED

30-40

Conclusion..................................................... 40
Parties....................................................... 40
Contentions...................................................41
Prayer for Relief........................................... 41-42
Verification.................................................. 43

//

//

//

//

//

# TABLE OF AUTHORITIES

**FEDERAL CASES:**                                                    **Page[s]**

Beazell V. Ohio 269 U.S., p.171................................................38

Biggs V. Terhune (9th Cir. 2003) 334 F. 3d 895.........26, 32, 33

Board of Pardons V. Allen 96 L.Ed.2d 303 .........................31

Brown V. Poole (2003) 337 F.3d 1155.................................35

CDC V. Morales 514 U.S. 499 (1995).................11,37, 38, 39, 40

Emmund V. Florida 102 S. Ct. 3368.................................15

Garner V. Jones (2002) 146 L.Ed.2d 236..........................40

Greenholtz V. Inmates Of Nebraska Penal & Com. complex (1979)
442 U.S. 1, 7, 11-12................................................22,21,31

Irons V. Carey 479 F.3d 658, p.___, 2007 DJDAR (9th Cir.) (Irons-
II) 3072, 3074.................................................14, 26

Irons V. Warden of CSP-Solano (East. Dist.) 358 F. Supp. 2d 936,
941-942(Irons-I)..................................................26, 27

INS V. St.Cyr (2002) 533 U.S. 289..................................35

Newton V. Rumery (1987) 480 U.S. 386..............................35

Martin V. Marshall 431 F. Supp. 1038 (2006)...............26, 27

Mayard V. Cartwright 100 L. Ed. 2d 372, 108 S. Ct. 1853..8, 28,
29

Mcquillion V. Duncan (9th Cir. 2002) 309 F. 3d 895.........11, 13, 16,
25, 27, 31, 33, 36

Rosenkrantz V. Marshall  (Rosenkrantz-V) 444 F. Supp. 2d 1063
(2006).................................................27

Sanchez V. Kane 444 F. Supp. 2d 1049 (2006)...................27

Sellar V. Procunier 461 F. 2d 1295 (1981)................15, 22

**STATE CASES:**

Andrade, In Re, (2006) 141 Cal.App.4[th] 807.....................26, 27

Caswell, In Re, 112 Cal. Rptr. 2d 462, (2001) 92 Cal. App. 4th
1017..............................................27,30,33

Cunningham, People V., (1996) 49 Cal.App.4[th] 1044...........12, 35

Dannenberg, In Re, 125 Cal.Rptr.2d 458..........................30

Dillion, People, 194 Cal. Rptr.___, p. 393.................15, 22

Elkins, In Re, (2006) 50 Cal. Rptr. 3d, 503, 523, 523....26, 27

Jackson, In Re, (1985) 39 Cal. 3d 464, 216 Cal. Rptr. 760..........4,
32, 33, 38

Jefferson, People v., 21 Cal.4[th] 85.............................23, 34

Lee, In Re, 49 Cal. Rptr. 3d 931................................8, 25,
28

Martin, People V., (1986) 42 Cal.3d 437.........................23

Minnis, In re, (1972) 7 Cal.3d 639..............................28

Powell, In Re, (1988) 45 Cal.3d 894............................16, 24

Ramirez, In Re, 114 Cal. Rptr. 2d 381, 94 Cal. App. 4th 549...16,
29, 32

Roberts, In Re, (1975) 40 Cal.2d 749.........................3, 18, 22

Roberts V. Duffy (1914) 167 Cal. 629............................22

**State Cases:** (Continued from pg. ii)                                    **Page[s]**

Rodriguez, In Re, 122 Cal. Rptr. 552........13, 15, 18, 19, 20, 22, 23, 24

Rosenkrantz, In Re, (Rosenkrantz-II) 95 Cal. Rptr. 2d 279...8, 26, 28, 29

Rosenkrantz, In Re, (Rosenkrantz-IV) 29 Cal. 4th 616......8, 11, 15, 16, 18, 24, 25

Schoengarth, In Re, 66 Cal.2d 295........................21

Scott, In Re, (Scott-I) 15 Cal. Rptr. 3d 32, 119 Cal. App. 4th 871........................

Scott, In Re, (Scott-II) 133 Cal. App. 4th 5........26, 29, 33

Seabock, In Re, 189 Cal.Rptr. 310........................26, 27

Smith, In Re, (2003) 114 Cal.App.4th 343........................20

Smith, People V., 34 Cal.3d, p.260........................12

Stanworth, In Re, 187 Cal.Rptr. 783........................38

Strum, In Re, (1974) 11 Cal. 3d 258........................25

Thamos, In Re, 21 Cal.4th 1122 (1999)........................16

Van Houten, In Re, (2004) 116 Cal. App. 339........................9

Walker, People V., 54 Cal.3d 1013........................29

Weider, In Re, 145 Cal. App. 4th 570 No. H030203. Sixth Dist.,.14

Wingo, People, (1975) 14 Cal. 3d 169........................22, 24

Yates, People, 34 Cal.Rptr. 765........................15

**CODES AND RULES/REGULATIONS**                          Pages

Cal.Rules of Court, Rule 4.420(d)........................34

Cal. Penal Code            §190........................15

Cal. Penal Code            §1168........................19

Cal. Penal Code            §1170........................19, 34

Cal. Penal Code            §1170(a)(1)........................23

Cal. Penal Code            §3041 (a).......7, 8, 19, 23, 29, 30, 34

Cal. Penal Code            §3041(b)(1)........................9, 27

Cal. Penal Code            §3041(b)(2)(B)........................31

Cal. Penal Code            §3041.5........................34

**California Code of Regulations, Title 15, (C.C.R.):**

                           §2403 (b)........................14, 20, 21, 27

**TABLE OF EXHIBITS**

EXHIBIT-A CERTIFIED TRANSCRIPT OF 2005 BPH HEARING
EXHIBIT-B MENTAL HEALTH EVALUATION, 2004
EXHIBIT-C LIFE PRISONER EVALUATION REPORT, 2005

1  LUIS CASTILLO, C-73437

2  P.O. BOX 5002

3  CALIPATRIA, CA 92233

4  In Pro Per

5

6  # UNITED STATES DISTRICT COURT

   # CENTRAL DISTRICT OF CALIFORNIA

7

8  **In Re: LUIS CASTILLO,**                    **CASE NO.**
                                                **PETITION FOR WRIT OF HABEAS**
9                           **Petitioner,**     **CORPUS; MEMORANDUM OF POINTS &**
                                                **AUTHORITIES**
10 **FOR WRIT OF HABEAS CORPUS**

11                         <u>**INTRODUCTION**</u>

12       1. This petition was originally submitted for filing in Los

13  Angeles Superior on December 19, 2006 (see, Proof of Service and

14  Certified/Registered Mail Notice, Exhibit[EX.]-D). Pursuant to

15  the claims, facts, authorities, and exhibits incorporated and

16  set forth in this court action, Petitioner seeks relief by a Pe-

17  tition for Writ of Habeas Corpus directing Respondent, Board of

18  Parole Hearings (BPH), to: **(1)** reverse its decision in Peti-

19  tioner's Parole Consideration Hearing (BPH) conducted 1-17-05

20  (EX.-A, CERTIFIED TRANSCRIPT, November 17,2005, BPH HEARING) to

21  deny Petitioner parole primarily based on the commitment offense

22  because Petitioner's crime is not **"particularly egregious"**, and

23  thus, not more violent or aggravating than the minimum necessary

24  to sustain his conviction, **(2)** order the BPH not to continue to

25  rely on the committed offense  in the future to deny him parole,

26  **(3)** declare that Petitioner is entitled to Annual, parole, Re-

27  views based on the law that was applicable at the time

28

1  of his arrest and should have been incorporated into his plea

2  agreement as he reasonably understood at the time of waiving his

3  right to a jury trial, (4) order the BPH to convene a fair and

4  impartial hearing within 30 to 60 days as Petitioner is entitled

5  to have in accordance with statute, have his term of confinement

6  set according to the appropriate Matrix Table Scheme, and thus,

7  set a parole date; if said time has lapsed, to release Peti-

8  tioner on parole forthwith and to credit his term with the num-

9  ber of days during which he has been con-fined to prison beyond

10  said parole date.

11

## CHARGES AND PROCEDURAL HISTORY

12

13      2. On January 11, 1982, Petitioner was charge and subse-

14  quently, in 1983, convicted of Cal. P.C. §187 (murder) in Los

15  Angeles County Superior Court, Case No.#A375051, for which he

16  received a sentence of 25 Years to Life, however, Petitioner

17  case is somewhat convoluted and confusing based on the fact that

18  Petitioner had several charges pending in another case (Case

19  No.#A149652, 10-14-81), also in Los Angeles County, and the two

20  said cases were merged in this Court; Petitioner accepted a plea

21  bargain for both cases in the same agreement, and the Court sen-

22  tenced Petitioner to twenty-three (23) years and eight (8)

23  months for the first case (Case No.#A149652, series of robber-

24  ies); thus, some how based on the two stated cases above, this

25  Court sentenced petitioner to a total of thirty-five (35) years

26

27  with some part of the determinate sentence for the series

28

1  of robberies running concurrent with the indeterminate sentence

2  for the controlling offense of murder - 25 Years to Life. ("...two

3  sentences will run together during the time the periods over-

4  lap.", **In Re Roberts** (1975) 40 Cal.2d 749.)

5     3. Petitioner was received by the California Department of

6  Corrections on 9-23-83; his Minimum Eligibility Parole Date

7  (MEPD) was determined to be 12-20-05.

8     4. The first decade (1983-1987) of Petitioner's incarcera-

9  tion was a "rocky" period where Petitioner suffered episodes of

10  maladjustment which is reflected by committed infractions or se-

11  rious prison misbehavior (Petitioner has approximately 14 seri-

12  ous disciplinary rules violation reports - "write-ups", two in-

13  fraction are of a violent nature [assault on an inmate with a

14  weapon, 1985], EX.-C, Lifer Prisoner Evaluation, 2004, p.7, D.)

15     5. However, about 19 years ago (1988), Petitioner began to

16  see the errors of his ways, so to speak, or simply began to ma-

17  ture; he made a conscious decision to disassociate himself from

18  all the negative elements in a prison environment which had

19  marred  his life in prison to that point, and instead,  commit

20  himself to spend the duration of his confinement making a strong

21  effort to re-evaluate his priorities, values, and shortcomings;

22  thus, he dedicated his time to character rebuilding and to live

23  a more positive lifestyle - or rehabilitation.

6. Therefore, about 1987, Petitioner cut all ties with his former street/prison gang associates which he knew was essential if he wanted to seriously study theology and practice his relig-ion (Christianity) and acquired a basic education (G.E.D.); Pe-titioner eventually received a Degree of Graduate Theology from The Gulf Coast Bible Institute, 2004. (EX.-C, p.7)

7. To say more, in order to escape the violence and manipu-lation by more aggressive and violently prone inmate in the Gen-eral Population and to maintain on his path of rehabilitation, Petitioner requested to be placed in Protective Custody (pres-ently referred to as "Sensitive Needs" status) in 2000, and where he is currently housed to date; ergo, Petitioner **cooper-ated with authorities** in all respects as to prison affairs in a long interview conducted by appropriate staff in order for Peti-tioner to officially cleared for housing in protective custody. **(cooperating with authorities/law enforcement is an indication of rehabilitation or suitability for parole, <u>In Re Jackson</u>** 39 Cal.3d 464 (1985), at 475.)

8. Also, he has remained disciplinary free the last nine-teen (19) years to date or the last seventeen (17) years prior to his, 2005, parole consideration hearing. Petitioner has ap-proximately 60 to 70 positive or laudatory reports/write-ups of acknowledgement in the forms of certificates of Comple-tion/achievement, work reports, laudatory chronos, etc..., in

contrast to his approximate 15 disciplinary write-up reports which occurred before 1988, aforementioned.

9. Petitioner raises no challenge herein to the judgement of conviction. Petitioner raises challenges only against the Board of Prison Hearings (BPH) concerning its denial of Petitioner's parole on November, 17, 2005. Petitioner has also acquired solid marketable skills by completing vocational Autobody and Fender, 6-24-02, and eight (8) Certificates of Achievement in the area of vocational Silk Screening. (EX.-C, p.7.)

10. Moreover, Petitioner has taken advantage and participated in all self-help program available to date, i.e., but not limited to A.A., N.A., Anger Management, Life Without A Crutch, Straight Life (mentor program), etc.... Petitioner does have a viable job after on the outside in the auto field, however, a job offer is not required by law, rules, or regulations as a condition of parole only that the parole applicant have marketable skills. Furthermore, petitioner last, 2004, psychological evaluation prepared by Doctor Magner is totally supportive of parole. (Ex.-B, Mental Health Evaluation, 2004, p.5-6, indicated: Petitioner's potential for violence in the free community is felt to no more than the average male citizen Petitioner's age.)

//
//

## FACTS OF THE CASE

11. On January 10, 1982, Petitioner and accomplice (EX.-A, pp.15-34) robbed a local restaurant (Rusty's Hacienda) and its patrons; Petitioner admits to "roughing up" a security guard who did not reveal he was armed when questioned.

12. The authorities were alerted of the robbery in progress and were immediately dispatched to the scene while petitioner and accomplice simultaneously fled the scene of the crime in a vehicle; soon after, a police vehicle and a helicopter were in pursuit and a high speed chase commenced.

13. Petitioner and accomplices fired a weapon (shotgun) out of their speeding vehicle into the air in forlorn hope that the loud blast of their firearm would slow down the pursuing vehicle and allow them to escape.

14. However, a mile or so down the street, Petitioner's ac-complice driving the "get away" vehicle lost control of the ve-hicle and crashed to a stop; at this time, Petitioner still con-scious attempted to help his brother, murdered victim, out of the crashed vehicle, but his brother stated that he wanted to stay and surrender; no gun shots were fired at police at any time after the fleeing vehicle crashed; ergo, Petitioner left the murder victim in the vehicle unarmed and still alive before police fired their weapons and killed him which is a plausible

scenario when it is considered that Petitioner was able to es-
cape and allude police until the next morning and only after po-
lice canine units were dispatched was he discovered. Fortu-
nately, no other people were physically injured besides Peti-
tioner's brother/accomplice.

## PAROLE HEARING HISTORY

15. On 11-17-05, the Board of Prison Hearings (BPH) con-
ducted an "Initial" parole consideration hearing; to determine
Petitioner's suitability for parole. (EXHIBIT-A, CERTIFIED TRAN-
SCRIPT, 2005, BPT HEARING); however, it is worth noting that
statute (Cal.P.C. §3041(a)) mandates that an inmate serving an
indeterminate sentence with the possibility of parole shall be
scheduled for a parole consideration hearing one (1) year before
reaching his Minimum Eligibility Parole Date (MEPD), thus, in
2005, Petitioner should have been scheduled not for his "Ini-
tial" but for his "Subsequent #1" parole consideration hearing.
Nevertheless, at the, 2005, BPH hearing, Petitioner was denied
parole two (2) years primarily based on the committed offense.
The BPH's decision became final on March 17, 2006. (EX.-A, Id.,
pp.96-108.)

16. Petitioner alleges that the BPH's reliance primarily on
the nature and circumstances of the crime to deny him parole two
(2) years is contrary and belies the California Supreme Court's

1  opinion in **In Re ROSENKRANTZ**, [ROSENKRANZ-IV] 29 Cal.4th 616,

2  661, which determined that the crime an inmate was convicted of

3  committing must be more violent and aggravating than the minimum

4  necessary to sustain the conviction to justify denial of parole;

5  it is reasonable to say that this point is amplified by the fact

6  that statute mandates that the Parole Board "shall normally"

7  set a parole date (P.C.§3041(a)) at every parole considering

8

9  hearing conducted.

10      17. Petitioner's accomplice, brother, was shot to death by

11  police after petitioner escaped the scene of the crash site in

12  the process of evading arrest for an attempted robbery, and Pe-

13  titioner was convicted of his brother's homicide; thus, to say

14

15  that the murder was exceptionally callous, dispassionate, and/or

16  calculating (EX.-A, p.98, ¶21-26) is flippant and inflammatory -

17  wording used to describe crime is **unconstitutionally vague**. (**Ma-**

18  **yard V. Cartwright** 100 L.Ed.2d 372, 380-81 - also compare, **In Re**

19  **Rosenkrantz** [Rosenkrantz-II] 80 Cal.App. 409, 425.)

20

21      18. Moreover, the BPH never demonstrated how the specific

22  facts of the committed offense relied on to deny Petitioner pa-

23  role which occurred more than two (2) decades prior to the,

24  2005, BPH parole hearing were supportive of "Some Evidence" of

25

26  petitioner's unreasonable present threat to public safety

27  (**In Re Lee** 49 Cal.Rptr.3d 931, 936-937, 143 Cal.App.4th 1400,

28  p.____, (2006)), especially, when considering that Petitioner

1  has been a model inmate approximately eighteen (18) years prior
2  to his last hearing, and his last psychological evaluation was
3  totally supportive of parole. (EX.-B, Mental Health Evaluation,
4  2004, p.5-6.)

6      19. Therefore, Petitioner additionally alleges that because
7  the BPH failed to apply relevant standards properly, Peti-
8  tioner's **due process** rights were violated, and the BPH decision
9  can not be shielded by invocation of the "Some Evidence" stan-
10  dard.

12      20. Petitioner alleges he has a constitutionally protected
   liberty interest and expectancy to receive annual, yearly, re-
13  view parole consideration hearings per P.C. §3041.5(b)(2).

15      21. However, at the decision phase of the, 2005, parole
16  hearing, the BPH recited the specific factors and reasons enun-
17  ciated for denying parole (EX.-A, pp.96-108) which is an auto-
18  matic one (1) year deferment or denial of parole then
19  the BPH basically, and/or effect, recited the same fac-
20  tors(elements) and reasons again it just used to deny him parole
22  in order to **enhance** the denial of parole an extra year totaling
23  two (2) years, Ex.-A, pp.96-107; this is contrary to sentencing
   principles barring "dual usage" of elements for sentence en-
25  hancement purposes.(Cal.Rules of Court, Rule 4.420(d); **People V.**
26  **Thomas** 21 Cal.4th 1122 (1999).)

22. Furthermore, at the time of Petitioner's committed offense, defendants convicted of First Degree Murder were entitled to Annual Reviews, thus, could apply every year for parole; Petitioner accepted a plea agreement and plead guilty to First Degree Murder, and he was sentenced to 25 Years to Life; however, before accepting the plea agreement, Petitioner did consult pertinent rules and regulations and did act upon the advice of his attorney, C. Brown, who informed him that upon becoming eligible for parole according to statute and regulations, Petitioner would be able to apply for parole on an annual basis. Thus, Petitioner did believe that the law applicable at the time of his committed offense would be incorporated into his plea bargain agreement by operation of law.

23. To say more, the law that allowed the BPH discretion to deny inmates convicted of murder multiple years not in effect at the time of Petitioner's committed offense unless an inmate had multiple murder convictions which Petitioner does not (committed offense occurred on January 10, 1982); thus, applying such a law retroactively violates **EX POST FACTO** provisions

24. Before Petitioner accepted his plea agreement, he was not given fair notice that a law could be implemented in the future that could increase punishment for the covered crime by delaying his right to apply for parole on an annual basis, and thus, by virtue lengthening his sentence in practice since

according to recent state an federal case law Petitioner or in effect does have a reasonable expectation to parole at every parole consideration hearing; Petitioner dces not belong to a "subclass" of inmates serving an indeterminate sentence that does not have a reasonable expectation to parole considered in **CDC V. Morales** 514 U.S 499 (1995); ergo, petitioner alleges that his expectations under the plea bargain have been breached because the BPH has failed to grant Petitioner Annual Review since reaching his Minimum Eligible Parole Date (MEPD). The concluding grounds are detailed below for relief.

## THE REQUIREMENT OF DUE PROCESS AND STANDARD OF REVIEW

1)     California statute establishes a liberty interest in parole protected by due process. (**In Re Rosenkrantz** (2002) 29 Cal.4[th] 616, 661 [**Rosenkrantz**-IV]; **McQillion v. Duncan** (9th Cir., 2002) 309 F.3d 895, 901-903.)

2)     when an inmate is denied parole primarily based on the crime, the committed offense **must be more aggravating and violent than what is necessary to sustain the conviction**, or must be "**particularly egrgious**".(**Rosenkrantz**-IV, supra, 29 Cal.4[th], p.683.) If the circumstances and facts of the controlling offense of [First Degree] murder are within the BPH's **term fixing guidelines (**Title 15, CCR §2403(b), Matrix of Base Terms…,

[matrix table scheme]), the committed offense can not be considered to be exceptional or particularly egregious.

3) However, Petitioner may be denied suitability for parole if there is "some evidence"[1] to support factors that petitioner is an "unreasonable risk" to public safety. (**In Re Powell** 45 Cal. 3d 894; **Rosenkrantz-IV**, Id., at p. 658; Title 15 C.C.R. 2402 (a).) At any rate, if the BPH used a combination of factors to deny an inmate parole, and there is no "**some evidence**" to support one or more of the factors relied on to deny parole, the entire decision can not stand. (**In Re Smith** (Ernest) (2003)114 Cal.App.4th 343, 373.)

4)  A negotiated guilty plea requires both parties to honor the agreement as to the sentence. (**People V. Walker** 54 Cal.3d 1013, 1024.) "A plea agreement is, in essence, a contact between the defendant and the prosecutor to which the court consents to be counted.", **People v. Cunningham** (1996) 49 Cal.App.4th 1044, 1047.

---

1.  Although, the state courts have adapted the very low standard of "Some Evidence" in cases where parole is denied originally established in Superintendent V. Hill 472 U.S. 445 which was based on the rationale that only a very low standard was necessary in a case involving an administrative disciplinary hearing in order to protect a "CONFIDENTIAL SOURCE", Petitioner argues that the higher standard of "CLEAR AND CONVINCING EVIDENCE" should apply instead because the administrative decision in his case involves a significant deprivation of liberty or stigma... Petitioner would otherwise be condemned to suffer grievous loss, see, Santosky V.Kramer 455 U.S. 745 (1982), and the individual interest at stake in a state proceeding are both particularly important and more substantial than mere loss of money, see, Addington V. Texas 411 U.S. 418, cited in Stantosky, Id.

MEMORANDUM OF POINTS AND AUTHORITIES

Constitutional Claims:

I

BECAUSE PETITIONER WAS DENIED PAROLE PRIMARILY BASED
ON HIS COMMITTED OFFENSE WHICH IS NOT PARTICULARLY EGREGIOUS,
PETITIONER'S DUE PROCESS WAS VIOLATED

In 1983, Petitioner was convicted of First Degree Murder
and sentenced to serve 25 Years to Life (note: if the parole
board does not set a parole date promptly, it is considered to
be set at the maximum of life, **In Re Rodriguez** 122 Cal.Rptr.
552, 563.) On 11-17-06, Petitioner was denied parole by the
Board of Prison Hearings (BPH) at an "Initial" (First) parole
consideration hearing. (EX.-A, CERTIFIED TRANSCRIPTS, 2005, BPH
HEARING, pp.96-108.)

The BPH's power and authority to deny petitioner parole es-
sential and logically stems from the conviction of First Degree
Murder which carries a life sentence with the expectation of a
parole (**McQuillion**, infra, inmate has a liberty interest in pa-
role); without this "primary factor",  all other factors left
over that the BPH may considered and/or used against Petitioner
to justify denial of parole do not tantamount to a life sentence
or to justify setting Petitioner's date at **LIFE** at his, 2005,
parole consideration hearing when it is considered  that with
**good time custody credit** Petitioner has been confined 25 to 30

1   years or more and to date has served more time incarcerated as

2   that for a more aggravated offense. (compare, **In Re Weider** 145

3   Cal. App. 4th 570, p.____ (No. H030203 Sixth Dist. December 5,

4   2006); in **Weider**, the Court noted that with custody credits an

5   inmate serving  indeterminate sentence with a possibility of

6   parole could be within or passed the appropriate Matrix for the

7   covered offense, and thus, the minimum necessary of aggravating

8   factors to sustain the conviction is or should not be any longer

9   a question to keep denying him parole based on the committed of-

10  fense multiple times <u>because he has now served the time of con-</u>

11  <u>finement for a more aggravating offense</u>), and thus, Petitioner

12  has <u>passed the minimum term</u> of his confinement (**Irons V. Carey**

13  479 F.3d 658, supra, 2007 DJDAR, p. 3074) and also the terms in-

14  dicated in BPH's Rules/Regulations or Matrix Table (Title 15,

15  CCR P.C. §2403 (b)) for term fixing or sentencing guidelines to

16  help determine a uniform term of confinement for an inmate con-

17  victed of first degree murder based on the unique facts and cir-

18  cumstances of Petitioner's controlling offense which do not fall

19  outside stipulated sentencing guidelines show that Petitioner's

20  facts of the crime are not the most aggravated based on said

21  term fixing guidelines, e.g., torture being at the most extreme

22  end and not remotely related to Petitioner's circumstances in

23  the crime; because the BPH has not promptly set a parole date

24  for Petitioner's release, it is considered to be set at the

maximum of "Life"; the BPH justifies setting Petitioner's date at the maximum of life by basing its decision on factors that are never going to change. (EX.-A, p.96-107.) Noteworthy, "Murder without special circumstances (§190, '25 Years to Life' for first degree, '15 Years to Life' for second degree) and conspiracy to commit murder (§182, punishable prescribed for first degree murder currently carry the only indeterminate life sentence as defined by the **CLOUGH** line of case…. The CLOUGH line of cases holding that an Indeterminate life sentence is not a life term….", (underline added), see, **People V. Yates** 34 Cal.Rptr. 765.

Nevertheless, even if an inmate is serving an indeterminate sentence with the possibility or expectation of parole, he is entitled not to be confined for a time beyond what is disproportionate to his individual culpability in a particular crime (compare, **Rodriguez**, supra, 122 Cal.Rptr., p.562); the California Supreme Court and federal courts have recognized this principle even in cases of murder and those punishable by the death penalty. (**People V. Dillion** 1014 Cal.Rptr.\_\_\_\_, pp.413-15; **Sellars V. Procunier** 614 F.2d 1295 (1981), p.1303; **Emmund V. Florida** 102 S.CT. 3368, 3377-78.)

California's parole statutes and regulations bestow on petitioner who is serving an indeterminate sentence a liberty interest in parole protected by due process. (**In Re Rosenkrantz**

1  [Rosenkrantz-IV] 29 Cal.4th 616; McQuillion V. Duncan (9th Cir.,

2  2002) 309 F.3d 895, 901-903.)Only if a committed offense is es-

3  pecially or particularly egregious, and/or, if a crime is more

4  violent or aggravated than what is necessary to sustain the con-

5  viction, can the crime be used to primarily justify denial of

6  parole. (Rosenkrantz-IV, supra, 29 Cal.4th, p.683; In Re Ramirez

7  114 Cal.Rptr.2d 381, 397.)

8

9       The BPH's determination to jsutify denial of parole must be

10  Supported by "Some Evidence." (In Re Powell 45 Cal.3d 894, 904;

11  Rosenkrantz-IV, Id., p.658.) Furthermore, Petitioner is entitled

12  to have his case dully considered. (In Re Sturm (1974) 11 Cal.3d

13  258, 268.)

14

15      This is an unusual case where on January 10, 1982, Peti-

16  tioner and accomplice (EX.-A, pp.15-34) robbed a local restau-

17  rant (Rusty's Hacienda) and its patrons; Petitioner admits to

18  "roughing up" a security guard who did not reveal he was armed

19  when questioned.

20

21      The authorities were alerted of the robbery in progress and

22  were immediately dispatched to the scene while petitioner and

23  accomplice simultaneously fled the scene of the crime in a vehi-

24  cle; soon after, a police vehicle and a helicopter were in pur-

25  suit and a high speed chase commenced.

26

27      Petitioner and accomplices fired a weapon (shotgun) out of

28  their speeding vehicle into the air in forlorn hope that the

loud blast of their firearm would slow down the pursuing vehicle and allow them to escape.

However, a mile or so down the street, Petitioner's accomplice driving the "get away" vehicle lost control of the vehicle and crashed to a stop; at this time, Petitioner still conscious attempted to help his brother, (murdered victim), out of the crashed vehicle, but his brother stated that he wanted to stay and surrender; no gun shots were fired at police at any time after the fleeing vehicle crashed; ergo, Petitioner left the murder victim in the vehicle unarmed and still alive before police fired their weapons and killed him which is plausible when it is considered that Petitioner was able to escape and allude police until the next morning and only after police canine units were dispatched was he discovered; Petitioner remembers being rushed by police and canine unit, then after, without explanation fell, he was unconscious from asphyxiation; when Petitioner became conscious, he found himself entirely covered with a white sheet by authorities as if to indicate that Petitioner was deceased. Petitioner was then immediately placed in restraints and arrested. Fortunately, no other people were physically injured besides Petitioner's brother/accomplice.

Consequently, in a plea agreement, Petitioner received a determinate sentence (23 years, #A149652) which runs concurrent to his indeterminate term of 25 Years to Life for the control-

ling offense (#A375051) and some way ended up with a total of 35 Years to life sentence. ("…two sentences will run together during the time the periods overlap.", **In Re Roberts** (1975) 40 Cal.2d 749.) And thus, because Petitioner's crime is not **particularly egregious** he should not be denied parole by the BPH the rest of his natural life essentially based on these lesser included changes and sentences not related to the controlling offense.(if the parole authorities do not set a parole date promptly, it is considered to be set at the maximum, **Rodriquez**, supra, 122 Cal.Rptr., p.563, fn.18.)

Hence, any prudent person could reasonably assess that Petitioner's murder conviction under his unique circumstance is of the least aggravating in comparison to other crimes of the same nature, or is not more violent or aggravating that the minimum necessary to sustain Petitioner's conviction to justify denial of parole. (**Rosenkrantz**-IV,Supra, 29 Cal.4[th], p.683.)

Moreover, the BPH normally ignores its own official guidelines or rules and regulations which clearly and ostensibly make distinctions between facts and circumstances of a committed offense even for the same degree of murder until first a parole applicant is found suitable for parole. (T.15, CCR, §2403(b).) This practice belies the California Supreme Court decision in

1  **Rodriguez** , supra, 122 Cal.Rptr., p.562, where it is clearly in-

2  dicated in its opinion that parole-granting or determining an

3  inmate is suitable for parole and actually setting a parole date

4  are two completely distinct functions; the rationale is that the

5  latter should not be dependent on the former or the BPH will run

6  the high risk of confining a parole applicant beyond what is

7  proportionately acceptable relative to his individual culpabil-

8

9  ity related to the committed offense, and also, leave Petitioner

10 with no remedy to challenge or seek judicial review to test the

11 constitutionality of a specific length of confinement based on

12 term proportionality and individual culpability, Id., p.560;

13 compare, Cal.P.C. §3041(a), "term uniformity"; and thus, the BPH

14 undermines its statutory obligation to **promptly** and **normally** set

15 a parole date contrary to state statute and court precedent

16 (Id., p.563; Id., §3041(a), "…shall normally set a date…") espe-

17 cially when it is evident that Petitioner's committed offense is

18

19 not **exceptional** or **particularly egregious**; Petitioner contends

20 that although the High Court's decision in **Rodriguez** opined

21 based on **Indeterminate Sentence Law** guidelines (former P.C.

22 §1168[ISL], and he was sentenced under **Determinate Sentence Law**

23 guidelines (P.C. §1170[DSL]), in principle as it pertains to pa-

24 role, it is "one in the same" since the DSL naturally evolved

25 from the ISL and the wisdom derived from common law court deci-

26

27 sion which have interpreted these parole guidelines, official

28

1   and unofficial, from the onset of the parole system in general.

2   ("..., **the standard for parole have not been altered under the**

3   **DSL. The criteria utilized under the ISL as developed through**

4   **practice and as modified by case law were not altered by the**

5   **DSL.",** **In Re Seabock** 189 Cal.Rptr. 310, p.318.) Thus, the

6   DSL does not exempt the BPH to promptly set a parole date sepa-

7   rate from granting parole in the same way the Adult Authority

8   (former name for the BPH) was not exempted under the ISL or the

9   term will be considered at the maximum which may be dispropor-

10  tionate to petitioner's individual culpability and thus uncon-

11  stitutional. (**Rodriguez**, Ibidem.)

12

13      Following this thread of reasoning, Petitioner would now

14  like to direct the Court to these said guidelines that are une-

15  quivocally indicative of the fact that the legislature by the

16  DSL and relative rules and regulations never intended for all

17  inmates convicted of First Degree Murder to suffer the maximum

18  term of **LIFE** despite the worse case scenario; for example, Title

19  15, CCR, §2403(b)(MATRIX OF BASE TERMS FOR FIRST DEGREE MURDER

20  ON OR AFTER NOVEMBER 8, 1978) discussed and displays a graph

21  like system with a wide range of base terms and gradation of

22  specific circumstances and facts related to the inmate's indi-

23  vidual culpability in the committed offense which also suggests

24  trio-terms of low, mid, and high per gradation level; it is at

25  the same time worth noting that this matrix system does not at

26

27

28

1  all suggest, indicate, or enunciate a maximum of life term for

2  any set of factors and not even in the worse case scenario,

3  aforementioned; more specific, this **matrix table** indicates four

4  categories imposed on two separate axes; the **VICTIM**'s axis would

5  consider the relationship of the victim and petitioner, and the

6  **CIRCUMSTANCES** axis would focus on the degree of involvement of

7  the Petitioner and the nature of the murder; now to select the

8  base term, the BPH looks at the combination of factors along

9  both axes to find the appropriate range of confinement for the

10  particular combination. And thus, the facts and circumstances of

11  Petitioner's committed offense would irrefragably place him at

12  the lower than the maximum of 31-32-33 years for which circum-

13  stances involve a threat to public order, murder for hire, and

14  torture (Title 15, CCR, §2403(b) "VICTIM IV" in conjunction with

15  " CIRCUMSTANCES D"); none of these most aggravated factors are

16  even remotely related to Petitioner's individual case or of-

17  fense. Petitioner. Petitioner has been confined over twenty-five

18  (25) years to date and with good time custody credit factored

19  into calculating his base term, he would be past the lesser ag-

20  gravated terms on the appropriate matrix which apply to his con-

21  trolling offense.

22      Although Petitioner has no vested right to a term fixed at

23  less than the maximum (**In Re Schoengarth** 66 Cal.2d 295), Peti-

24  tioner does have a right to have his term fixed within a range

that is not disproportionate to his individual culpability for the committed offense or to have his term set in uniformity with offense of similar gravity. (**People V. Wingo** (1975) 14 Cal.3d 169, 182; **Rodriguez**, supra, 122 Cal.Rptr., p.561; P.C. §3041(a), uniformity; also, **Dillion** and **Sellars**, Ibidem, p.15; thus, **the oft-stated rule that a prisoner has no right to a term fixed at less than the maximum [Schoengarth, Id., In Re Cowen** (1946) 27 Cal.2d 637, 641] **is therefore subject to the overriding consti- tutionally compelled qualification that the maximum may not be disproportionate to the individual prisoner's offense. [Wingo**, Id., at p.182], **Rodriguez**, Id., at p.652.) Petitioner respect- fully points out the Court that it makes tremendous sense that the very nature and purpose of devising a parole system is to release an inmate at the earliest possible time that the law permits with consideration of the merits and objectives of each individual case. (**Roberts V. Duffy**(1914) 167 Cal. 629; also com- pare, **Greenholtz V. Inmates Of Nebraska Penal**... 442 U.S. 1, 7, 11-12 (1979), which stated, "It is important that we not over look the ultimate purpose of parole which is a component of long rang objective of rehabilitation.", Id., at p. 13.

Consequently, as a result of the **Wingo** and **Rodriguez**, su- pra, decisions, the BPH, fromerly the Adult Authority, issued a new directive (No.75/30, date September 2, 1975); the directive declared that every effort will be made to establish parole

dates the <u>first time</u> the inmate appears for his regularly scheduled parole consideration hearing; therefore, if we follow this course to its logical conclusion, it is not surprising that the following year, 1976, the Legislature codified new provision to remedy the abuses discussed in **Rodriguez** by amending P.C. §3041(a). These new provisions or reforms were added and part of the same bill that enacted the DSL (Stats.1976, Ch.1139, §281, p.515) which were intended to serve the same purpose, i.e., to punish crimes by imposing terms that are proportionate to the seriousness of the offense by comparing offenders, offenses, and circumstances, "...The Board of Prison Terms...will provide uniform terms for offenses of similar gravity...", P.C. §3041(a); compare, P.C. §1170(a)(1), (Added stats. 1976, Ch.1139, §237, opperative July 1, 1977, [DSL]), **People V. Martin** (1986) 42 Cal.3d 437, at pp.442-443; in addition, our High Court has determined that the "uniform terms" mandated by §3041(Id.) are analytically equivalent to determinate sentences imposed under §1170(Id.), **People V. Jefferson** 21 Cal.4th 86, pp.95-96.

Considering the chain of events leading up to these said new provisions, it obvious what the Legislature intended by their language and construction; in P.C. §3041(a), the Legislature was specific to include that the BPH **shall normally** set a parole date one year prior to parole applicant's MEPD or at his very **first consideration for parole** hearing to remedy the lack

Page 23

in **promptness** by the BPH for setting parole dates; and law mak-

ers went further by adding to these provisions that the BPH will

provide **uniform term** for crimes of similar gravity to resolve

the disproportionate disparities between an indeterminate life

sentence and the specifics of a committed offense which were two

major issues criticized, discussed, and established in **Wingo** and

**Rodriguez**, supra. And last but not least, the "**Matrix Table**"

scheme came into play to facilitate the BPH's duty to set terms

that are uniform and consistent with crimes of the same nature.

However, it is worth noting, contrary to statute, the BPH **does**

**not normally set parole dates** and uniformity in terms is virtu-

ally unheard of since after 25 years of confinement Petitioner

has still no idea from the BPH when he may be paroled not even

when compared to other offenders serving life sentences despite

the circumstances and facts of comparable crimes.

Hence, Petitioner adamantly contends that the facts and

circumstances of his crime can not be reasonably characterized

as being especially exceptional and/or particularly egregious;

thus, there is no evidence to support that his committed offense

is **particularly egregious** (**Rosenkrantz**-IV, supra, 29 Cal.4th,

p.683) to primarily justify denial of parole based on the com-

mitted offense because the crime can not be deemed to be more

violent or aggravating than what is necessary to sustain the

conviction of First Degree Murder by any legal stan-

dard(**Roesenkrantz**-IV, Ibid.);  the BPH should not have used the committed offense to justify denial of parole at Petitioner's "Initial" parole consideration hearing; the committed offense was the first and most elaborate factor described and used against Petitioner when the BPH explained its decision to deny him parole and enhance his denial by an entire year (EX.-A, pp.96-107); it is reasonable to say that the primary factor for denying Petitioner parole was the murder conviction.

In addition, and more peculiar is the fact that California parole boards have granted parole dates to inmates convicted of First Degree Murder and Second Degree Murder serving indeterminate sentences who were found guilty of committing ostensibly heinous and unequivocally **particularly egregious** crimes of murder in less time than Petitioner has actually already been confined, e.g., **Dennis Stanworth** (**In Re Stanworth** 187 Cal.Rptr. 783-784) was found suitable for parole thirteen (13) years after he was convicted of committing two (2) counts of First Degree Murder; **Stanworth** had kidnaped, raped, robbed, and murder two (2) teenage girls. Also, **Carl D. McQuillion** (**McQuillion V. Duncan** (9th Cir., 2002) 306 F.3d 895) who was found suitable for parole six (6) to seven (7) years after his conviction; **McQuillion** and accomplice had murdered a father and son execution-style who were proprietors of a sporting-goods store in the process of committing a robbery; above more, in more recent cases the same is true: 1) **Lee**, **In Re Lee** 49 Cal.Rptr.3d 931, went to the establishment of his intended victim armed with a gun. The victim owed him money. Lee ended up shooting and only wounding

the intended victim, but inadvertently killed the intended victim's wife; 2) **Rosenkrantz**, <u>In Re</u> **Rosenkrantz**-II, Id., brutally murdered his victim by shooting him multiple times with a semi-automatic machine gun after a week of fully preparing himself; 3) **Elkins**, <u>In Re Elkins</u> (2006) 50 Cal. Rptr. 3d 503, 523), beat his victim to death with a baseball bat in the process of committing a robbery and then attempted to conceal the body by throwing it over a mountain gorge where the body was found many months later – body parts strew and partially eaten by wild animals, just to name a few cases.

At any rate, as demonstrated above, inmates with obviously particularly egregious crimes, especially when compared to Petitioner's committed offense, have received parole dates from California parole boards under the Determinate Sentence Law (DSL), the same parole board that has denied Petitioner parole; Petitioner's committed offense is not even remotely as violent, aggravating and/or heinous as those crimes committed by **Stanworth, McQuillion, Elkins**, etc..., who are now free and some off parole. It looks like Petitioner is distant to be confined longer in prison than those cases named above; Petitioner poses the question to the Court, "How is this possible?" Nevertheless, even if a crime maybe particularly egregious, **which Petitioner's is not, continuous reliance on unchanging factors** to deny parole may violate due process. (<u>In Re Scott</u> 133 Cal. App. 4th 573, 594-95 (<u>Scott</u>-II); **Biggs V Terhune** (9th Cir. 2003) 334 F. 3rd 910, 917; **Irons V. Carey** 479 F.3d 658, p.___, 2007 DJDAR (9th Cir.) 3072, 3074 (<u>Irons</u>-II); <u>**Irons V. Warden Of California State Prison-Solano**</u> (**Eastern District**) 358 F. Supp. 2d 936, 941-42.

1  (**Irons-I**); also see, **Martin V. Marshall** 431 F. Supp. 2d 1038

2  (2006). Moreover, "...continued reliance on unchanging circum-

3  stances transforms an offense for which California law provides

4  eligibility for parole into a de facto life imprisonment without

5  the possibility of parole", **Irons**-I, Id. P. 347;**Rosenkrantz V.**

6  **Marshall** 444 F Supp. 2d 1063, 1082 (2006) (**ROSENKRANTZ-**

7  **V**);**Sanchez V. Kane** 444 F. Supp. 2d 1049 (2006); **In Re Elkins**

8  (2006) 50 Cal. Rptr. 3d 503, 523.)

9      Petitioner further contends, the BPH ignores crucial and

10  significant rules and regulations or sentence term fixing guide-

11  lines which were designed to avoid punishing an inmate beyond

12  his individual culpability in the crime or punish an inmate by

13  confining him for a term that is disproportionate to his indi-

14  vidual culpability and to be given true uniformity in sentencing

15  mandated in state statute. (P.C. §3041(a), Title 15, CCR,

16  §2403(b); compare, **In Re Andrade** (2006) 141 Cal.App.4th 807,

17  p.___, unreasonable application of parole rules.)

18      Instead, the BPH attempts to raise Petitioner's committed

19  offense to a level of particularly egregious or especially ex-

20  ceptional by "mouthing off" conclusionary words ( **McQuillion**,

21  supra, 309 F.3d, p.902; **In Re Caswell** 92 Cal.App.4th 1017, 1027,

22  112 Cal.Rptr.2d 462; **In Re Scott** [**Scott**-I]15 Cal.Rptr.3d 32)

23  without any **factual underpinning** that would truly or even rea-

24  sonably indicate that Petitioner's crime is in any way particu-

25  larly egregious or exceptional, and thus, by virtue exaggerate

26  his threat to public in order to justify denial of parole

27  (**Caswell**, supra, 92 Cal.App.4th 1017, p.___, 112 Cal.Rptr.2d 462,

28  469; **Scott**-I, Id., 15 Cal.Rptr.3d, p.50); for example, the BPH

1  seems to believe that just by "**mouthing off**" aggravating word

2  descriptions of the committed offense, i.e., calculated, dispas-

3  sionate, ...an exceptional callous disregard for human suffering

4  (EX.-A, p.98, ¶21-26) in conjunction with mentioning some of the

5  facts and never pin pointing which inflammatory characterization

6  apply to what fact, etc..., as the BPH generally does at every

7  parole board hearing where an inmate convicted of First Degree

8  Murder is denied parole; this <u>boilerplate</u> harague of conclusion-

9  ary wording to aggravate any and every crime to justify

10  denial of parole is common practice and "<u>unconstitutionally</u>

11  <u>vague</u>" at best because this <u>suspect wording</u> would basically ap-

12  ply to all cases of First Degree Murder no matter how violent or

13  aggravating. (compare, **In Re Rosenkrantz** [**Rosenkrantz**-II] 80

14  Cal.App.4th 409, 425; **Mayard V. Cartwright** 100 L.Ed.2d 372, 380-

15  81, 486 U.S. 356.) Petitioner further contends that the law per-

16  mits consideration based on the merit, i.e., on an individual

17  case bases, and for the BPH to deny Petitioner based on a vir-

18  tual "**blanket-policy**" justified by simply reciting a **boiler-**

19  **plate** one-size-fits-all harague of circumstances and factors of

20  a crime regardless of the individual case factors violates due

21  process. (compare, **In Re Minnis** (1972) 7 Cal.3d 639, 646; Also

22  see, **In Re Lee** 49 Cal. Rptr. 3d 931, 936, 143 Cal.App.4th 1400,

23  p.____:

24

25

26  "The test is not whether some evidence sup-
    ports the reasons...for denying parole, but

27  whether some evidence indicates a parolee's
    release unreasonably endangers public

28  safety", furthermore, "some evidence of the
    existence of a particular factor does not

necessarily equate to some evidence the pa-
rolee's release unreasonably endangers pub-
lic safety."


Following, this thread of reasoning, Petitioner further ar-

gues that all First Degree Murders by definition and/or nature

involve some callousness, i.e., lack of usual emotion/sympathy,

some level of emotional insensitivity, indifference to the feel-

ing and suffering of others, etc..., (**Rosenkrantz** -II and **Ma-**

**yard**, Ibidem); however, parole is **the rule** rather than the ex-

ception (P.C. §3041(a); **Ramirez**, supra, 114 Cal.Rptr.2d 381,

397), and the conviction of a First Degree Murder does not auto-

matically render one unsuitable for parole. Therefore, to demon-

strate an exceptionally callous disregard for human suffering,

the offense in question must have been committed in a more ag-

gravating or violent manner than that ordinarily shown in the

commission of a First Degree Murder. (**Scott**-I, supra, (2004) 119

Cal.App.4th, p.891, 15 Cal.Rptr.3d 32, p.___; see, **In Re Van**

**Houten** (2004) 116 Cal.App.4th 339, in **Scott**-I, **Van Houten** was

found to be the "**sort of gratuitous cruelty require**" to be more

violent or aggravated than ordinary, and thus, especially excep-

tional or particularly.)

In sum, there is no evidence what so ever that Petitioner's

crime is particularly egregious or exceptional that it is justi-

fied by the BPH to use his committed offense as a primary factor

to deny him parole after serving the statutory minimum and

considering the statutory mandate that the BPH shall normally

set a parole date at Petitioner's "Initial" parole hearing (P.C.

§3041(a)), and because Petitioner's crime does not fall outside

the parole board's own **Matrix Table** guidelines which display

scenarios with common facts and circumstances that are expected

during the commission of a First Degree Murder (Title 15, CCR,

§2403(a)), hence, further proof that Petitioner's crime was not

particularly egregious or especially exceptional (**In Re Dannen-**

**berg** 125 Cal.Rptr.2d 458, 469, detailed matrix of various fac-

tors); and because the BPH continued to characterized or regard

Petitioner's crime as it is more violent and aggravating than

what is necessary to sustain the conviction and any factors left

over that the parole board attempts to utilize to deny Peti-

tioner parole are not tantamount to a life sentence, Peti-

tioner's due process was violated.


## II

**BECAUSE THE BPH DENIED PETITIONER MULTIPLE (TWO) YEARS BEFORE HE**

**MAY BE RECONSIDERED FOR PAROLE, PETITIONER'S DUE PROCESS, PLEA**

**BARGAIN, AND THE EX POST FACTO CLAUSE WERE VIOLATED**

A)    On 11-17-05, a parole hearing was conducted by the BPH

to consider Petitioner for release on parole; Petitioner was de-

nied two (2) years parole. Petitioner contends that he has a

constitutionally protected liberty interest, and thus, an

expectancy to receive annual parole consideration reviews after

reaching his Minimum Eligible Parole Date (MEPD – 1995) based on

the mandatory language and the substantive predicate of govern-

ing statute, i.e., Cal.P.C. §3041.5(b)(2) which reads in perti-

nent part:

> "The board shall hear each case annually…except…two…
> if the board finds that it is not reasonable to expect
> that parole would be granted…following year."

The mandatory **"shall"** language in conjunction with the substan-

tive predicate starting with the prepositional phrase"…**if the**

**board finds…"**, creates an expectancy that Petitioner will be re-

considered for parole no later than the following year unless

there is **good cause** to differ him longer, and thus, establish a

liberty interest worthy of "adequate" due process procedural

protection. (**Board of Pardons V. Allen** 96 L.ed.2d 303, 313, 482

U.S. 369, 107 S.Ct. 2415, citing **Greenholtz V. Nebraska Penal**

**Inmates** 442 U.S. 1, 12;  **McQuillion V. Duncan** 306 F.3d 895, 901-

902.)

Petitioner strongly contends that his liberty interest to

receive annual parole hearing is not at the time adequately pro-

tected by procedural due process. According to statute (P.C.

§3041.5(b)(2)(B), the BPH must state the basis for a multiple

year denial of parole; however, the BPH has established a prac-

tice of stating the reasons for denying him parole which is an

automatic one year difference and then the BPH in a separate

stipulation will essentially recite the same reason it just used to deny him parole to **enhance** the denial by more than one year. (EX.-A, pp.96-107, CERTIFIED TRANSCRIPTS OF 2005 BPH HEARING.) The California Supreme Court in **In Re Jackson**, infra, stated that when parole consideration is postponed beyond the one year rule, the BPH must make a separate stipulation to justify a multiple year difference an that the reasons, "…may involve some of the same facts on which the unsuitability determination is based." , 39 Cal.3d 464, 479, Id.; the BPH's recent practice belies the **Jackson** Court's opinion which was attempting to eliminate a long standing "stated" practice where the BPH would just **"Ditto"** or merge the reasons for denying parole and differing parole consideration multiple years without any further consideration (at p.78, Id.) which is why the Court did not say that "**the BPH may use all the same reasons**" for both denying and differing parole or else a separate stipulation would have been in effect meaningless.

Furthermore, Petitioner vies that any authority the BPH has to make an **"exception"** to deny Petitioner parole consideration multiple years **should not swallow the rule** that he is entitled to receive annual reviews thereafter reaching his MEPD. (compare, **In Re Ramirez** 114 Cal.Rptr.2d 381, 397.) Moreover, the BPH has used its authority to deny Petitioner two (2) years parole consideration arbitrarily not based on any merit or whether he

could be reasonably paroled or not paroled the following year[s]; even the Court in **Jackson**, supra, recognized the importance of the right to annual reviews and inferred that not all multiple year denials even with a separate stipulation may be justified. (Id., 39 Cal.3d, p.477, fn.12.)

Although, denying Petitioner parole consideration for multiple years may have been initially justified since statute does allow such differences with good cause, however, continuous reliance essentially on unchanging factors to deny Petitioner his liberty interest or reasonable presumption that he will be allowed to apply for parole on an annual basis or the following year may violate due process. (compare, **Biggs V. Terhune** (9th Cir., 2003) 334 F.3d 910, 917.) The BPH should not deny Petitioner parole consideration multiple years without first establishing a "**factual undrpinning**" that would constitute good cause (compare, **McQillion** , supra, 306 F.3d, p.902; **In Re Caswell** (2001) 92 Cal.App.4th 1017, 1027, 112 Cal.Rptr.2d 462; **In Re Scott**-I 15 Cal.Rptr.3d 32, 50) to explain or demonstrate why the unchanging factors relied on are reasonably relevant to Petitioner's presumptive right to annual reviews that it is not reasonable to expect that he would receive a parole date the following year; instead, the BPH mouthed off "conclusionary words" (**Scott**-I, Ibid.) to enhance Petitioner's denial of parole multiple years based on nothing more than just repeating all of the

same reasons for denying him parole in the first place. (EX.-A, pp.96-107, BPH, 2005, HEARING DENIAL.)

Therefore, because Petitioner was denied parole for multiple years arbitrarily based on circumstances that are never going to change and without first establishing a "factual underpinning" to constitute good cause in order to determine why it is not reasonable to expect Petitioner to be found suitable for parole the following year, Petitioner's due process was abrogated.

B)    The BPH used the nature of the committed offense to first deny Petitioner parole which is an automatic one denial of parole and then used the same element of the crime to enhance his parole denial one more year (for a total of two years) at his BPH, 2005, parole consideration hearing (EX.-A, pp.96-107); this constitutes an impermissible **"dual use"** [elements] to enhance punishment (Cal.Rules of Court, Rule 4.420(d); **People v. Jefferson** 21 Cal.4th 86, 96, uniform terms called for in P.C. §3041(a) are analytically the same as determinate sentences under P.C. §1170); therefore, Petitioner's due process was violated by the BPH.

C)    At the time of Petitioner's committed offense, January, 1982, a defendant convicted of First Degree Murder was entitled to annual parole reviews after reaching his Minimum eligible Parole Date or MEPD. (West Ann.Cal.P.C. §3041.5.)

In 1983, Petitioner accepted a plea bargain which required that he plead guilty to First Degree Murder; Petitioner was sentenced to 25 Years to Life. After Petitioner's attorney, C. Brown, advised him of the true consequences of the plea bargain, i.e., Petitioner would be eligible for parole after serving his statutory minimum (MEPD, 12-20-05) and, most significant, that he would be allowed to apply for parole on an annual basis upon crossing his MEPD, Petitioner was finally persuaded to accept the plea agreement based on this advised. ("A plea agreement is, in essence, a contact between the defendant and the prosecutor…", **People V. Cunningham** (1996) 49 Cal.App.4th 1044, 1047; "When the state enters a plea bargain with a criminal defendant, it receives a immediate and tangible benefit, such as promptly imposed punishment without the expenditure of prosecutorial resources.", **Newton V. Rumery** (1987) 480 U.S. 386, 394.

Petitioner reasonably understood that the law in effect at the time of his committed offense would be incorporated automatically into his plea agreement. The court and the prosecution are fully aware of, and rely on, the fact that when a person enters a plea to murder he is focused on, and motivated by, the prospect of parole pursuant to the process then in place. (see, **Brown v. Poole** (2003) 337 F.3d 1155, citing, **INS V. St.Cyr** (2001) 533 U.S. 289, 322-323, 325.)

Thus, because the BPH is ignoring the law in place at the time of Petitioner's committed offense in respect to parole procedures that he understood would be incorporated into his subsequent plea agreement, Petitioner's pleas agreement has been breached; he is entitled to the benefits of his plea agreement with the state and prosecutor to be enforced accordingly that Petitioner is entitled to apply for parole annually as per the agreement he understood and relied on at the time.

D)    Any change in law that is applied retroactively to Petitioner which increases the time between parole consideration hearings after Petitioner has served more than 23 years, has been convicted of one murder, has conducted himself as virtually a model inmate the past eighteen (18) years prior to his, 2005, hearing and 25 years to date, and has a definite liberty interest in receiving parole, such a law applied this late in the process does violate the Ex Post Facto Clause by running the high risk of significantly increasing his time of confinement in his individual case.

At time of Petitioner's committed offense, January, 1982, he would have been entitled to annual parole consideration reviews; Petitioner has a liberty interest, and thus, a reasonable expectation to receive a parole date at every parole consideration hearing (**McQillion**, supra, 309 F.3d, pp.901-903); the Legislature at the time of Petitioner's committed offense contem-

plated that this expectation or presumption of being granted pa-
role would extend every year following Petitioner's MEPD based
on the mandatory language of the governing statute. (P.C.
§3041.5.)

Moreover, when Petitioner accepted his plea bargain, he be-
lieved that he had a high expectation that he would be allowed
to apply for parole annually upon crossing his MEPD as long as
he conducted himself well for a significant period of time, and
Petitioner never thought that this high expectation to parole
annually would be negated by a law that was not applicable at
the time of his committed offense which creates a substantial
**lower or delayed** expectancy of parole that goes from an annual
basis to a multiple year basis (up to five year); therefore, by
lowering his expectations to parole on a **whim** by denying inmates
multiple years regularly, he contends that this increases his
punishment severely or makes his punishment more onerous; Peti-
tioner also argues that this change in law does run the high
risk of increasing his time of confinement because by California
parole law, he had a reasonable expectation to parole on an an-
nual basis upon reaching his MEPD.

Furthermore, Petitioner does not belong to a **subclass** of
inmates serving indeterminate sentences that do not have a rea-
sonable expectation to parole (those inmate convicted of multi-
ple murders. (**CDC V. Morales** 131 L.Ed.2d 588, 597 (1995), 514

1  U.S. 499, 115 S.Ct. 1597.) Hence, applying such new provisions

2  (multiple year denials) retroactively to this distinct **subclass**

3  of inmates convicted of more than one murder is not likely to

4  increases the severity of punishment only because these inmate

5  do not have a reasonable expectation to parole, and thus, does

6  not offend the Ex Post Facto Clause. Petitioner belong to the

7  **Greater Class** of inmates serving a life sentence with a possi-

8  bility of parole that does have a reasonable expectation to pa-

9

10  role. Nevertheless, the California Supreme Court in **Jackson**, su-

11  pra, said:

12

13        "Obviously the opportunity to be heard is an important
          right. Restrictions on that right may have significant
14        consequences. For this reason, not every retroactive
          encroachment on the right to annual review will pass
15        muster under ex post facto principles as merely proce-
          dural. Each case must be determined on its own facts.
16        (**Beazell V. Ohio**, supra, 269 U.S., at p.171; **People V.
          Smith**, supra, 34 Cal.3d, at p.260.)",

17

18  Id., (1985) 39 Cal.3d 464, 477, fn.12; petitioner contends that

19  his is such a case in point.

20        Moreover, the U.S. Supreme Court also inferred that the

21  more denials of parole an inmate had received the higher his ex-

22  pectation and percentage of probability of actually receiving a

23

24  parole date at his following parole consideration hearing

25  (**Morales**, Ibid.) If Petitioner had received annual reviews from

26  the time that he should have been scheduled for his "Initial"

27  Parole consideration hearing, i.e., one year before his MEPD

28  (2004, not 2005), as statute mandates, Petitioner would have had

three (3) denials of parole by now, and thus, would have had even a higher expectation than he does now have according to **Morales** , Id.. Therefore, applying a provision that was to become effective after Petitioner's committed offense that allows multiple year exceptions to the annual review parole consideration mandate  (P.C. §3041.5) should not apply to Petitioner's individual case; applying such an exception this late into Petitioner's confinement **does create a sufficient risk of increasing the measure of punishment attached to the cover crime** also in light of the lack of fair notice before Petitioner accepted his plea agreement, more so, because the BPH has grown accustomed to a gradation practice where it denies inmates parole multiple years many times before it allows annual reviews for again many more times until on a whim it grants parole; therefore, it is fair to say that the BPH essentially eliminates Petitioner's liberty interest to reasonably expect a grant of parole at his following parole consideration hearing if he received a multiple year denial at his prior BPH, 2005, parole consideration hearing. Petitioner has as never heard in the 25 years of his incarceration that an inmate had gone from a multiple year denial to a following grant of parole; if this ever happened, it has not happened often enough to be significant.

Petitioner argues that his case should be reviewed individually not in a **"pro forma"** style bunch as the BPH thinks it

1   is proper by relying on **Morales**, Id., in such cases; the U.S.
2   Supreme Court in a later case also stated that states should not
3   try to use **Morales** as a model to avoid offending the Ex Post
4   Facto Clause when making such parole procedural changes, and
5   thus, by virtue inferred that the **State** of California should
6   also not rely on **Morales** as a model to circumvent Ex Post Facto
7
8   violations when making future parole procedural changes and ap-
9   plications which the BPH has taken liberty to do at every turn.
10  (**Garner V. Jones** (2002) 146 L.Ed.2d 236, 245.)
11
12       When Petitioner accepted his plea bargain agreement, he was
13  never advised or informed that a change in law could possibly be
14  applied retroactively that would essentially increase his con-
15  finement by delaying his application for parole nor could he
16  contemplate this at the age of nineteen (19) and without a basic
17  education, thus, violating Ex Post Facto provisions.
18
19                          **CONCLUSION**
20       For the above stated reasons, the relief sought in the Pe-
21  tition and contended in its Memorandum of Points and Authority
22  should be granted.
23
24                            **PARTIES**
25       25. Petitioner is a prisoner of the State of California and
26  presently incarcerated at California State Prison (CSP) - Ca-
27  lipatria, Calipatria, California.
28

26. Respondent, T. Ochoa, is Petitioner's custodian, Warden of CSP-Calipatria.

27. Petitioner contends that Respondent is keeping him in custody in violation of **due process** and **ex post facto** rights.

## CONTENTIONS

### I
**BECAUSE PETITIONER WAS DENIED PAROLE PRIMARILY BASED ON HIS COMMITTED OFFENSE WHICH IS NOT PARTICULARLY EGREGIOUS, PETITIONER'S DUE PROCESS WAS VIOLATED**

### II
**BECAUSE THE BPH DENIED PETITIONER PAROLE MULTIPLE YEARS, PETITIONER'S PLEA BARGAIN, DUE PROCESS, AND EX POST FACTO PROVISIONS WERE VIOLATED**

## PRAYER FOR RELIEF

28. Petitioner is without remedy save by writ of habeas corpus, WHEREFORE, Petitioner prays the Court:

1) Issue a writ of habeas corpus;

2) Declare the rights of the parties;

3) Declare that Petitioner's committed offense is not "particularly egregious" to justify denial of parole, and thus, committed offense is not more violent or aggravating than the minimum necessary to sustain the conviction; hence, order a new hearing and/or order the BPH to not continue relying on the committed offense at any future parole hearing to justify denial of parole;

4) Declare that even if the committed offense is "particularly egregious", which Petitioner's in not, continued reliance on **UNCHANGING, IMMUTABLE, FACTORS** could violate due process;

5) Declare that Petitioner does have a liberty interest in and is entitle to Annual Parole Reviews;

6) Appoint counsel and/or award reasonable attorney fees; and

7) Grant all other discovery, relief, and/or motion the Court deems necessary to meet the ends of justice.

I, Louis Castillo, declare, under penalty of perjury, that I am over the age of eighteen (18) and that all of the facts stated above are true and correct.

Date: __6-8-08__ , at Calipatria, California.

Respectfully Submitted,

_Luis Castillo_ .

Luis Castillos, In Pro Per

//

//

//

//

//

//

//

//

//

## VERIFICATION

I am a layman in the practice of law, and I am totally re-liant on other inmates to assist me in legal matters. Thus, I implore this Court not to hold me to the standard of a member of the California State Bar.

I, Luis Castillo, declare, under penalty or perjury, that I am over the age of eighteen (18) and that all of the above stated facts are true and correct.

Date: _6-8-08_____, at Calipatria, California.


_Luis Castillo_____

Luis Castillo, (Declarant)

//

//

//

//

//

//

//

//

//

//

//

//

Page 43

# EXHIBITS A

(CERTIFIED TRANSCRIPT OF 2005 BPH HEARING)

INITIAL PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )
    )   CDC Number C-73437
    )
LUIS CASTILLO )
    )
    )
_____)

**INMATE COPY**

CALIPATRIA STATE PRISON

CALIPATRIA, CALIFORNIA

NOVEMBER 17, 2005

9:00 A.M.

PANEL PRESENT:

Mr. Tom Sawyer, Presiding Commissioner
Ms. Carol Bentley, Deputy Commissioner

OTHERS PRESENT:

Mr. Luis Castillo, Inmate
Ms. Linda Buchalter, Attorney for Inmate
Mr. Charles Caparella, Parole Representative
Mr. Alanied, Correctional Counselor
Mr. Jose Castillo, Inmate's Father
Ms. Christina Barrett, Inmate's Sister
Ms. Carmen Pankratz, Inmate's Sister
Interpreter for Mr. Jose Castillo

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No    See Review of Hearing
_____  Yes   Transcript Memorandum

**Kathryn Kenyon, Peters Shorthand Reporting**

INDEX

                                                          PAGE

Proceedings........................................ 1

Case Factors...................................... 15

Pre-Commitment Factors............................ 28

Parole Plans...................................... 40

Post-Commitment Factors........................... 56

Closing Statements................................ 77

Recess............................................ 95

Decision.......................................... 96

Adjournment...................................... 108

Transcriber Certification........................ 109

--oOo--

1  a handgun.  Fifteen through nineteen are all 211
2  robberies.  Twenty is 211 robbery with the use
3  of a handgun.  Twenty-one is 245, assault with a
4  deadly weapon with a handgun, 12022.5, great
5  bodily injury.  Twenty-two, 236, false
6  imprisonment, 12022.5, use of a handgun.
7  Twenty-three and twenty-four are both 236, false
8  imprisonment with the use of a handgun.  Twenty-
9  five is 211, robbery, 12022(a), armed with a
10  firearm as well as 26 and 27.  Those are all
11  211, robbery.  12022A, armed with a firearm.
12  Okay.  This hearing is being tape recorded and
13  for the purpose of voice identification each of
14  us is required to state our first and last name,
15  spelling our last name.  When it comes to your
16  turn, Mr. Castillo, after you spell your last
17  name we would also like you to give us your CDC
18  number as well.  Do you understand?
19      INMATE CASTILLO:  Yes, sir.
20      PRESIDING COMMISSIONER SAWYER:  Okay.  I
21  will start.  Tom Sawyer, S-A-W-Y-E-R.
22  Commissioner.
23      DEPUTY COMMISSIONER BENTLEY:  Carol
24  Bentley, B-E-N-T-L-E-Y. Deputy Commissioner.
25      INMATE CASTILLO:  Luis Castillo, C-A-S-T-
26  I-L-L-O.  CDC No. C-73437.
27      PRESIDING COMMISSIONER SAWYER:  Thank

1  you.

2         **ATTORNEY BUCHALTER:**  Linda Buchalter, B-

3  U-C-H-A-L-T-E-R.  Attorney for Mr. Castillo.

4         **PRESIDING COMMISSIONER SAWYER:**  Thank

5  you.

6         **MR. CAPARELLA:**  Charles Caparella

7  (phonetic).  Assistant classification and parole

8  representative (indiscernible).

9         **PRESIDING COMMISSIONER SAWYER:**  Thank

10  you.

11        **MR. ALANIED:**  (Indiscernible)

12  correctional counselor, last name A-L-A-N-I-E-D.

13        **PRESIDING COMMISSIONER SAWYER:**  Speak up

14  a little louder.

15        **MR. CASTILLO:**  Jose Castillo, C-A-S-T-I-

16  L-L-O.

17        **PRESIDING COMMISSIONER SAWYER:**  Thank

18  you.

19        **MS. BARRETT:**  Christina Barrett.  My last

20  name is B-A-R-R-E-T-T.

21        **PRESIDING COMMISSIONER SAWYER:**  Thank

22  you.

23        **MS. PANKRATZ:**  Carmen Pankratz.  Last

24  name P-A-N-K-R-A-T-Z.

25        **PRESIDING COMMISSIONER SAWYER:**  Okay.  At

26  this time I'm going to swear in the interpreter.

27  Would you raise your right hand, sir?  Do you

1  solemnly swear or affirm that the testimony

2  you're about to give in this hearing and the

3  interpretation will be the truth, the whole

4  truth, and nothing but the truth?

5        **THE INTERPRETER:**  I do.

6        **PRESIDING COMMISSIONER SAWYER:**  Thank

7  you.  We also have a correctional peace officer

8  in the room for security purposes.  Okay.  Mr.

9  Castillo, before you there should be Americans

10  with Disabilities Act.  Okay.  Mr. Castillo, can

11  I ask you to read that out loud and then I'm

12  going to ask you what it means.

13        **INMATE CASTILLO:**  The ADA, Americans with

14  Disabilities Act.  The Americans with Disability

15  Act, ADA, is a law to help people with

16  disabilities.  Disabilities are problems that

17  make it harder for some people to see, hear,

18  breathe, talk, walk, learn, think, work, or take

19  care of themselves than it is for others.

20  Nobody can be kept out of public places or

21  activities because of a disability.  If you have

22  a disability, you have a right to ask for help

23  to get ready for your BPT hearing, get to the

24  hearing, talk, read forms and papers, and

25  understand the hearing process.  BPT will look

26  at what you ask for to make sure that you have a

27  disability that is covered by the ADA and that

6

1  you have asked for the right kind of help.  If

2  you do not get help, or if you don't think you

3  got the kind of help you need, ask for a BPT

4  1074 grievance form.  You can also get help to

5  fill it out.

6        PRESIDING COMMISSIONER SAWYER:  Very

7  good.  Thank you.  What does that mean to you,

8  sir?

9        INMATE CASTILLO:  It means that if I

10  don't understand something or -- excuse me.  To

11  me it would be like if I needed help with

12  understanding or reading or comprehension.

13        PRESIDING COMMISSIONER SAWYER:  Okay.

14  That help's available to you.

15        INMATE CASTILLO:  Yes, sir.

16        PRESIDING COMMISSIONER SAWYER:  Okay.

17  Very good.  Thank you.  The record reflects that

18  you signed a BPT form 1073 which is a reasonable

19  accommodation notice and request in accordance

20  with the provisions of the Americans with

21  Disabilities Act.  Sir, you signed that last

22  year on 9/23 of '04.  You indicated on here you

23  do not need help for your parole hearing and you

24  also indicate you do not have a disability.  Is

25  that true?

26        INMATE CASTILLO:  Yes, sir.

27        PRESIDING COMMISSIONER SAWYER:  Okay.  I

1  notice you're wearing glasses.

2        **INMATE CASTILLO:**  Yes.

3        **PRESIDING COMMISSIONER SAWYER:**  Okay.

4  You have a disability, okay, because you have

5  your glasses with you.  All right.  As many in

6  the room also suffer.  Can you read with those

7  glasses?

8        **INMATE CASTILLO:**  Yes.

9        **PRESIDING COMMISSIONER SAWYER:**  You read

10  the form.  It's a normal-size font and you read

11  it well.  So you don't have any trouble seeing

12  across the room?  Can you see us?  Okay.  You're

13  very responsive so you can hear me well?

14        **INMATE CASTILLO:**  Yes.

15        **PRESIDING COMMISSIONER SAWYER:**  I'm going

16  to send this, if I can have the police officer

17  take this over to Ms. Buchalter.  If you can

18  make sure that that is a current and correct

19  1073 form.

20        **ATTORNEY BUCHALTER:**  That's correct.

21        **PRESIDING COMMISSIONER SAWYER:**  Thank

22  you.  I'm going to ask you some questions.  Do

23  you have any problem walking up or down stairs

24  or for distances of a hundred yards or more?

25        **INMATE CASTILLO:**  No, sir.

26        **PRESIDING COMMISSIONER SAWYER:**  Okay.

27  And we've already discussed your glasses and you

1 do have your glasses and indicate that you can

2 read and see. And I've asked you about your

3 hearing impairments. You say you have none.

4 You can hear all right. Have you ever been

5 included in triple CMS or EOP programs while in

6 the institution?

7    INMATE CASTILLO: (Inaudible response.)

8    PRESIDING COMMISSIONER SAWYER: Okay.

9 Have you ever taken psychotropic medications

10 either while in prison or on the streets?

11    INMATE CASTILLO: No, sir.

12    PRESIDING COMMISSIONER SAWYER: How far

13 did you get through school?

14    INMATE CASTILLO: Through the eighth

15 grade.

16    PRESIDING COMMISSIONER SAWYER: Through

17 the eighth grade.

18    INMATE CASTILLO: Yes.

19    PRESIDING COMMISSIONER SAWYER: Okay.

20 Did you take any special education classes while

21 you were growing up? You know, take some extra

22 reading glasses or ESL?

23    INMATE CASTILLO: In prison or --

24    PRESIDING COMMISSIONER SAWYER: No, when

25 you were growing up. Secondary education.

26    INMATE CASTILLO: ESL?

27    PRESIDING COMMISSIONER SAWYER: ESL.

1    INMATE CASTILLO:  I do remember that.

2    PRESIDING COMMISSIONER SAWYER:  Okay.

3  Well, your English is very good.  Do you suffer

4  from any disability that you would prevent you

5  from participating in today's hearing?

6    INMATE CASTILLO:  No, sir.

7    PRESIDING COMMISSIONER SAWYER:  Okay.

8  All right.  Are you okay with the ADA?

9    ATTORNEY BUCHALTER:  Yes.

10    PRESIDING COMMISSIONER SAWYER:  Thank

11  you, Ms. Buchalter.  Okay.  I'm going to be

12  reading the outline of the hearing procedure.

13  This hearing is being conducted pursuant to

14  Penal Code Section 3041, 3042, and the Rules and

15  Regulations of the Board of Prison Terms

16  governing parole consideration hearings for life

17  inmates.  The purpose of today's hearing is to

18  consider your suitability for parole.  In doing

19  so we will consider the number and nature of the

20  crimes you were committed for, your prior

21  criminal and social history, and your behavior

22  and programming since your commitment.  We've

23  had an opportunity to review your central file,

24  and you will be given an opportunity to correct

25  or clarify the record.  We will consider your

26  progress since your commitment, your counselor's

27  report, your psychological report, and any

1  change in parole plans should be brought to our

2  attention.  We will reach a decision today and

3  inform you whether or not we find you suitable

4  for parole and the reasons for our decision.  If

5  you are found suitable for parole, the length of

6  your confinement will be explained to you.

7  Before we go any further, I want to advise you

8  that we expect you to be totally honest with us

9  today.

10      INMATE CASTILLO:  Yes, sir.

11      PRESIDING COMMISSIONER SAWYER:  If you do

12  not get a date today, this hearing will form the

13  foundation for future hearings.  If you do not

14  get a date today, any false statements you make

15  could have an adverse effect on your ability to

16  get a date in the future.  Do you understand?

17      INMATE CASTILLO:  Yes, sir.

18      PRESIDING COMMISSIONER SAWYER:  This is a

19  very important hearing.  If you do not get a

20  date today, as I said, it will -- any bad

21  information, that's why we take our time on this

22  particular hearing.  In future hearings you may

23  not have to go through some of the -- if you

24  don't get a date today, you may not have to go

25  through some of the things that we are going

26  through today so we're establishing a foundation

27  here, and it's really important that you be very

1    honest with us.  Nothing that happens here today

2    will change the findings of the court.  We're

3    not here to retry your case.  We are here for

4    the sole purpose of determining your suitability

5    for parole.  This hearing is conducted in two

6    phases.  I will discuss with you the crime that

7    you are committed for, your prior criminal and

8    social history, your parole plans and any

9    letters of support or opposition that may be in

10   your file.  Deputy Commissioner Bentley will

11   discuss with you your progress since your

12   commitment, your counselor's report, and your

13   psychological evaluation.  Once that is

14   concluded, your attorney will be given the

15   opportunity to ask you questions.  Before we

16   recess for deliberations, your attorney and you

17   will be given an opportunity to make a final

18   statement regarding your parole suitability.

19   Your statement should be directed as to why you

20   feel that you are suitable for parole.  The

21   victim's next of kin representatives will have

22   an opportunity at that time to give a statement

23   regarding the crime and your responsibility.

24   And we will then recess, clear the room, and

25   deliberate.  Once we have made your -- once we

26   have completed our deliberations, we will resume

27   the hearing and announce our decision.

1  California Code of Regulations states that

2  regardless of time served, a life inmate shall

3  be found unsuitable for and denied parole if, in

4  the judgment of the Panel, the inmate would pose

5  an unreasonable risk of danger to society if

6  released from prison.  You have certain rights.

7  These rights include the right to a timely

8  notice of this hearing, the right to review your

9  central file, and the right to present relevant

10 documents.  Has the inmate's rights been met,

11 Ms. Buchalter?

12      **ATTORNEY BUCHALTER:**  Yes.

13      **PRESIDING COMMISSIONER SAWYER:**  Thank

14 you.  You also have a right to be heard by an

15 impartial Panel.  Is there any objections to

16 that Panel?

17      **INMATE CASTILLO:**  No, sir.

18      **PRESIDING COMMISSIONER SAWYER:**  Okay.

19 Thank you.  You will receive a copy of our

20 written, tentative decision today.  This

21 decision is subject to review by the Decision

22 Review Unit by the entire meeting as body.  It

23 will become effective within 120 days.  It's

24 also subject to review by the governor.  A copy

25 of the tentative decision and a copy of the

26 transcript will be sent to you.  As of May 12th,

27 2004, there were major changes limiting your

1  formal right to appeal Board decisions or

2  actions directly to the Board.  The old Board

3  regulations were repealed.  The current policy

4  is entitled "Administrative Appeals

5  Correspondence and Grievances Concerning Board

6  of Prison Terms Decisions," and it's available

7  at the prison law library.  You are not required

8  to admit your offense or discuss your offense,

9  if you do not wish to do so.  However, the Panel

10  does accept as true the findings of the court,

11  and you are invited to discuss the facts and

12  circumstances of the offense if you desire.  The

13  Board will review and consider any prior

14  statements you have made regarding the offense

15  in determining your suitability for parole.

16  Commissioner Bentley, is there any confidential

17  material that will be used at this hearing

18  today?

19       **DEPUTY COMMISSIONER BENTLEY:**  We won't be

20  using any.

21       **PRESIDING COMMISSIONER SAWYER:**  Okay.  Is

22  there confidential material?

23       **DEPUTY COMMISSIONER BENTLEY:**  Um-hmm.

24       **PRESIDING COMMISSIONER SAWYER:**  Okay.

25  I'm going to pass the hearing checklist marked

26  Exhibit 1 to Ms. Buchalter.  If you can help me

27  with that.  Compare that with your documents.

1    ATTORNEY BUCHALTER:  I don't have the

2    charges documents but I will certainly waive

3    that.  I just want to be sure they're not

4    included in this maybe.  It's the police report.

5    Obviously I don't have a confidential folder and

6    I wouldn't expect it, so I'm okay with this.

7    PRESIDING COMMISSIONER SAWYER:  Okay.

8    Thank you.  And I'm going to cross on the

9    miscellaneous here.  This was a box checked that

10   says "crime partner's parole decision" and I

11   don't think you have that.

12   ATTORNEY BUCHALTER:  That's true.

13   PRESIDING COMMISSIONER SAWYER:  And

14   I'm --

15   ATTORNEY BUCHALTER:  It's in the

16   confidential.

17   PRESIDING COMMISSIONER SAWYER:  Right.

18   And the confidential folder we have, but she

19   does not have that.  Do you have any additional

20   documents you would like to submit?

21   ATTORNEY BUCHALTER:  No.

22   PRESIDING COMMISSIONER SAWYER:  Okay.

23   Are there any preliminary objections?

24   ATTORNEY BUCHALTER:  No.

25   PRESIDING COMMISSIONER SAWYER:  Okay.

26   Will the inmate be speaking with the Panel?

27   ATTORNEY BUCHALTER:  He will.

1          **PRESIDING COMMISSIONER SAWYER:**  About the
2    commitment offense?

3          **ATTORNEY BUCHALTER:**  Yes.

4          **PRESIDING COMMISSIONER SAWYER:**  Okay.
5    Okay.  Would you raise your right hand, sir.
6    Okay.  Do you solemnly swear or affirm the
7    testimony you are about to give in this hearing
8    will be the truth, the whole truth, and nothing
9    but the truth?

10         **INMATE CASTILLO:**  Yes.

11         **PRESIDING COMMISSIONER SAWYER:**  Thank
12   you.  Okay.  We will make an inquiry here into
13   the crime.  I'm going to be reading from the
14   January 2005 calendar in the Board report, Page
15   1, commitment offense.  Summary of crime:

16              "On January 10, 1982,
17              approximately 1:15 a.m.,
18              defendant entered Rusty's
19              Hacienda Restaurant, South Boyle
20              Avenue in Los Angeles, armed
21              with handguns and shotgun.
22              Approximately 125 customers were
23              in the restaurant at the time.
24              According to testimony of Manuel
25              Bendana, B-E-N-D-A-N-A, who was
26              working as a manager when three
27              defendants entered.  They were

1    not dressed in proper attire.

2    They asked to use the bathroom.

3    After what seemed an appropriate

4    amount of time, he checked to

5    see if they had left and was

6    confronted by all three

7    defendants in possession of

8    handguns.  They checked the

9    manager's jacket to see if he

10   head a gun and told him they

11   wanted money.  Castillo then

12   went to the bar and shot at the

13   ceiling with a shotgun and

14   robbed customers and employees

15   of money and jewelry.  One of

16   the customers present at the

17   time was Ramine (phonetical)

18   Castillo, C-A-S-T-I-L-L-O, an

19   off-duty Los Angeles Police

20   Department officer who was

21   working as a restaurant security

22   officer.  When he heard the

23   shotgun and saw people screaming

24   and running, he drew his

25   revolver and walked towards the

26   end of the bar where he saw

27   inmate Castillo holding a

```
 1          shotgun.   Officer Castillo put
 2          his gun in his waistband and
 3          when questioned by inmate
 4          Castillo as to whether he had a
 5          gun, he said no.  He was ordered
 6          to lie face down on the floor
 7          with the barrel of the shotgun
 8          in his back.  He was then
 9          searched and the gun was found.
10          Inmate Castillo then ordered him
11          to stand up and at gunpoint
12          directed him to walk to the east
13          end of the bar where she was
14          handcuffed to victim Bendana.  A
15          few seconds later, he was
16          ordered to lie down on the floor
17          and shortly after that, heard
18          one of the defendants yell, 'la
19          placa,' L-A P-L-A-C-A, Spanish
20          slang for police coming.  At
21          approximately 1:30 a.m. on
22          January 10th, 1982, patrol
23          officers Jay Nunez, N-U-N-E-Z,
24          and Argomaniz, A-R-G-O-M-A-N-I-
25          Z, responded to a possible
26          robbery in progress.  Upon their
27          arrival, they were told by
```

1      another officer standing outside

2      the robbery was in progress with

3      suspects and possible hostages

4      still inside.  The two uniformed

5      officers driving a marked LAPD

6      car, went to the rear, saw three

7      persons with their hands, bags

8      in their hands running across

9      the parking lot to a parked 1980

10     Chevy in which the driver was

11     waiting.  They got in the car

12     and sped away.  As they

13     approached the intersection of

14     Santa Fe, shots were fired from

15     suspect's vehicle at the patrol

16     officers.  Pursuit continued

17     northbound Santa Fe toward 7th

18     Street at which time Officer

19     Mirabel, M-I-R-A-B-E-L, and

20     Officer Lund, L-U-N-D, joined in

21     the pursuit.  Mirabel and Lund,

22     also driving a marked patrol

23     car, were driving southbound on

24     Santa Fe Street when the

25     defendants shot at them and

26     their patrol car.  Defendant's

27     vehicle, traveling at a high

1    rate of speed, eventually spun

2    out of control and stopped

3    against the curb.  Chase had

4    covered a distance of 1.5 miles.

5    As Officer Nunez and Argomaniz

6    got out of the car at the

7    intersection at 7th and

8    Anderson, they observed the

9    defendants with guns, firing

10   shots at them.  Officers

11   returned fire.  Officer Mirabel

12   arrived and took up a position

13   in the southwest corner of the

14   building and saw the three

15   defendants exchanging gunfire

16   with Officer Nunez and

17   Argomaniz.  The defendants then

18   observed Officer Mirabel at the

19   time and then fired at him while

20   they ran into a junkyard.  An

21   LAPD helicopter arrived on the

22   scene and illuminated

23   defendant's car and was also

24   fired upon.  Officers fired

25   several arms from their service

26   revolvers and suspects who had

27   attempted to conceal themselves

)

```
 1          from both ground units and the
 2          helicopter.  The inmate's
 3          brother, Frank Castillo, was
 4          pulled from the car.  He had
 5          sustained gunshot wounds to the
 6          head and died at the scene.  At
 7          approximately 4:00 a.m.,
 8          codefendants Ledesma, L-E-D-E-S-
 9          M-A, and Prado, P-R-A-D-O,
10          emerged from the salvage yard,
11          where they had tried to hide,
12          and surrendered without
13          incident.  Both had been wounded
14          by gunfire and were taken by
15          ambulance to White Memorial
16          Hospital for treatment.  Shortly
17          thereafter, Luis Castillo was
18          found in the salvage yard after
19          a systematic search using a
20          police dog.  He was taken to
21          White Memorial Hospital and
22          treated for dog bite injuries.
23          Officers recovered several bags
24          of money and jewelry taken in
25          the robbery as well as a sawed-
26          off shotgun and several
27          handguns.  No officers were
```

```
 1              injured in the gun battle.  The

 2              information used in portraying

 3              circumstances of the commitment

 4              offense was taken from the

 5              probation officer's report."

 6  The prisoner's version of this, he says:

 7              "I remembered sitting in the

 8              parking lot in one of my

 9              codefendant's apartment

10              buildings.  As we sat, we

11              thought on some quick money and

12              the first thing that came across

13              was the restaurant.  We made

14              quick plans and went in to try

15              to rob the place.

16              Unfortunately, everything went

17              wrong that night.  The officers

18              got there.  We were trying to

19              get away.  Shots were fired and

20              everything was done and said.

21              Two of my codefendants were shot

22              in the back and my brother Frank

23              was killed in the seat of the

24              vehicle.  I was later arrested

25              from where I was hiding.  I

26              would like to express to the

27              Board that I was a 19-year-old
```

1 man that was uneducated, had a

2 cocaine habit, and made a lot of

3 bad choices.  The decisions I

4 made as a young man cost my

5 brother his life.  I hurt my

6 parents, my daughter.  I lost my

7 fiancée, my freedom, my nephew

8 grew up without a father, and

9 his wife became a young widow.

10 And it was something that I have

11 to live with for the rest of my

12 life.  I'm now 43 and that has

13 taken advantage of the self-help

14 program groups and learned to

15 read, write, and spell.  Because

16 of hard work and a lot of help,

17 I got my GED and took a four-

18 year Christian college course

19 from which I have graduated.  I

20 have learned that decisions and

21 choices I made were all wrong

22 and I have repented and

23 regretted all the things I did

24 as a young man.  I would like

25 the opportunity to get out and

26 look after my father and help my

27 daughter raise my grand kids."

1  The aggravating factors in this case:

2          "The inmate had opportunity to

3          cease, but continued with the

4          crime.  The circumstances of the

5          crime created potential for

6          serious injuries to others of

7          the multiple crimes, past

8          criminal history, use of

9          chemical weapon, use of alcohol

10         and drugs in the crime, actively

11         planned, conspired, and induced

12         others to participate.  The

13         nature of the crime exhibited

14         viciousness, cruelty, and

15         callousness.  There are no

16         mitigating factors."

17  Do you want to talk about it a little bit?  Tell

18  me what you were thinking at the time?  I read

19  your statement and there is -- let me ask you

20  this first of all.  Is there anything that we

21  need to clarify?  Is there anything that I read

22  that you feel was wrong?

23         **INMATE CASTILLO:**  Other than we were not

24  already shooting at the officers.  We were

25  shooting at the -- pretty much is --

26         **PRESIDING COMMISSIONER SAWYER:**  You were

27  shooting at the helicopter?

24

1        **INMATE CASTILLO:**  Yeah.  We did shoot at

2    the helicopter.  (Indiscernible) that it was

3    (indiscernible) us and --

4        **PRESIDING COMMISSIONER SAWYER:**  But you

5    were shooting in the air.  Why were you shooting

6    in the air?

7        **INMATE CASTILLO:**  We were just trying to

8    get them to stay back so we could get away.

9    That's what we were trying to do.  We were just

10    trying to get away.  We never -- I never shot at

11    anybody.

12        **PRESIDING COMMISSIONER SAWYER:**  Um-hmm.

13        **INMATE CASTILLO:**  (Indiscernible.)  I

14    know that -- I now know that they were doing

15    their job.

16        **PRESIDING COMMISSIONER SAWYER:**  Did you

17    rough up Officer Castillo?

18        **INMATE CASTILLO:**  Yes, sir.

19        **PRESIDING COMMISSIONER SAWYER:**  You

20    roughed him up?

21        **INMATE CASTILLO:**  Yes, sir.

22        **PRESIDING COMMISSIONER SAWYER:**  Okay.

23    You said you didn't want to hurt an officer, but

24    you did.

25        **INMATE CASTILLO:**  Yes, I did.

26        **PRESIDING COMMISSIONER SAWYER:**  You

27    kicked him.  Right?

1     **INMATE CASTILLO:**  Yes, sir.

2     **PRESIDING COMMISSIONER SAWYER:**  Okay.

3  While he was laying on the floor.

4     **INMATE CASTILLO:**  Yes, sir.

5     **PRESIDING COMMISSIONER SAWYER:**  Because

6  he lied to you about not having a gun.

7     **INMATE CASTILLO:**  Yeah.  He pointed a gun

8  at me and the best that I can recall, I know

9  that he (indiscernible) he expected to be

10  (indiscernible).  We couldn't leave because

11  (indiscernible) the gun and (indiscernible) took

12  the shot at us and (indiscernible) and I do

13  remember finding the gun and taking it while he

14  was down and running out of the place, getting

15  to the vehicle, and trying to get away.

16     **PRESIDING COMMISSIONER SAWYER:**  Um-hmm.

17  But you only went a mile and a half, all right,

18  according to this report.

19     **INMATE CASTILLO:**  Yes, sir.  Well, the

20  reason why I hesitate is because the blocks were

21  like very long.  And, yeah.

22     **PRESIDING COMMISSIONER SAWYER:**  Well,

23  somebody measured it.

24     **INMATE CASTILLO:**  Oh.

25     **PRESIDING COMMISSIONER SAWYER:**  Okay.

26  What compelled you to come out of the junkyard?

27  The dog?

1    INMATE CASTILLO:  The truth is that I

2  thought everybody was gone, and I came out.  And

3  as I got out, away from where I was hiding, I

4  didn't see the dog and the dog's -- the dog had

5  left and came back with some officers.  And I

6  was told to show them my hands and I did.  They

7  pulled me out and put me in handcuffs and

8  (indiscernible).

9    PRESIDING COMMISSIONER SAWYER:  Did you

10  have some dog bites?

11    INMATE CASTILLO:  Yes, sir.

12    PRESIDING COMMISSIONER SAWYER:  Okay.

13  And did they take you to the hospital and have

14  those treated?

15    INMATE CASTILLO:  Yes, sir.

16    PRESIDING COMMISSIONER SAWYER:  And you

17  had a shotgun?

18    INMATE CASTILLO:  Yes, sir.

19    PRESIDING COMMISSIONER SAWYER:  Sawed-

20  off?

21    INMATE CASTILLO:  I don't recall, sir.

22    PRESIDING COMMISSIONER SAWYER:  Short?

23    INMATE CASTILLO:  No.  It wasn't short.

24    PRESIDING COMMISSIONER SAWYER:  It was

25  full length?

26    INMATE CASTILLO:  Yes, sir.

27    PRESIDING COMMISSIONER SAWYER:  Okay.

1    And you fired it into the ceiling?

2          INMATE CASTILLO:  No, sir.  A shotgun

3    wasn't fired in that place.  It was a .38 that

4    was fired.

5          PRESIDING COMMISSIONER SAWYER:  It was a

6    .38.  Okay.  Who shot that?

7          INMATE CASTILLO:  I couldn't tell you

8    because it was very dark in the place.  I had my

9    back turned to whoever shot up at the air.

10          PRESIDING COMMISSIONER SAWYER:  Now this

11    place had a lot of people in it.  Huh?  So

12    according to the report, there was 125 people. .

13          INMATE CASTILLO:  Yeah, I couldn't say,

14    sir.

15          PRESIDING COMMISSIONER SAWYER:  It was a

16    big restaurant?

17          INMATE CASTILLO:  No, it was small.

18          PRESIDING COMMISSIONER SAWYER:  Small.

19          INMATE CASTILLO:  Yes.

20          PRESIDING COMMISSIONER SAWYER:  Okay.

21    And you took jewelry and money and stuff from

22    people.  You had some bags of money and jewelry?

23          INMATE CASTILLO:  I had one bag, sir.  I

24    believe it was like watches and rings.  I do

25    remember holding onto a watch.  There's really

26    (indiscernible) money.

27          PRESIDING COMMISSIONER SAWYER:  Was there

28

1  people screaming?  Do you remember that?

2        INMATE CASTILLO:  After the shot was

3  fired, yes.

4        PRESIDING COMMISSIONER SAWYER:  And

5  running?

6        INMATE CASTILLO:  I don't remember that.

7        PRESIDING COMMISSIONER SAWYER:  Okay.

8  Anybody crying?

9        INMATE CASTILLO:  No, sir.

10       PRESIDING COMMISSIONER SAWYER:  Okay.

11  Let's talk a little about your record here.

12  Says that you had three juvenile probation files

13  which have been destroyed.  CII shows two

14  arrests as a juvenile, 16-year-old for assault

15  with a deadly weapon, nunchakus.  You're good at

16  nunchakus?

17       INMATE CASTILLO:  The movie groups --

18       PRESIDING COMMISSIONER SAWYER:  Yeah,

19  Grizzly.

20       INMATE CASTILLO:  And I made

21  (indiscernible).

22       PRESIDING COMMISSIONER SAWYER:  Yeah.

23  Okay.  And you were released for insufficient

24  evidence.

25       INMATE CASTILLO:  Yes.

26       PRESIDING COMMISSIONER SAWYER:  Most of

27  the time we have seen people carry nunchakus are

1   illegal weapons.   Do you understand that?

2          INMATE CASTILLO:   I didn't know that at

3   the time.

4          PRESIDING COMMISSIONER SAWYER:   Yeah.

5   It's an illegal weapon.   Most people hurt

6   themselves more than they hurt anybody else with

7   those.

8          INMATE CASTILLO:   Yes.

9          PRESIDING COMMISSIONER SAWYER:   It's a

10  real art.   Second arrest was on 6/14 of 1979 for

11  12020, possession, manufacturing, selling

12  dangerous weapons.   What kind of weapon did you

13  have?

14         INMATE CASTILLO:   I don't know where they

15  got that from, sir.   I've never got arrested for

16  anything like that.

17         PRESIDING COMMISSIONER SAWYER:   It might

18  have been the nunchakus.

19         INMATE CASTILLO:   Yeah, because I've

20  never been arrested for that.

21         PRESIDING COMMISSIONER SAWYER:   When you

22  were a juvenile?

23         INMATE CASTILLO:   Yes, sir.

24         PRESIDING COMMISSIONER SAWYER:   Okay.

25  When interviewed, the defendant said that he was

26  arrested when he was 16 or 17 for an open

27  container, placed on probation, and fined.

1   Denied any other arrest as a juvenile.  Were you

2   drinking at 16.

3        INMATE CASTILLO:  I drank (indiscernible)

4   and had a beer.

5        PRESIDING COMMISSIONER SAWYER:  Were you

6   drinking at 16?

7        INMATE CASTILLO:  (Indiscernible).

8        PRESIDING COMMISSIONER SAWYER:  A lot?

9        INMATE CASTILLO:  No, sir.

10       PRESIDING COMMISSIONER SAWYER:  Drugs?

11       INMATE CASTILLO:  No, sir.

12       PRESIDING COMMISSIONER SAWYER:  Okay.

13   When did you start drinking, doing drugs?

14       INMATE CASTILLO:  At about the age of 17

15   I had met a guy that I was working on his car

16   and he introduced me to drugs but

17   (indiscernible) took them.  I mean, he didn't

18   force me on anything.  I was introduced to drugs

19   at the age of 17.

20       PRESIDING COMMISSIONER SAWYER:  What kind

21   of drugs?

22       INMATE CASTILLO:  It was cocaine,

23   experimented with cocaine.

24       PRESIDING COMMISSIONER SAWYER:  Okay.  On

25   10/14/1981.  And this is the crime you are

26   serving concurrent or is it consecutive?  The

27   other crime?  The one a year earlier.

1      **ATTORNEY BUCHALTER:**  I think it was

2  consecutive.

3      **PRESIDING COMMISSIONER SAWYER:**  Okay.

4  This is a robbery in which you and two crime

5  partners -- this a year before, this is 10/14 of

6  '81 -- charged with a series of robberies which

7  occurred in August, September, and October of

8  1981 at various market drugstores in which safes

9  were forcibly opened at gunpoint.  Various

10  customers in the store, mostly employees, were

11  also robbed.  Victims were threatened and

12  intimidated and in one of the robberies at

13  Ralph's, the defendants shot one of the victims

14  in the stomach, resulting in the removal of his

15  intestine and loss of his spleen, while he was

16  kicked on the ground.  During the pre-sentence

17  investigation, the defendant said he might have

18  done about four of the robberies with which he

19  was charged but denied shooting anyone and

20  claimed he was not -- he was involved because he

21  was hanging around with the wrong people.  Did

22  they force you to do these robberies?

23      **INMATE CASTILLO:**  No, sir.

24      **PRESIDING COMMISSIONER SAWYER:**  Okay.

25  Did you shoot this guy?

26      **INMATE CASTILLO:**  No, sir.

27      **PRESIDING COMMISSIONER SAWYER:**  Okay.

1   Who shot him?

2       **INMATE CASTILLO:**  One of my codefendants.

3       **PRESIDING COMMISSIONER SAWYER:**  Okay.

4   You were charged and convicted or did you just

5   plead out in this case?

6       **INMATE CASTILLO:**  We pleaded out.

7       **PRESIDING COMMISSIONER SAWYER:**  Okay.

8   You pleaded to 211 robbery with the use of a

9   firearm, 20 counts.  Right?

10      **INMATE CASTILLO:**  Yes, sir.

11      **PRESIDING COMMISSIONER SAWYER:**  245(a)

12  PC, one count.  False imprisonment.  Was it 236

13  PC, counts 22 through 24, use of a firearm with

14  great bodily injury, allegation was count 21.

15  Convicted of all counts of allegations on 7/6 of

16  1983.  Sentenced for 23 years and 8 months; is

17  that correct?

18      **INMATE CASTILLO:**  Yes, sir.

19      **PRESIDING COMMISSIONER SAWYER:**  What was

20  going on there other than you said you were

21  hanging around with the wrong people?

22      **INMATE CASTILLO:**  You know, I grew up,

23  quitting school at a young age to help my

24  brother paint cars.  And (indiscernible) the

25  guys that I hanged around with because I

26  participated willfully.

27      **PRESIDING COMMISSIONER SAWYER:**  How old

1  were you at the time of these -- in 1981?

2          INMATE CASTILLO:  Eighteen, I believe.

3          PRESIDING COMMISSIONER SAWYER:  Eighteen.

4  Because you were 19 in '82 for those --

5          INMATE CASTILLO:  That's right.

6          PRESIDING COMMISSIONER SAWYER:  -- for

7  the other crime, the commitment offense.

8          INMATE CASTILLO:  Yeah.  I really can't

9  tell in words what happened.  I grew up not

10  (indiscernible).  My father always taught me to

11  work and treat people with respect and --

12          PRESIDING COMMISSIONER SAWYER:  Were you

13  under the influence of anything when you were

14  doing this particular crime?

15          INMATE CASTILLO:  No, sir.

16          PRESIDING COMMISSIONER SAWYER:  You were

17  sober?

18          INMATE CASTILLO:  It was just

19  (indiscernible).

20          PRESIDING COMMISSIONER SAWYER:  For quick

21  money.  How much money did all those crimes net

22  you?

23          INMATE CASTILLO:  A couple hundred

24  dollars.

25          PRESIDING COMMISSIONER SAWYER:  Really?

26          INMATE CASTILLO:  (Indiscernible.)

27          PRESIDING COMMISSIONER SAWYER:  And where

34

1   were these victims located during these August,

2   September, October of '81, markets and

3   drugstores?  Where in Los Angeles was this?

4           INMATE CASTILLO:  It was in Sylmar area.

5           PRESIDING COMMISSIONER SAWYER:  Sylmar?

6           INMATE CASTILLO:  Yes, sir.

7           PRESIDING COMMISSIONER SAWYER:  And where

8   did you live at the time?

9           INMATE CASTILLO:  In (indiscernible).

10          PRESIDING COMMISSIONER SAWYER:  That's

11  kind of a quiet community.  I used to live there

12  at one time.

13          INMATE CASTILLO:  Yes, it is.  Like 20

14  (indiscernible) very quiet.

15          PRESIDING COMMISSIONER SAWYER:  Yeah.

16  It's kind of a bedroom community to Los Angeles

17  in the north valley.  And this sentence is

18  running concurrent --

19          INMATE CASTILLO:  Yes.

20          PRESIDING COMMISSIONER SAWYER:  -- with

21  your 35 to life.

22          INMATE CASTILLO:  Yes, sir.

23          PRESIDING COMMISSIONER SAWYER:  And this

24  is the 23 and 8 months.  And you were -- this

25  indicates you were on bail from your previous

26  arrest when you committed the commitment

27  offense; is that correct?

1          INMATE CASTILLO:  Yes, sir.

2          PRESIDING COMMISSIONER SAWYER:  How much

3     was your bail for the --

4          INMATE CASTILLO:  I don't know.

5          PRESIDING COMMISSIONER SAWYER:  Do you

6     know?  Okay.  Let's talk a little about you.

7     Born in Mexico, one of eight children raised by

8     your parents Jose and Delores Castillo.  Says he

9     came to this country illegally in 1964 with his

10    family.  Resided here ever since, but there is

11    an INS hold detainer in your C file for

12    violation of immigration laws.  You attended

13    school until the 9th grade.  Dropped out at 17.

14    Started working.  Although your work history is

15    sketchy, in a previous investigation, defendant

16    said he had worked as a security guard for a

17    couple of years.  Is that true?

18         INMATE CASTILLO:  Yes, sir.

19         PRESIDING COMMISSIONER SAWYER:  And quit

20    over a pay dispute.  You also claimed that you

21    worked as a gardener for about a year with Los

22    Angeles City School Board.

23         INMATE CASTILLO:  Yes, sir.

24         PRESIDING COMMISSIONER SAWYER:  Which

25    school did you work at?

26         INMATE CASTILLO:  (Indiscernible) San

27    Fernando Valley.  And there is a junior high

1    around there.  I can't recall the name of it,

2    but we took care of three schools, and a high

3    school.

4         PRESIDING COMMISSIONER SAWYER:  You were

5    on a crew?

6         INMATE CASTILLO:  Yes, sir.  We did

7    (indiscernible) and garden work.

8         PRESIDING COMMISSIONER SAWYER:  This is

9    deja vu.  I used to do that too, in that

10   neighborhood.

11        INMATE CASTILLO:  Yeah.

12        PRESIDING COMMISSIONER SAWYER:  Yeah.  In

13   1980 and '82, you were laid off when you failed

14   to pass your probation their term because you

15   couldn't pass the test?

16        INMATE CASTILLO:  Yes.

17        PRESIDING COMMISSIONER SAWYER:  Okay.

18   Never married.  Sporadic on and off relationship

19   with Yolanda Ontebros.

20        INMATE CASTILLO:  Ontebros.

21        PRESIDING COMMISSIONER SAWYER:  O-N-T-E-

22   B-R-O-S.  And you have a child?

23        INMATE CASTILLO:  Yes, sir.

24        PRESIDING COMMISSIONER SAWYER:  Who is

25   24, now 25?

26        INMATE CASTILLO:  Yes, sir.

27        PRESIDING COMMISSIONER SAWYER:  Boy or

)

1    girl?

2          **INMATE CASTILLO:**  She's a girl.

3          **PRESIDING COMMISSIONER SAWYER:**  She's a

4    girl.  Okay.  And you visit with her or does she

5    visit with you?

6          **INMATE CASTILLO:**  Yes, sir.

7          **PRESIDING COMMISSIONER SAWYER:**  I think I

8    read -- I have a letter from her, don't I?

9          **INMATE CASTILLO:**  Yes, sir.

10          **PRESIDING COMMISSIONER SAWYER:**  Yeah.

11    You have a good relationship with her?

12          **INMATE CASTILLO:**  Not really, because she

13    really doesn't know me.  She's come up to visit

14    a few times.

15          **PRESIDING COMMISSIONER SAWYER:**  Um-hmm.

16    Does she correspond with you?  Write?

17          **INMATE CASTILLO:**  Yes, sir.

18          **PRESIDING COMMISSIONER SAWYER:**  Do you

19    phone her?

20          **INMATE CASTILLO:**  Yes, sir.

21          **PRESIDING COMMISSIONER SAWYER:**  She

22    accepts your collect calls?

23          **INMATE CASTILLO:**  Yes, sir.

24          **PRESIDING COMMISSIONER SAWYER:**  Okay.

25    Said here you've had -- according to defendant,

26    he admitted injecting cocaine for three years

27    every other day and had a 200-dollar-a-week

1  habit.  Okay.  If you were arrested -- if you

2  went into custody at 19, that puts you starting

3  about 16.

4      INMATE CASTILLO:  No that's --

5      PRESIDING COMMISSIONER SAWYER:  That's

6  not true?

7      INMATE CASTILLO:  No.

8      PRESIDING COMMISSIONER SAWYER:  How long

9  had you been using coke?

10     INMATE CASTILLO:  I started experimenting

11  when I was 17.

12     PRESIDING COMMISSIONER SAWYER:  Okay.

13     INMATE CASTILLO:  And it was towards the

14  end of the year or something.

15     PRESIDING COMMISSIONER SAWYER:  Do you

16  have a 200-dollar-a-week habit?

17     INMATE CASTILLO:  It's more of a -- I had

18  a (indiscernible).  Injected and I did it once

19  or twice.

20     PRESIDING COMMISSIONER SAWYER:  Okay.

21     INMATE CASTILLO:  But it was more

22  (indiscernible).

23     PRESIDING COMMISSIONER SAWYER:  Okay.

24  You deny the use of any other narcotics.  You

25  didn't try LSD, PCP?

26     INMATE CASTILLO:  No, sir.

27     PRESIDING COMMISSIONER SAWYER:  Meth

1    wasn't around as bad as it is today.  Marijuana?

2          INMATE CASTILLO:  No, sir.

3          PRESIDING COMMISSIONER SAWYER:  Says you

4    acknowledged the use of marijuana in this

5    report.  Castillo denied any gang affiliation.

6    No gang?

7          INMATE CASTILLO:  I knew a lot of people

8    in gangs.

9          PRESIDING COMMISSIONER SAWYER:  Um-hmm.

10   Because there was gangs in that neighborhood.

11         INMATE CASTILLO:  Yes.

12         PRESIDING COMMISSIONER SAWYER:  But you

13   didn't -- you didn't have any gang affiliation

14   at all?

15         INMATE CASTILLO:  No, sir.

16         PRESIDING COMMISSIONER SAWYER:  Okay.

17   Records indicate you are a past member of the

18   Clanton Street Gang of North Hollywood.  Is that

19   true?

20         INMATE CASTILLO:  No, sir.  I went to

21   school with them, but no.

22         PRESIDING COMMISSIONER SAWYER:  Okay.

23   There's no evidence of current affiliation.  One

24   of the defendant's brothers, Frank Castillo, was

25   the victim in the present offense.  One of the

26   defendant's brothers, Frank Castillo, was the

27   victim in the count one.  Yes, we knew that.

40

1    Okay.  Let's look at your future plans, what you
2    plan on doing.  Okay.  "When I parole, I plan to
3    make my home in Mexicali, BC."  That's Baja
4    California.  Right?
5        INMATE CASTILLO:  Yes, sir.
6        PRESIDING COMMISSIONER SAWYER:
7            "Where I can pursue the trades
8            that I have been certified in.
9            I will have a job the day I get
10           out.  Nunez, N-U-N-E-Z, Mechanic
11           Shop in Mexicali, plan to save
12           enough money to get my own body
13           shop.  I have saved -- I have
14           money saved up from the time
15           I've worked at CCI and PIA."
16   How much money do you have saved up?
17       INMATE CASTILLO:  A couple hundred
18   dollars, sir.
19       PRESIDING COMMISSIONER SAWYER:  I plan --
20   I also plan to help preach on Sundays in
21   Mexicali.  It says "Christian."  Is that the
22   name of a church?
23       INMATE CASTILLO:  Yes.
24       PRESIDING COMMISSIONER SAWYER:
25           "And help the pastor with
26           whatever I can.  I would like to
27           continue to share my life

)

1          experience with the youth in

2          Mexicali and the counselors that

3          have visited the prison through

4          the Straight Life Youth

5          Diversion Program have expressed

6          this, so if given the chance, I

7          would be there for the youths.

8          I plan to take care of my father

9          and spend the last years of his

10          life with him.  I lost my mom in

11          April of 2002."

12  Sorry about that.  I saw that there was some

)

13  newspaper articles that you were involved in.

14          **INMATE CASTILLO:**  Yes, sir.

15          **PRESIDING COMMISSIONER SAWYER:**  The

16  Straight Life Program?

17          **INMATE CASTILLO:**  Yes, sir.

18          **PRESIDING COMMISSIONER SAWYER:**  Do you

19  enjoy doing that?

20          **INMATE CASTILLO:**  Yes.

21          **PRESIDING COMMISSIONER SAWYER:**  Well, you

22  just really light up when you talk about it.

23  Your whole body language changed.  Your smile

24  got twice as big and your eyes started

25  sparkling.

26          **INMATE CASTILLO:**  It's a way of giving

27  back.

1      **PRESIDING COMMISSIONER SAWYER:**  Do you
2  feel it's productive?

3      **INMATE CASTILLO:**  Yes, sir.

4      **PRESIDING COMMISSIONER SAWYER:**  How?

5      **INMATE CASTILLO:**  We've had many groups
6  come out.  The youth, the adult ladies that have
7  drug problems, and we share with them that we
8  have been there, where they are at.  We share
9  with the kids that, you know, cutting classes,
10  smoking a cigarette, leads to bigger things.
11  The people that come out of the colleges, I will
12  bring out students to ask us questions.  They
13  are going to be counselors.  They are going to
14  be judges.  And I don't know.  It's just a joy
15  to be able to help, to give back to the
16  community.

17      **PRESIDING COMMISSIONER SAWYER:**  What kind
18  of questions do they ask you?

19      **INMATE CASTILLO:**  Mostly how do I feel
20  about my brother's death is the biggest question
21  I get.  And I always tell them that it's
22  something that I've lived with for the past 24
23  years.  It's hard.  I think about the victims as
24  well, because through the bible college that I
25  took, I realized that I hurt a lot of people.  I
26  didn't know that I was hurting them by taking
27  their money, their hard-earned money, their

43

1   jewelry.  I didn't know that I was hurting

2   people and I've come to realize that --

3       PRESIDING COMMISSIONER SAWYER:  We have

4   to stop a minute.  We occasionally have to turn

5   the tapes over.

6       DEPUTY COMMISSIONER BENTLEY:  Okay.  This

7   is side two in the initial parole consideration

8   hearing for Luis Castillo, CDC No. C-73437.

9       PRESIDING COMMISSIONER SAWYER:  Thank

10  you.  Go ahead.

11      INMATE CASTILLO:  I realize that I've

12  hurt a lot of people and that, you know, I hurt

13  my parents.  And that's what we share with them

14  is that they are hurting their parents because

15  they work very hard to put, you know, clothes on

16  their back and roof over their heads and the

17  meals.  I was a very selfish person and

18  (indiscernible), please me all the time.  I

19  never thought about my fiancée or my parents.

20  It was always me, me, me.  And even the bible

21  has taught me that, you know, I've sat many

22  times with my father and told him that it isn't

23  his fault.  It was mine, because I made the bad

24  choices.  I made the bad decisions.  And it was

25  never his fault.  He raised me to be a

26  productive person and (indiscernible) work.  And

27  this is the stuff I share with these young kids

1   because a lot of these kids come in and they are

2   laughing and they are making jokes and say well,

3   I can come in here and do time.  Well, sure

4   anybody can come in here and do time, but you're

5   in and you are out.  You get tired of the same

6   thing.  And there is a lot of bad people in here

7   that will teach you a lot of able things.  And I

8   tell them, you know, you got to be a strong

9   person to stand up for yourself.  Educate

10  yourself because if you don't care for yourself,

11  nobody else cares for you.  The officers are

12  here to secure the place.  They are not

13  babysitters.  And I share with them those kinds

14  of things.  And a lot of times the counselors

15  tell us, well, you're not going to reach

16  everybody.  But if we can reach one or two, then

17  we can make a difference.  And there's where the

18  (indiscernible).

19      **PRESIDING COMMISSIONER SAWYER:**  Good.

20  Residence.  If you are unable to reside in the

21  United States, you plan to reside with your

22  father, Jose, and fame friend Marco Antonio

23  Aguilar, A-G-U-I-L-A-R, at the following

24  address, and this is in Mexicali.

25      **INMATE CASTILLO:**  Yes.

26      **PRESIDING COMMISSIONER SAWYER:**  "If I am

27  unable to stay in the United States I plan to

)

1  reside" -- if I'm able to stay, that you would

2  stay with your father Jose in Valley -- Spring

3  Valley, California.  Is that still accurate?

4        **INMATE CASTILLO:**  Yes, sir.

5        **PRESIDING COMMISSIONER SAWYER:**  And is it

6  still accurate with Marco Aguilar?

7        **INMATE CASTILLO:**  Yes, sir.

8        **PRESIDING COMMISSIONER SAWYER:**  Okay.

9  And you have employment, as I said before, Mr.

10  Nunez has a mechanic shop in Mexicali.  Okay.

11  Also, the INS hold is A17175321.  I have a

12  letter from the district attorney, L.A. County

13  District Attorney's Office, dated November 3,

14  2005, signed by Lawrence C. Morrison, M-O-R-R-I-

15  S-O-N, Deputy District Attorney, the Lifer's

16  Hearing Unit.  It says:

17              "The district attorney of Los

18              Angeles County opposes parole

19              for inmate Luis Castillo.

20              Inmate, his brother Frank, and

21              two confederates committed on

22              armed robbery and of numerous

23              patrons at Rusty's Hacienda

24              Restaurant in Los Angeles.

25              Inmate was armed with a sawed-

26              off shotgun."

27  Where do they keep coming up with a sawed-off

)

1   shotgun?

2          INMATE CASTILLO:  I haven't --

3          PRESIDING COMMISSIONER SAWYER:  Okay.

4   I've got the police report.  Maybe we will try

5   to hunt that out.  And the illegal weapon, it's

6   fired it numerous times at pursuing police.  Did

7   you fire the shotgun --

8          INMATE CASTILLO:  No, sir.

9          PRESIDING COMMISSIONER SAWYER:  -- at

10  police?

11         INMATE CASTILLO:  Yes.  I did fire from

12  the vehicle.

)

13         PRESIDING COMMISSIONER SAWYER:

14             Okay.  "Pursuing police cars

15             during the attempts to apprehend

16             the fleeing robbers.  Police

17             helicopter was also shot at by

18             robbers.  Inmate's brother Frank

19             was killed during the multiple

20             exchanges of gunshots between

21             the bandits and the police.

22             Inmate was allowed to plead

23             guilty to first-degree murder

24             and 30 other counts including

25             multiple attempt murder,

26             robberies, and case total of 35

27             years to life.  In return, the

47

1       district attorney dropped

2       special circumstances allegation

3       that would have imprisoned the

4       inmate for life without the

5       possibility of parole.  Inmate's

6       sentence in this case runs

7       concurrent with a sentence of 23

8       years, 8 months which he

9       received in Los Angeles, case

10      number 149652, in a plea bargain

11      exchanged for the guilty pleas

12      to 27 counts of robbery and ADW,

13      most of them armed.  This case

14      involved a series of robberies

15      of markets and drugstores in the

16      San Fernando Valley in August,

17      September, October, of 1981,

18      just moments before the life

19      offense.  Clearly, inmate is a

20      vicious, dangerous, and

21      determined criminal.  All of

22      those robberies did not deter

23      him from engaging in extremely

24      reckless and dangerous conduct

25      at Rusty's Restaurant and

26      robberies resulting in shoot

27      out.  While in prison, inmate

```
 1              has received approximately
 2              twenty 115 serious rules
 3              violation, the most recent being
 4              1998.  We note that several of
 5              these related to force and
 6              violence and several, notably
 7              weapons assault, stabbing,
 8              possession of alcohol, are
 9              actual felonies, since inmate is
10              now a 31 counts in case number
11              375075 plus 27 counts in case
12              number 149652."
13  That's not correct, the case number.
14          ATTORNEY BUCHALTER:  The (indiscernible)
15  is not correct.
16          PRESIDING COMMISSIONER SAWYER:  Okay.  I
17  think yeah he's gotten the 128s as well.  We
18  will sort that out.
19          ATTORNEY BUCHALTER:  And the date.
20          PRESIDING COMMISSIONER SAWYER:  The date?
21          ATTORNEY BUCHALTER:  That would be a 128
22  also.
23          PRESIDING COMMISSIONER SAWYER:  Okay.
24  For the record I'm going to clarify the case
25  number since the inmate is now 31 counts in case
26  number 375051, plus case number 149652.  That's
27  correct.  It's a total of 58 strikes.
```

1       "Fifty-eight strikes.  And under

2       the three strikes law, we invite

3       CDC to properly document and

4       present to the local district

5       attorney any further violations

6       of law committed in prison so

7       that he may be prosecuted for

8       consecutive 25-to-life

9       sentences.  We believe the

10      psychologist John Mangers

11      (phonetical) 2004 assessment of

12      the inmate's potential for

13      violence -- .if released from the

14      free community, is about average

15      for a 43 year-old male -- is

16      absolutely without foundation.

17      This assessment ignores the

18      violent, predatory nature of the

19      inmate's crime -- all of which

20      are which were not even

21      mentioned in the psych report.

22      It seems to accept the inmate's

23      version which is devoid of

24      insight and acceptance of full

25      responsibility for all of his

26      crime.  And we believe Axis II

27      diagnosis of antisocial

)

```
 1          personality improved found by
 2          Dr. T-A-V-O-U-L-A-R-I-S-A,
 3          psyche in 1992, is more cogent
 4          and persuasive.  Assessment of
 5          the inmate.  At the time of his
 6          plea, as the transcript of the
 7          legal section of the CDC packet
 8          shows, Pages 10 and 11, inmate
 9          was advised that he could spend
10          the rest of his life in prison.
11          We believe that's appropriate
12          for the time -- at an
```

)

```
13    :     appropriate time for the inmate
14          to serve in the sentence.
15          Consequently, we believe inmate
16          possesses an unreasonable risk
17          of public safety and opposes
18          parole.  Furthermore, based on
19          the inmate's abysmal conduct in
20          prison, which is entirely
21          accurate, we believe that he
22          should not even be considered
23          for parole for five years.
24          Thank you for this opportunity
25          to share our views."
26    Signed by Lawrence Morrison.  Okay.  In the
27    letters we have quite a few letters.  Okay.
```

51

1  This letter is dated November 29, 2004, from

2  Frank Gustino Junior.  Is that the victim's son?

3       **INMATE CASTILLO:**  Yes, sir.

4       **PRESIDING COMMISSIONER SAWYER:**  He feels

5  it's time for you to be released.  Family

6  especially have been waiting for over 20 years

7  to have him back in our lives.  "Before my dad's

8  death we were so close."  How old is he now?

9       **INMATE CASTILLO:**  About 28 or 27.

10       **PRESIDING COMMISSIONER SAWYER:**  Okay.

11  "He's a changed man since he's been in jail.  A

12  relationship has trailed.  I'm excited about the

13  possibility of being reunited and rebuild our

14  friendship."  He recognizes what you have been

15  doing in jail.  It's been 23 years since you've

16  been able to look at him in the eyes and tell

17  him that I love him.  He's never come to visit?

18       **INMATE CASTILLO:**  No, sir.

19       **PRESIDING COMMISSIONER SAWYER:**  Okay.

20  Where does he, live?

21       **INMATE CASTILLO:**  He lives in

22  (indiscernible).

23       **PRESIDING COMMISSIONER SAWYER:**  Okay.  "I

24  have a letter on behalf of my children and

25  myself.  I'm missing my father.  Would like to

26  have him back in my life."  This is your

27  daughter?

52

1      **INMATE CASTILLO:**  Yes.

2      **PRESIDING COMMISSIONER SAWYER:**  How do

3   you pronounce her first name?

4      **INMATE CASTILLO:**  Dezery.

5      **PRESIDING COMMISSIONER SAWYER:**  Dezery?

6   D-E-Z E-R-Y, Haimenez, H-A-I-M-E-N-E-Z.  "I

7   would like him to be a grandfather and a

8   father."  She's missing you.  And you missed her

9   wedding.  The birth of her two children?

10     **INMATE CASTILLO:**  Yes, sir.

11     **PRESIDING COMMISSIONER SAWYER:**  She sent

12  pictures.  Feels you are a good man.  Feels you

13  have changed.  She's 24 years old and "all I

14  know is he likes scrambled eggs.  As funny as it

15  sounds, it's sad to me."  And it's signed in

16  addition to Dezery, it's signed by Isaiah

17  Haimenez and Andrew Haimenez.  How old are your

18  grandchildren?

19     **INMATE CASTILLO:**  They are seven and

20  eight.

21     **PRESIDING COMMISSIONER SAWYER:**  Okay.  I

22  have some documents and some translations.  I

23  have a letter from John J, Castillo.  It's dated

24  September 28, 2004.  Who is -- that's your

25  brother?

26     **INMATE CASTILLO:**  Yes, sir.

27     **PRESIDING COMMISSIONER SAWYER:**  Okay.

1    Talks about your regrets and you have repented.

2    They pray for you every day.  You were dumb,

3    young, and naive, not thinking of the

4    consequences.  You've been through a lot in

5    prison.  He believes you're a different person.

6    "He has committed his life to Lord Jesus Christ,

7    and loyal servant to God."  He's been to visit

8    with you?

9          INMATE CASTILLO:  Yes, sir.

10          PRESIDING COMMISSIONER SAWYER:  He talks

11   about that.  And they are praying for you and

12   they miss you very much.  A letter from Theresa

13   Castillo.  September 23rd, '04.  This is your

14   sister?

15          INMATE CASTILLO:  Yes, sir.

16          PRESIDING COMMISSIONER SAWYER:  Talks

17   about your incarcerations, your family, how

18   young you were at the time.  You found faith

19   since you have been down.  Says she's very

20   close.  Does she visit with you?

21          INMATE CASTILLO:  Yes, sir.

22          PRESIDING COMMISSIONER SAWYER:  Okay.

23   And she's willing to provide anything he needs

24   including an address that he can consider this

25   his home any time.  She lives in Chula Vista,

26   California.  I have a letter from Marco Aguilar,

27   and he lives in Mexicali.  And he's offering a

54

1    place to reside.  Being friends of the family,

2    he's informed that there's a pending

3    deportation.  You could live with him and his

4    family and will provide him with a home to live

5    when he comes back to our country.  Okay.  And

6    that's dated September 23rd, '04.  Do you feel

7    his offer still stands?

8        **INMATE CASTILLO:**  Yes.

9        **PRESIDING COMMISSIONER SAWYER:**  Okay.

10   And I have a letter: "In regards to my son, Luis

11   Castillo, being distanced from his family.

12   Please consider giving him his freedom.  I live

13   alone in my house.  I need for him to be with

14   me.  He's been a great moral support."  And he's

15   waiting for you to be free.  I have a letter

16   from your niece, Mary Jane Priseno.

17       **INMATE CASTILLO:**  Yes.

18       **PRESIDING COMMISSIONER SAWYER:**  Is that

19   your niece?  P-R-I-S-E-N-O.  "My uncle's been

20   incarcerated for 22 years."  This is notarized

21   on September 23, 2004.  But she believes you're

22   ready to be released and enjoy life with your

23   family.  He's dedicated to the Lord.  And

24   (indiscernible) a new start.  Start a family

25   again.  I have a letter from Mike Castillo,

26   dated July 14th, 2004.  This is your nephew?

27       **INMATE CASTILLO:**  Yes, sir.

55

1      **PRESIDING COMMISSIONER SAWYER:**  It's

2  actually from Mr. and Mrs. Mike Castillo in

3  Spring Valley.  Feels you paid your debt to

4  society.  Would like us to consider you for

5  parole, certainly supportive.  And a letter from

6  Mr. Nunez, Sergio Nunez, who is the owner of --

7  it's on stationery.  Declaring the proper owner

8  of Nunez Mechanic Shop offering you a job.  Also

9  acknowledge that you have auto body trade and is

10  recently finishing his auto mechanics vocational

11  trade.  He's interested in employing you.  Have

12  you had any discussion as to how much he would

13  pay you?

14      **INMATE CASTILLO:**  No, sir.

15      **PRESIDING COMMISSIONER SAWYER:**  Okay.  I

16  have another letter from him.  Actual it's the

17  same letter, retyped.  Claudia Valdez or Valdiz.

18  September 23rd, 2004, from New Mexico.  And this

19  is your sister?

20      **INMATE CASTILLO:**  Yes, sir.

21      **PRESIDING COMMISSIONER SAWYER:**  And it

22  talks about the mistakes you made.  Youngest

23  sister.  She owns a video store and diner.  She

24  has a job waiting for you.

25      **INMATE CASTILLO:**  Yes, sir.

26      **PRESIDING COMMISSIONER SAWYER:**  And her

27  husband has opened a savings account.  "We are

1  ready to take him shopping for clothes and

2  anything else he would need." Signed by Claudia

3  Valdez.  You understand it's very difficult to

4  be paroled to another state, and given the fact

5  that you still have this INS detainer on you,

6  that takes precedent over any other plans in the

7  United States.  Do you understand that?

8      **INMATE CASTILLO:**  Yes, sir.

9      **PRESIDING COMMISSIONER SAWYER:**  Okay.

10  And as I read earlier, we have a letter from

11  Mexicali to us from Gerrardo (phonetical)

12  Galardo, G-A-L-A-R-D-O, Pastor General of the

13  Christian Community Church.  He indicates in

14  here that he would offer you a job in the

15  ministry.  Also help you locate to our city, and

16  the city is Mexicali.  They have a possible way

17  of showing him around the city and part of our

18  community.  Okay.  That's it.  At this time I

19  will turn it over to Commissioner Bentley.

20.      **DEPUTY COMMISSIONER BENTLEY:**  Thank you.

21  This is your initial hearing so we are going to

22  go back to when you first came into the

23  Department of Corrections and that was back in

24  September of '83 at (indiscernible).  And then

25  in October of '83 you went to Folsom and you

26  stayed there until October of '86 when you went

27  to Tehachapi, and then you have been here at

57

1  Calipatria since August of '99.  You've dug

2  yourself a big hole in the start.

3          INMATE CASTILLO:  Yes.

4          DEPUTY COMMISSIONER BENTLEY:  Yeah,

5  because your classification score is 93.  If you

6  hadn't have done that, you wouldn't have that

7  classification score and you would probably be

8  at a level two institution now.

9          INMATE CASTILLO:  Yes, ma'am.

10          DEPUTY COMMISSIONER BENTLEY:  Okay.

11  You've had some really serious 115s.  You got 16

12  of them.  And you know, like the district

13  attorney said, you could have been charged on

14  that assault and stabbing of another inmate.

15  And received a second 25-to-year-life sentence.

16  Did you realize that?

17          INMATE CASTILLO:  No.

18          DEPUTY COMMISSIONER BENTLEY:  Okay.  What

19  made you get into all this trouble?

20          INMATE CASTILLO:  I would say the

21  environment, but the choice was mine.

22          DEPUTY COMMISSIONER BENTLEY:  Yeah, it

23  has to be because we see a lot of inmates that

24  come before us and they don't have any.  And

25  they have been to some of these same

26  institutions because everybody when they first

27  commenced is at a level four.  Almost everybody.

58

1   And yeah, those are difficult situations, but

2   they somehow managed to avoid this.  You had a

3   dangerous contraband and another assault on

4   staff back in '86 and a fistfight.  Then you had

5   a (indiscernible) in '87.  And when did you quit

6   drinking?

7        INMATE CASTILLO:  That was probably it.

8        PRESIDING COMMISSIONER SAWYER:  Okay.

9   And then you had a razor and a sewing needle a

10  couple of different razors.  '87 again you had

11  pruno.  Your last one was in '87 and that again

12  was another razor.  What are you doing with all

13  these razors?  This was in Tehachapi.

14       INMATE CASTILLO:  Yes.  I was in the SHU

15  where you learn about (indiscernible) to remove

16  the razors from the whole thing that shaves you.

17       DEPUTY COMMISSIONER BENTLEY:  Yeah.

18       INMATE CASTILLO:  And I used to take them

19  out of because I used to sew there in the

20  prison.  And I used to use sewing needles and

21  (indiscernible).

22       DEPUTY COMMISSIONER BENTLEY:  Okay.  But

23  seems to me after you picked up one 115, you

24  would cut it out.

25       INMATE CASTILLO:  Yes, (indiscernible).

26       DEPUTY COMMISSIONER BENTLEY:  Yeah.

27       INMATE CASTILLO:  But I didn't.

```
 1          DEPUTY COMMISSIONER BENTLEY:  Right.
 2    Okay.  And then you have four counseling
 3    chronos.  And your last one of those was
 4    3/24/98.  So this has really put you in -- you
 5    know, you just kind of wasted those first years.
 6          INMATE CASTILLO:  Yes, ma'am.
 7          DEPUTY COMMISSIONER BENTLEY:  Yeah.  What
 8    made you stop getting disciplinaries?  Because
 9    you said it was kind of the environment.  But it
10    was still the environment.
11          INMATE CASTILLO:  What made me do the --
12          DEPUTY COMMISSIONER BENTLEY:  Stop
13    getting 115s?
14          INMATE CASTILLO:  When I get sent to
15    Tehachapi.
16          DEPUTY COMMISSIONER BENTLEY:  You still
17    got 115s at Tehachapi.
18          INMATE CASTILLO:  Yeah.  Towards the last
19    year, they (indiscernible) and (indiscernible).
20          DEPUTY COMMISSIONER BENTLEY:  Okay.  Did
21    you -- you got one at Tehachapi and
22    (indiscernible).
23          INMATE CASTILLO:  Yes.  They were very
24    strict in Tehachapi about any little thing they
25    could find until the cell that wasn't --
26          DEPUTY COMMISSIONER BENTLEY:  Like pruno.
27          INMATE CASTILLO:  I got a write up in
```

60

1    Tehachapi for pruno?

2           DEPUTY COMMISSIONER BENTLEY:  Two of

3    them.

4           INMATE CASTILLO:  I don't remember.

5           DEPUTY COMMISSIONER BENTLEY:  One on

6    August of '87 and then another one in October of

7    '87.  Again, you got the one and you didn't

8    learn.  Okay.  But you have done some really

9    good things and we will get into that.  You were

10   in the sewing at Tehachapi.

11          INMATE CASTILLO:  Yes, ma'am.

12          DEPUTY COMMISSIONER BENTLEY:  Okay.  You

13   were getting average to above average work

14   reports.  Then when you got down to Tehachapi,

15   you were in the silkscreen.

16          INMATE CASTILLO:  Yes.

17          DEPUTY COMMISSIONER BENTLEY:  And you

18   were the lead man and you were making flags for

19   a number of years.  Right?

20          INMATE CASTILLO:  Yes.

21          DEPUTY COMMISSIONER BENTLEY:  Were those

22   California flags?

23          INMATE CASTILLO:  Yes.  Stars and stripes

24   and California flags.

25          DEPUTY COMMISSIONER BENTLEY:  Okay.  And

26   then what's done with those flags?

27          INMATE CASTILLO:  Excuse me?

1          **DEPUTY COMMISSIONER BENTLEY:**  What's done

2    with the flags?

3          **INMATE CASTILLO:**  They were sent to

4    another prison to get the stripes sewn.

5          **DEPUTY COMMISSIONER BENTLEY:**  So these

6    would be like these flags?

7          **INMATE CASTILLO:**  Yes.  We used to sew

8    the blue part --

9          **DEPUTY COMMISSIONER BENTLEY:**  Oh, okay.

10          **INMATE CASTILLO:**  -- to the stars.

11          **DEPUTY COMMISSIONER BENTLEY:**  Okay.  And

12    you were the lead man on many of your

13    assignments in there.

14          **INMATE CASTILLO:**  I was taken from the

15    sewing site to the silkscreen site.

16          **DEPUTY COMMISSIONER BENTLEY:**  Why?  And

17    you picked up social certificates at the same

18    time --

19          **INMATE CASTILLO:**  Yes.

20          **DEPUTY COMMISSIONER BENTLEY:**  -- while

21    you were in there.

22          **INMATE CASTILLO:**  That also allowed me to

23    take the course.

24          **ATTORNEY BUCHALTER:**  It would allow me an

25    hour every single day to allow me to take the

26    things that I needed to get certificated.

27          **DEPUTY COMMISSIONER BENTLEY:**  Okay.  And

1  did you get certified?

2      **INMATE CASTILLO:**  No.  We were shipped

3  out of there before I could complete the course.

4      **DEPUTY COMMISSIONER BENTLEY:**  Okay.  You

5  came down here at Calipatria?

6      **INMATE CASTILLO:**  Yes, ma'am.

7      **DEPUTY COMMISSIONER BENTLEY:**  Okay.  But

8  you did pick up some skills because I saw a

9  certificate.  Okay.  And then in 2000 your work

10  assignment was the yard crew and then you became

11  a clerk and then you got in the auto body

12  vocation.

13      **INMATE CASTILLO:**  Yes, ma'am.

14      **DEPUTY COMMISSIONER BENTLEY:**  And in

15  2002, you completed that.

16      **INMATE CASTILLO:**  Yes, ma'am.

17      **DEPUTY COMMISSIONER BENTLEY:**  Okay.  And

18  then you went back to being a clerk.

19      **INMATE CASTILLO:**  Yes, ma'am.

20      **DEPUTY COMMISSIONER BENTLEY:**  And you got

21  an exceptional work report.  And then you got

22  into auto mechanics and I think you told Mr.

23  Sawyer that you have completed that?

24      **INMATE CASTILLO:**  No.

25      **DEPUTY COMMISSIONER BENTLEY:**  Oh, I

26  didn't see a completion.

27      **INMATE CASTILLO:**  That was one of the

1    shut ups that was originally one of the

2    upholstery and it shut down.  And when I got in

3    the class, we had to wait many months to have

4    that stuff removed.  As a matter of fact, me and

5    a few other inmates cleaned up the shop and

6    (indiscernible) for the auto body class.

7         **DEPUTY COMMISSIONER BENTLEY:**  In that

8    auto mechanic?

9         **INMATE CASTILLO:**  Yes, it's auto

10   mechanic.

11        **DEPUTY COMMISSIONER BENTLEY:**  Oh, okay.

12   So it's both.

13        **INMATE CASTILLO:**  Well, they have a

14   number one and then they have a number two where

15   they do like (indiscernible) and tune ups and

16   then they have the other shop where they do

17   heavier stuff.

18        **DEPUTY COMMISSIONER BENTLEY:**  Okay.  In

19   '96 you were out to court as a witness.  What

20   was that about?

21        **INMATE CASTILLO:**  The district attorney

22   called me and my codefendants back because they

23   had arrested my brother on this case.

24        **DEPUTY COMMISSIONER BENTLEY:**  Okay.  Was

25   he the fourth member?

26        **INMATE CASTILLO:**  Yes, ma'am.

27        **DEPUTY COMMISSIONER BENTLEY:**  Okay.  And

1   did he get convicted?

2          INMATE CASTILLO:  Yes, ma'am.

3          DEPUTY COMMISSIONER BENTLEY:  Okay.

4   Well, that was a long time?

5          INMATE CASTILLO:  Yeah.

6          DEPUTY COMMISSIONER BENTLEY:  Okay.  All

7   right.  In August of '91 you got your GED, but

8   then there were some suspicions that there might

9   have been some cheating going on then.

10          INMATE CASTILLO:  There wasn't cheating

11   going on.

12          DEPUTY COMMISSIONER BENTLEY:  Oh, okay.

13   You were cheating?

14          INMATE CASTILLO:  No, ma'am.

15          DEPUTY COMMISSIONER BENTLEY:  Okay.  But

16   some of the inmates were?

17          INMATE CASTILLO:  Yeah.

18          DEPUTY COMMISSIONER BENTLEY:  Okay.  So

19   you redid it in May of '02.

20          INMATE CASTILLO:  Yes.

21          DEPUTY COMMISSIONER BENTLEY:  So you've

22   got a clean one now.

23          INMATE CASTILLO:  Yes, ma'am.

24          DEPUTY COMMISSIONER BENTLEY:  Right.

25   Okay.  And I didn't see any type of substance

26   abuse programming and that's been recommended by

27   the Board in the past.

1          **INMATE CASTILLO:**  Well, I've never told

2  that, but I've tried to get in those programs

3  (indiscernible).

4          **DEPUTY COMMISSIONER BENTLEY:**  Way back at

5  your documentation hearing when you met with the

6  Board and (indiscernible) suggesting that.

7          **INMATE CASTILLO:**  They did?

8          **DEPUTY COMMISSIONER BENTLEY:**  Yeah.

9          **INMATE CASTILLO:**  I don't recall that.

10          **DEPUTY COMMISSIONER BENTLEY:**  Okay.

11  Well, anyone that's addicted to cocaine, as you

12  are, claims the reason you were committing all

13  those robberies was for your cocaine, obviously

14  needs to get (indiscernible) slip back into that

15  when he is released.  Okay.  And Mr. Sawyer went

16  over with you your Straight Life --

17          **INMATE CASTILLO:**  Yes, ma'am.

18          **DEPUTY COMMISSIONER BENTLEY:**  -- Program.

19  Okay.  And I'm going to go over some of the

20  other chronos that we have in here.  And this is

21  your degree as graduate of theology from the

22  Gulf Coast Bible Institute.

23          **INMATE CASTILLO:**  Yes, ma'am.

24          **DEPUTY COMMISSIONER BENTLEY:**  Do they

25  provide that for free?

26          **INMATE CASTILLO:**  No, ma'am.

27          **DEPUTY COMMISSIONER BENTLEY:**  You had to

1    pay for it?

2        **INMATE CASTILLO:**  Yes, ma'am.

3        **DEPUTY COMMISSIONER BENTLEY:**  Okay.  And

4    your graduate of theology, but that's not like a

5    bachelor's degree, is it?

6        **INMATE CASTILLO:**  I tried to take that,

7    but this prison did not help.

8        **DEPUTY COMMISSIONER BENTLEY:**  Okay.  And

9    then you have been in life skills development

10   class?

11       **INMATE CASTILLO:**  Yes, ma'am.

12       **DEPUTY COMMISSIONER BENTLEY:**  Here at --

13   and that does include some substance abuse,

14   recovery, anger management, and you did the

15   parenting.

16       **INMATE CASTILLO:**  Yes, ma'am.

17       **DEPUTY COMMISSIONER BENTLEY:**  And you did

18   Life Without a Crutch, and that's substance

19   abuse, isn't it?

20       **INMATE CASTILLO:**  Yes.

21       **DEPUTY COMMISSIONER BENTLEY:**  Okay.  And

22   then you did a completion of the AA, NA, 12-step

23   process curriculum of the Life Skills Program.

24   But you know if you're in that, do you continue

25   to practice?  Do you know the 12 steps?

26       **INMATE CASTILLO:**  No, I don't know the 12

27   steps, but I do continue to take training on

1  that.

2       **DEPUTY COMMISSIONER BENTLEY:**  Okay.  And

3  you did social development and the anger

4  management that we mentioned and the health.  I

5  guess you took all the courses that we have in

6  it.  Right?

7       **INMATE CASTILLO:**  Right.

8       **DEPUTY COMMISSIONER BENTLEY:**  And then we

9  have a lot of certificates here that were your

10  auto body.

11       **INMATE CASTILLO:**  Yeah.

12       **DEPUTY COMMISSIONER BENTLEY:**  And because

13  you completed various facets of that and then

14  you did a business management course and then

15  that was part of the silkscreen.  Right?

16       **INMATE CASTILLO:**  Yes.

17       **DEPUTY COMMISSIONER BENTLEY:**  Okay.  And

18  then you have a laudatory chrono here about your

19  Straight Life Program and it indicates that this

20  is court ordered and through in struggling the

21  youth, the inmate said Straight Life was to

22  educate them, so when they are confronted with

23  having to commit on illegal act or something

24  against a moral (indiscernible) they make the

25  right choice.  And these are more chronos here

26  and your Straight Life and then here you are to

27  be commended by Correctional Counselor Sarala

1    (phonetical) for your positive behavior and

2    you're courteous, respectful, and cooperative

3    with both staff and inmates and said it's highly

4    appreciated and then we have Jane McCurry

5    (phonetical), the Life Skills Development

6    teacher who indicates you have completed

7    personalized self-help study, self-study life

8    skills development, and all the various facets

9    of it.  And says, "He's been working on your own

10   volition, beyond your regular job assignment.

11   You demonstrate knowledge of the material by

12   doing excellent on tests and homework

13   assignments."  And then here's some more in

14   Straight Life and he's one from Edwina

15   Vancecoder (phonetical), the vocational

16   education officer, and she says she commends you

17   for your attitude and performance, and that's

18   when you were a clerk there.  And then here's

19   some more straight life.  And you're still

20   involved with that; is that correct?

21       **INMATE CASTILLO:**  Yes, ma'am.

22       **DEPUTY COMMISSIONER BENTLEY:**  Okay.  And

23   so you keep yourself pretty busy.  Anything that

24   I've over looked?

25       **INMATE CASTILLO:**  No, ma'am.

26       **DEPUTY COMMISSIONER BENTLEY:**  Do you

27   think I've covered everything that I have been

69

1   doing?

2       **INMATE CASTILLO:**  Yes, ma'am.

3       **DEPUTY COMMISSIONER BENTLEY:**  Okay.

4   Well, 2you've really made a big change since

5   '87.  That's really when you started serving

6   your time.  Wouldn't you say?

7       **INMATE CASTILLO:**  Well, I mean every day

8   here is hard on a person.

9       **DEPUTY COMMISSIONER BENTLEY:**  Yeah.

10      **INMATE CASTILLO:**  Everybody has to

11  (indiscernible) new life.

12      **DEPUTY COMMISSIONER BENTLEY:**  But you

13  know when you do that, it adds to the time

14  you're going to stay in prison.

15      **INMATE CASTILLO:**  Yes.

16      **DEPUTY COMMISSIONER BENTLEY:**  Because

17  when we find you suitable for parole, we then

18  determine the length of your sentence.

19  (Indiscernible) off these years if you didn't

20  get into trouble and do programs so you missed

21  out on some.

22      **INMATE CASTILLO:**  Yes, ma'am.

23      **DEPUTY COMMISSIONER BENTLEY:**  Yeah.  But

24  you have got a good and clean time with you.  We

25  just had a similar initial hearing yesterday

26  with an inmate, and he didn't wake up

27  unfortunately until '99.  And he's still up at

1    210 classification.  Yeah.  So at least you saw

2    you better change sooner.

3           INMATE CASTILLO:  I do regret

4    (indiscernible).

5           DEPUTY COMMISSIONER BENTLEY:  Yeah.

6           INMATE CASTILLO:  You know, jobs and

7    (indiscernible).

8           DEPUTY COMMISSIONER BENTLEY:  Yeah.

9           INMATE CASTILLO:  So, you know, I do now,

10    especially now, for my (indiscernible) like

11    that.  If I had based myself, I could be in

12    level three right now where I could take

13    advantage of more programs that they have.

14    Because every prison is (indiscernible) programs

15    that they have.

16           DEPUTY COMMISSIONER BENTLEY:  Right.

17    Well, you are bringing them down.  It's going to

18    be a little bit longer.  Okay.  And then I'm

19    going to go to the psychological report that was

20    done for this hearing.  And this is done by Dr.

21    Magner.  Goes over your history and all the

22    stuff that we have already been talking about,

23    your substance abuse and your parole plans, and

24    it says under diagnosis you've got a cocaine

25    dependence that he claims is in remission and he

26    says that under Axis V you've maintained a good

27    level of adjustment in a controlled setting.

1    And he goes over with you in the review of the

2    life crime, says that you have demonstrated good

3    disciplinary history for the past 17 years.

4    There are two violent offenses noted, one in '85

5    and one in '87.  Describing the stabbing in '85,

6    the inmate notes that "they wanted me to hurt

7    this guy."  Inmate relates that he made the

8    attempt but does not know how badly he actually

9    hurt him.  And then you were involved in a

10   fistfight in '87, but the doctor missed that

11   there was another assault on an inmate back in

12   '86, and he says:

13           "Because of the history and that

14           you have been disciplinary free

15           for an extended period of time,

16           that your potential for violence

17           would be somewhat less than the

18           average level four inmate.

19           (Indiscernible) if released into

20           the free community it is felt

21           that your potential for violence

22           would be about average for a 43-

23           year-old male.  Certainly

24           precursors to that would be

25           relapse into substance abuse.

26           Another potential factor would

27           be loss of family support.

72

1           Release plans are feasible.

2           Your family support is very

3           strong.  Subsequent prognosis

4           for successful community living

5           would be considered good,

6           providing that you remain

7           substance free and continue to

8           have family support."

9    And he recommends that you got involved in AA or

10   NA.  Says you are on the waiting list?

11        **INMATE CASTILLO:**  Yes.

12        **DEPUTY COMMISSIONER BENTLEY:**  And there's

13   no need for mental health services.  So overall

14   it was a pretty positive report.  So with that I

15   will return to the Chair.

16        **PRESIDING COMMISSIONER SAWYER:**  Thank

17   you.  Ms. Buchalter, do you have any questions

18   of the inmate?

19        **ATTORNEY BUCHALTER:**  Is the Board going

20   to ask anymore questions or are you --

21        **DEPUTY COMMISSIONER BENTLEY:**  I had a

22   question.

23        **PRESIDING COMMISSIONER SAWYER:**  I'm

24   sorry.

25        **DEPUTY COMMISSIONER BENTLEY:**  That's all

26   right.

27        **PRESIDING COMMISSIONER SAWYER:**  You gave

1  it back to me and then --

2      DEPUTY COMMISSIONER BENTLEY:  I wanted to

3  be kind of quick because I was going to get back

4  into the -- it's just a little brief question.

5  I noticed in the probation officer's report you

6  said you expected to only get a two-year term

7  for all these crimes.

8      INMATE CASTILLO:  I don't understand.

9      DEPUTY COMMISSIONER BENTLEY:  This is a

10  quote.  When the probation officer interviewed

11  you in the -- before you were sentenced and you

12  said you didn't want to talk to him because you

13  were all confused because you said, I was told I

14  would only have to serve two years.

15      INMATE CASTILLO:  I don't recall that.

16      DEPUTY COMMISSIONER BENTLEY:  Okay.  All

17  right.  Okay.  That's it.

18      PRESIDING COMMISSIONER SAWYER:  Okay.  Do

19  you have any questions?

20      ATTORNEY BUCHALTER:  I do.

21      PRESIDING COMMISSIONER SAWYER:  Okay.

22      ATTORNEY BUCHALTER:  I would like to

23  comment on the probation officer's report.  I

24  used to be in court a lot with cases and the

25  probation officer's report are often not

26  accurate.  So that's a possible misstatement

27  because he has no recollection of that.  I do

74

1   have questions.  You also have a graduate degree

2   of theology from the Gulf Coast Bible Institute.

3   Correct?

4        INMATE CASTILLO:  Yes.

5        ATTORNEY BUCHALTER:  And you studied for

6   that for a few years?

7        INMATE CASTILLO:  Yes, ma'am.

8        ATTORNEY BUCHALTER:  Yes?  And you have

9   taken 12-step programs and you study on your

10  own.  Correct?

11       INMATE CASTILLO:  Yes, ma'am.

12       ATTORNEY BUCHALTER:  Correct?  12 steps.

13  Has anyone ever mentioned to you that -- this is

14  a rhetorical question -- 12 steps you must know

15  them in order to be released?  Has anyone ever

16  told you that?

17       INMATE CASTILLO:  No, ma'am.

18       ATTORNEY BUCHALTER:  You also have taken

19  substance abuse recovery?

20       INMATE CASTILLO:  Yes, ma'am.

21       ATTORNEY BUCHALTER:  Right?  And as far

22  as the charitable work that you do, I notice

23  that in the news article that talked about you

24  and some other companions of yours here gave

25  financial scholarships to some of the youth.

26       INMATE CASTILLO:  Yes, ma'am.

27       ATTORNEY BUCHALTER:  Was that funds that

1    you had raised?

2         INMATE CASTILLO:  Yes, ma'am.

3         ATTORNEY BUCHALTER:  So you're interested

4    in charitable work?

5         INMATE CASTILLO:  Yes, ma'am.

6         ATTORNEY BUCHALTER:  And a part of your

7    giving back --

8         INMATE CASTILLO:  Yes, ma'am.

9         ATTORNEY BUCHALTER:  -- to what you took

10   away.  The cocaine.  Was that a heavy addiction

11   or was that an experimental episode in your

12   life?  Which was it?  The cocaine?

13        INMATE CASTILLO:  The cocaine was

14   experimental, but I did it.

15        ATTORNEY BUCHALTER:  And you took it for

16   how much of your life, do you think?

17        INMATE CASTILLO:  To the best I can

18   remember, it was only a few months.

19        ATTORNEY BUCHALTER:  A few months?

20        INMATE CASTILLO:  It was only few months,

21   yeah.

22        ATTORNEY BUCHALTER:  And you experimented

23   with it during that two months?

24        INMATE CASTILLO:  Yes.

25        ATTORNEY BUCHALTER:  You snorted it?

26        INMATE CASTILLO:  Yeah.  I did inject it

27   though --

)

1          **ATTORNEY BUCHALTER:**  A couple of times

2   you testified to.  Correct?

3          **INMATE CASTILLO:**  Yes.

4          **ATTORNEY BUCHALTER:**  And you didn't like

5   alcohol, did you?

6          **INMATE CASTILLO:**  No, ma'am.

7          **ATTORNEY BUCHALTER:**  Although you had

8   pruno, 115, twice for pruno.

9          **INMATE CASTILLO:**  Yeah.  I used to make

10  it for --

11         **ATTORNEY BUCHALTER:**  For others?

12         **INMATE CASTILLO:**  For others, yes, ma'am.

)

13         **ATTORNEY BUCHALTER!**  All right.  But you

14  told me and tell the Commissioners if you can

15  that you did not like alcohol and --

16         **INMATE CASTILLO:**  No, ma'am.  I had a bad

17  accident in Folsom in 1983 with alcohol.  I

18  almost lost my eyesight to drinking and I never

19  touched it again.  I did make it.

20         **ATTORNEY BUCHALTER:**  That's why you got

21  the pruno write-ups?

22         **INMATE CASTILLO:**  Yes, ma'am.

23         **ATTORNEY BUCHALTER:**  All right.  But you

24  do study the 12 steps on your own.  Correct?

25         **INMATE CASTILLO:**  Yes, ma'am.

26         **ATTORNEY BUCHALTER:**  And you have taken

27  substance abuse recovery?

)

1          **INMATE CASTILLO:**  Yes, ma'am.

2          **ATTORNEY BUCHALTER:**  And you do discuss

3    these things with the youngsters who come to

4    prison in order to help divert them to the right

5    path.

6          **INMATE CASTILLO:**  Yes.

7          **ATTORNEY BUCHALTER:**  And you are on the

8    waiting list to get in.

9          **INMATE CASTILLO:**  Yes.

10          **ATTORNEY BUCHALTER:**  I think that's all I

11    have, Commissioner.

12          **PRESIDING COMMISSIONER SAWYER:**  Okay.

13    Thank you.  Would you like to close?

14          **ATTORNEY BUCHALTER:**  I would.  Thank you.

15    There's a lot I want to talk about today on

16    behalf of Mr. Castillo.  First of all, President

17    Bush early this year publicly stated that we are

18    a nation of second chances and that is why we

19    have a parole system.  Governor Schwarzenegger

20    also stated publicly that he is joining our

21    political leaders by insisting his word that

22    California make rehabilitation a focus of prison

23    life.  This new focus and importance is made

24    clear by the change of the name of our penal

25    system to include the word "rehabilitation."

26    The punishment aspect of incarceration that

27    society demands is met when the minimum eligible

78

1  parole date occurs.  That amount of time is the

2  punishment to society through its court's

3  demands and in this, that extraction of

4  incarceration time ends next month.  This

5  expectation of going home on parole when

6  rehabilitated pursuant to a court sentence is

7  now the focus and will help the taxpayers reduce

8  the huge financial burden that they have to keep

9  rehabilitated persons locked up.  My remarks

10  will be directed to the information that

11  evidences Mr. Castillo's complete

12  rehabilitation.  This is an initial hearing.

13  And it is not a practice hearing.  It's not a

14  trial run for release into a future release.  It

15  is an actual hearing with all the same weight

16  and evidence and importance that we bring to any

17  hearing, any subsequent hearing.  It's the same

18  weight that should be given.  If he's suitable

19  he should be given a grant of parole on his

20  initial hearing.  The district attorney's letter

21  opposes the parole and obviously a great deal of

22  his letter, most of his letter talked about the

23  facts of the offense.  And he also disagreed

24  with the current psych report which had a

25  favorable summation for my client, but he says

26  that you should be using one that's more

27  unfavorable but dated back 13 years ago.  So I'm

)

1    going to ask you to keep that in the proper

2    context.  His assessment was that clearly the

3    inmate is a vicious, dangerous, and determined

4    criminal.  He used the word "is."  I would like

5    to change that to the word "was."  Who he is

6    today is not that person as described by the

7    district attorney.  His opposition in and of

8    itself does not make Mr. Castillo an

9    unreasonable risk of harm to others.  It's just

10    in opposition to his parole.  And so he also

11    talked about that they believe the inmate's

12    appropriate time to serve is his entire life.  I

13    used the word "entire," but he felt that he was

14    given a life sentence and that's what he should

15    serve.  The district attorney has asked you

16    then, therefore, to please change his court-

17    mandated sentence of life with possibility of

18    parole to one without the possibility of parole,

19    and I believe that that kind of a statement is

20    asking you to do something that was not

21    expected, and so I would ask you to ignore that

22    because that would convert his life sentence.

23    So I believe that query or that request of you

24    is unusual and certainly unfortunate.  As far as

25    his priors go, we talked about the juvenile

26    history that he had.  There was a open beer

27    container, for one thing.  But his

1   rehabilitation that we are here about today is

2   not just from the life offense itself.  It's

3   also from all that went prior to the life

4   offense and I will get into that in a moment.

5   But even through all his juvenile history he hit

6   a bumpy road after certainly a very wonderful

7   upbringing with a large, loving living family.

8   Obviously, and he got into big trouble, and I

9   want to talk about the rehabilitation of not

10  just from the life offense but all that went

11  before it.  The vocational education that he's

12  had has been tremendous.  The auto body and

13  fender skills that he has, he's done a great

14  deal of that.  He's also done business

15  management, basic camera operations, process ink

16  and color mixing, art, and copy preparation,

17  press, printing, hand printing.  Therefore, he

18  also has silk screening capability which is a

19  marketable skill, also along with his auto body

20  and fender mechanical skills.  He's educated in

21  terms of getting his GED in prison, which he had

22  abandoned his high school on the outside and

23  thus we're here today.  The support summary

24  is -- these offers he has in Mexicali, he's

25  prepared to return there.  He's got two

26  residences offered and three job offers there.

27  He can live with his father.  They own property

1    there, I believe.  These offers of financial

2    support from the victim's family members,

3    whether he lives in Mexicali or California,

4    Theresa, Christina, and Claudia have all offered

5    all financial assistance for him in terms of his

6    transition.  He's also in California, he's also

7    got parole plans, three residences, a job offer.

8    He's got the marketable skills that he can take

9    here or there.  And the victim's family is very

10   supportive of him.  The victim's family, the one

11   who's dead, this family is here because they are

12   also the family of my client.  The father of the

13   victim is supportive of his release.  The son of

14   the victim wants him to come home.  Three

15   sisters, one brother, a niece, and a nephew all

16   have asked you to release him back into the

17   community.  The counselor writes also that his

18   parole plans are supported by the letters of

19   support.  So I would ask that you do, in fact,

20   and also there's being an savings account set up

21   for him, plus he had $200 of his own that he has

22   talked about, so I would ask that his parole

23   plans be given absolutely a plus.  I suggest

24   there is no issue with his parole plan, either

25   in Mexico or in the United States, because even

26   if the residence of a county is not available to

27   him for some reason, I didn't notice that, they

1   are providing all financial assistance that he

2   needs to transist wherever the parole department

3   would decide to send him.  As far as the help

4   self-help and therapy, he's now a very deeply

5   religious person as he's articulated to you

6   today.  He's got the graduate degree of theology

7   and hopes to become a minister, I suppose, on

8   Sundays.  Whenever he's out and available to do

9   that, he wants to do that.  He wants to continue

10  in his work assisting others.  You've already

11  articulated, I won't repeat the self-help

12  programs that he's done.  He's done 12 steps.

13  He's done substance abuse.  Obviously AA and NA

14  are faith-based programs, and I don't believe

15  that government is allowed --

16      **DEPUTY COMMISSIONER BENTLEY:**  Okay.  This

17  is tape number two in the initial parole

18  consideration hearing for Luis Castillo, CDC No.

19  C-73437.

20      **ATTORNEY BUCHALTER:**  Regarding substance

21  abuse and regarding taking care of that issue

22  and that problem, if it were a problem, NA and

23  AA are faith-based programs, and I don't believe

24  the government is allowed to order anyone into

25  these kinds of programs that have a faith-based

26  ideology.  As a matter of fact, be that as it

27  may, he does work on the 12 steps by himself,

)

1    knowing the 12 steps.  He said I don't really
2    know them, but obviously he practices them
3    because he is a sober person.  And it's not a
4    requirement for his release that he must be able
5    to quote to this Panel any of the 12 steps.
6    That's not a requirement.  He's had a substance
7    abuse recovery and you've already articulated
8    into the record some of the other programs that
9    he's had that also deal with substance abuse.
10   And his substance abuse is not as severe as some
11   that I've seen, of course.  He does experiment
12   with cocaine on the outside, and alcohol was
13   just not his choice of intoxicant at that time
14   or now, certainly.  He has no choice of
15   substance now.  Charitable work, he's already
16   described that he wants now to devote his life
17   to giving back by helping his father, for
18   example, giving back to his family, and giving
19   back to society for so much that he took away.
20   He took away a great deal from his family and
21   from society and certainly terrified a whole lot
22   of people.  There's no question about that.
23   He's rehabilitated from that.  That's a static
24   factor, Commissioners.  That will never change.
25   So I believe that his substance abuse recovery
26   is sufficient because he's spent 18 years free
27   from any kind of pruno.  He also talks about the

1    pruno he was making for somebody else and not

2    himself.  So his substance abuse, if there was

3    an addiction of any sort or if he was on the

4    road to an addiction, it's over.  It's gone.  As

5    far as the 128s, they are prohibited by law to

6    be used as unsuitability factors.  According to

7    the in re Smith case, they are insufficient to

8    rise to a level to say that he's unsuitable for

9    parole and therefore an unreasonable risk of

10   harm and should be kept in longer for

11   observation and treatment.  The 115s that he has

12   had were severe and it was a bumpy start.

13   There's no question about it. . And it was very

14   well examined today in this hearing, but that

15   was 18 years ago.  He did have a lot of 115s.

16   He's turned his life around in that, so, yes,

17   perhaps his, the last one was 18 years ago, so

18   for 18 years ago he did turn his life around

19   and, yes, those 115s can be added onto his

20   sentence when the matrix is done, but his

21   suitability factors is what we're looking at

22   here today, because all the years he's had can

23   also be deducted for months I believe, of every

24   year that he's been free so there is a

25   calculation to be done that would change that

26   next week.  But his assault is what we're about

27   here about, so 18 years of being free from the

1    115s that he had certainly speaks volumes about
2    who he is today.  We certainly know who he was
3    yesterday.  We're now talking about who he is
4    today.  So it's too far back to be used as an
5    unsuitability.  18 years is a long time.  So
6    what it's going to be used again, what is the
7    arbitrary number then that he should be
8    continued to be observed?  20 years good enough?
9    Or is it 40 years?  Is it a lifetime, as the
10   district attorney would have you do?  Or is 18
11   years sufficient to say obviously he's taken
12   care of this particular problem and he's not
13   going to do anymore 115s.  I think he's
14   exhibited that here today before you in not only
15   his performance, his lack of disciplinaries for
16   18 years, but the things he said and the way
17   he's answered and his commitment to who he is,
18   commitment to being sober, commitment to helping
19   others, commitment to try to be a good family
20   person.  So I would ask you to not keep him in
21   for a lengthy stay and observation for a 115s
22   that happened 18 years ago.  Obviously he wasn't
23   eligible or he wasn't eligible nor suitable 18
24   years ago.  But today he's a different story.
25   The life offense itself, he's spent over 22
26   years now, 23 years or so incarcerated.  He
27   certainly paid his debt to society for what

)

)

1  happened.  It was a felony murder.  He wasn't

2  the one who did the killing.  He's not a killer

3  per se, and I would also like to talk about the

4  fact that -- well, he didn't kill someone and

5  the victim, of course, the older brother, was

6  equally culpable in this tragic case because the

7  two of them were doing the same crime at the

8  same time.  They were committing robberies that

9  credited this death of an unfortunate young

10  person.  He was young.  He was age 19 at the

11  time and therefore this maturation of course is

12  a factor of suitability that should be

13  considered in giving great weight.  The plea

14  bargain that I read was certainly not a plea

15  bargain.  My client took full responsibility.

16  He admitted to absolutely everything, in the

17  most extreme.  That the district attorney put

18  down, yes, I did this.  Yes, I did that.  It's a

19  long and lengthy history.  So that plea bargain

20  was not a plea bargain.  What it was my client

21  taking responsibility for absolutely everything

22  the district attorney said this is what you did.

23  And he said, yes, I admit and I accept

24  responsibility and I will pay my price and he

25  has paid that price.  The psychological report,

26  which is important because we pay these mental

27  evaluators a lot of money to assess these

)

1   people.  They are qualified physicians.  In

2   terms of psychologists and psychiatrics, they

3   bring to you a guide, an assessment of them,

4   which I think should be given great weight.

5   Certainly a current report should be given more

6   weight than a 1992 assessment which doesn't have

7   the benefit of these 13 years of behavior and

8   change of mind or heart or attitude that my

9   client has, so this is the important report.  As

10  Dr. Magner, M-A-G-N-E-R, has written that his

11  violence potential for violence would be about

12  average for a 43-year-old man if no relapse into

13  substance abuse and keeps family support.

14  Obviously he's going to keep his family support,

15  and it's obvious that he won't be engaging in

16  substance abuse.  The doctor continues to state

17  that quote, "His prognosis for successful

18  community living would be considered good with

19  abstinence and continual family support that he

20  has."  That answers the question, does he pose

21  an unreasonable risk of harm to others?  The

22  professional mental health evaluator has said

23  no, he's not an unreasonable risk of harm so

24  it's a pro-parole release report and assessment

25  for him.  So even in 1992 though, the doctor

26  talked about his maturation and that his impulse

27  control was significantly better than the

1    average for this population also.  Also, doctor

2    Magner this year acknowledges that Mr. Castillo

3    demonstrates empathy and remorse.  Empathy of

4    course means he can put himself into the shoes

5    of the victims and understand what they felt and

6    the pain and fear and fright of those who

7    survived, who weren't harmed.  So that of course

8    means my client has made a tremendous

9    transformation in his character, and I have

10   spoken before that he has taken full

11   responsibility for everything that he has done

12   in the past.  The denial is not deserved today,

13   especially a multi-year denial.  It's just not

14   justified because there is no evidence of

15   unsuitability because the crimes that brought

16   him here today and the crimes before it are

17   static and can never be changed.  I also want to

18   just close with this.  I happen to have the Los

19   Angeles District Attorney Lifer Hearing manual

20   portion regarding victims' statements.  And it

21   does state, quote, "The victim's immediate

22   family have the right to appear and so express

23   their abuse concerning crime and the person

24   responsible."  This manual, a training manual,

25   further states in urging appearances from

26   victims, quote, "Consideration should be given

27   to having the victim or a member of the victim's

1   family at a murder case present at the hearing.

2   Such testimony at a hearing is extremely

3   influential on the Board members to convince

4   them to render a finding of unsuitability," end

5   quote. Since in this case the family members

6   are here to urge the Board to render the

7   opposite finding, meaning a grant of parole,

8   then should not the same be true? In other

9   words, shouldn't the victim's next of kin

10   support for release statement be also, quote,

11   "extremely influential on the Board," end quote,

12   to grant parole. I request that this be the

13   case with the statements of the father and the

14   sister of the victim, that their positive

15   statements be given the same extremely

16   influential weight as any negative statements

17   would have done, according to the district

18   attorney and according to my personal experience

19   with hearings such as this one. It would be in

20   my opinion unethical to give great weight to

21   opposition from victim's next of kin, our

22   victim, and not the same to victim's next of kin

23   who are very supportive of his release. They

24   would like to have him home. I can't see

25   anything that would tell you that he's an

26   unreasonable risk of harm or a danger to society

27   in any context whatsoever. I would submit,

1   Commissioners, and you for a grant of parole

2   today.

3          **PRESIDING COMMISSIONER SAWYER:**   Thank

4   you.  Mr. Castillo, this is your opportunity to

5   tell us why you feel you are suitable for parole

6   at this time.

7          **INMATE CASTILLO:**   Like I said it before,

8   back when this happened, I was a selfish person.

9   I only thought about myself, about all the drugs

10  that I experimented with and stuff and getting

11  money, and I realized that there are a lot of

12  people that I hurt and how much my sister-in-law

13  misses her husband and my nephew misses his

14  father.  I can be here today.  He can't.  It was

15  wrong.  (Indiscernible) money and jewelry.  Ever

16  since I came into the (indiscernible) reading

17  the bible has taught me that you've got to be

18  true to (indiscernible) and heart.  True

19  repentancy is in your heart because if it isn't

20  found in (indiscernible) the heart, you will go

21  back to doing the same thing.  And I admit that

22  (indiscernible) Christian life, take that

23  (indiscernible) in my heart.  And I'm not guilty

24  going to let my brother's death (indiscernible)

25  another death.  It meant something to me.  It

26  was my brother.  And I'm going to do it for the

27  Lord and I'm going to do it for him.  I won't

91

1　fall back into the same life of crime.  I told

2　my sisters many times that I just want another

3　chance to be out there with my father and take

4　care of him, my daughter and my grand kids and

5　give back to the community, to speak on the

6　things that other people kind of sweep under the

7　rug.  I seen people that go wrong, we can beat

8　it.  Say hey, you know, you got help.  We can

9　speak to (indiscernible) past in Mexicali.  I

10　would like to go back to Mexicali to help you

11　out on the weekends.  Take a job that this man

12　is offering me in Mexicali and fix cars.  And no

13　matter what he pays me, it's okay to me because

14　I work in here for pennies.  And here I really

15　learned the value of the things I took from

16　people and they work so hard for these things

17　and here I came along and took them.  Came along

18　and -- I don't know how I ever did things like

19　that.  I just pray that you guys will have mercy

20　and (indiscernible) and I pray that, you know,

21　the victims that I took things from, that the

22　officers that I (indiscernible) them to drink or

23　do drugs have killed somebody.  That the people

24　that were there that night, they (indiscernible)

25　drinking because (indiscernible) that.  Because

26　I know all that, they were hurt by my actions.

27　And like I said, I do take full responsibility

1   for what happened that night.  And I would like

2   to be (indiscernible) investigating officers

3   that interviewed me, tell them what happened.  I

4   just want to get this sentence and get on with

5   my sentence.  Come in prison and do what I do.

6   (Indiscernible) said, you know, why did you get

7   in these things?  I have no answer to it.  I can

8   say now that the bible's (indiscernible)

9   character and selfish and (indiscernible).

10          **PRESIDING COMMISSIONER SAWYER:**  Okay.

11  Thank you.  This is your opportunity to speak.

12  And who will be going first?  And I would like

13  you to identify yourself and your relationship

14  for the tape.  Are you going first?

15          **MS. BARRETT:**  My name is Christina

16  Barrett, and I'm the sister of Luis Castillo and

17  also the sister of Frank Castillo.  And

18  (indiscernible) paper.

19          **PRESIDING COMMISSIONER SAWYER:**  Okay.

20  Take a deep breath.

21          **MS. BARRETT:**  Okay.  In the event that

22  (indiscernible) loved one Luis in prison and

23  that our loved one, Frank, dead, has devastated

24  our entire family.  Our parents have lost two

25  sons and we want Luis back.  He has served many

26  years in prison and has paid a heavy price for

27  what happened.  The policeman in his line of

93

1   duty shot and killed my brother Frank.   Luis

2   took immediate responsibility and pled guilty to

3   his death and many other charges.   He could have

4   a trial but he was (indiscernible) for

5   everything that happened.   Luis is not a danger

6   to society in any way, and our family will be

7   there for him in every way possible, and we need

8   him home with us.   Hasn't he been punished

9   enough for his long years in prison?   Our family

10  has been impacted (indiscernible) and took Luis

11  in prison now that he is not a danger to

12  society.   Further punish not only Luis but all

13  of us as well.   We can't bring Frank back to our

14  family.   (Indiscernible) to have Luis back.

15  Please listen to what Luis and his attorney have

16  said and his excellent record that shows that he

17  will never commit harm again, and send him home

18  to us.   We love him dearly.   The past can never

19  be taken back to our future as the victim's next

20  of kin can have burden (indiscernible) by giving

21  Luis a parole date to come home.   Our father

22  especially (indiscernible) and he has

23  (indiscernible) remaining years.   I don't know

24  if you can find that Luis is still a danger to

25  anyone.   If you do this, the impact on our

26  family will be to continue a great and

27  (indiscernible).   Please give Luis a chance of

1   parole so our family will be complete together.

2   And also on behalf of his daughter who

3   (indiscernible) pleads to give his dad back to

4   him so he can know her father, and so her

5   children could also know their grandfather.  And

6   we are all willing to help with money and

7   anything he needs.  We will be there for him,

8   because we are a close family.  And we will be

9   praying together that he did his time.  It's

10  time for him to come home.  Thank you.

11       **PRESIDING COMMISSIONER SAWYER:**  Thank

12  you.  Mr. Castillo?  Stand.

13       **MR. CASTILLO THROUGH THE INTERPRETER:**

14  (Indiscernible) for my son.  I wish that we were

15  (indiscernible).  For all the years

16  (indiscernible).  I've lost two sons.  One that

17  died and the one that's in prison.  We wish for

18  his freedom.  If the last few years I have, I

19  would like to spend with him.  (Indiscernible)

20  have him.  Because all the years he's been in

21  prison, I've seen in him new changes.  And I

22  will take care of him.  I live alone and I wish

23  to live with him in these last few years I have

24  left.

25  //

26  //

27  //

1   night, go to the grocery store, go to Ralph's,

2   go to the drugstore to buy medication -- you

3   have to peek inside to see if it wasn't being

4   robbed -- go to the restaurant or the bar and

5   have dinner, having to look behind you all the

6   time to make sure that nobody's -- these guys

7   aren't coming out with guns.  I mean, it must

8   have been a terrible time for a lot of people.

9   Not just the victims, not just the immediate

10  victims that saw the barrels of those guns and

11  heard the order for their money and their

12  property, and in fear of their life.  The

13  policemen who risked their lives, chasing you

14  and your crime partners with bullets.  You just

15  never know.  Bullets don't have any conscience

16  and they go wherever they are pointed and then

17  sometimes they deflect and they go places they

18  are not pointed.  It's amazing that many people

19  didn't get hurt in this.  Unfortunately, you

20  lost your brother and he was certainly culpable

21  for part of this.  There's no question about it.

22  He was your crime partner, but you had, as I

23  read in the aggravating factors, you could have

24  ceased at any time.  You could have called the

25  police on him, you know.  There's a lot of

26  things that -- and hindsight is wonderful, isn't

27  **LUIS CASTILLO C-73437 DECISION PAGE 2 11/17/05**

1 it? But on January 10th, 1982, and this is the

2 commitment factor, the one at Rusty's Hacienda

3 Restaurant, it just went -- it just got out of

4 control real quick. You did, sir, minimize the

5 fact initially. And I want to make it clear. I

6 hope it cleared it up when you said you weren't

7 trying to hurt any of the policemen, but then I

8 pointed to you, sir, you kicked a policeman when

9 he was on the floor with a shotgun in his back.

10 That's hurting somebody. Okay. And you tried

11 to minimize the fact that you were just shooting

12 in the air. But then I remembered there was a

13 helicopter at the scene as well. And then

14 shooting at a helicopter, sir, can kill and hurt

15 lots of people. That's a very dangerous thing

16 to do. Quite frankly, my fellow Commissioner

17 and I feel you are very lucky to be here today

18 for a lot of reasons, sir. To even have the

19 opportunity to have a hearing because of crimes

20 that you have committed. Well, and on the

21 street and in prison, the crimes were calculated

22 and dispassionate. It was exceptional callous

23 disregard for human suffering. Sometimes we

24 have a tendency to overuse those words, those

25 legal terms, but in this -- it fits this crime

26 to a T. It was calculated. You went up on

27 **LUIS CASTILLO C-73437 DECISION PAGE 3 11/17/05**

1   didn't go blind when you drank that pruno.   I

2   can understand how a bad experience like that

3   would wake you up.   But there's two areas in

4   your self-help programs that you are -- that you

5   are to be commended for.   One is the 2/6 of '04,

6   the Gulf Coast Bible degree of graduate

7   theology.   Does that make you a minister?

8        **INMATE CASTILLO:**   Yeah, I do minister on

9   the yard.

10       **PRESIDING COMMISSIONER SAWYER:**   Okay.   I

11  mean officially.   Does that give you -- can you

12  start your own church?

13       **INMATE CASTILLO:**   Yes.

14       **PRESIDING COMMISSIONER SAWYER:**   And get a

15  nonprofit status?

16       **INMATE CASTILLO:**   Yes.

17       **PRESIDING COMMISSIONER SAWYER:**   Okay.   I

18  wasn't familiar with the South (sic) Coast Bible

19  degree.   And the other is your Straight Life

20  Youth Diversion Program as a volunteer and you

21  and your guys -- there he goes again,

22  Commissioner.   He's got twice the smile.   Got

23  twice the smile with his eyes sparkling.   You

24  obviously enjoy that and when you enjoy

25  something, it makes -- it makes your life good

26  and their life good.   It's a win-win, isn't it?

27  **LUIS CASTILLO C-73437 DECISION PAGE 7 11/17/05**

)

1   And we hope that you can salvage some of these

2   kids to keep them from replacing you when you

3   leave here.  Your psychiatric report, and it's a

4   very fresh psychiatric report, and I'm going to

5   read the assessment of dangerousness.  Inmate

6   has demonstrated a good disciplinary history for

7   the past 17 years.  Psych report was done on

8   11/21/04, so it's about almost a year old by Dr.

9   Magner, M-A-G-N-E-R.  There were two violent

10   offenses noted.  One in '85 and one in '87,

11   (indiscernible) stabbing.  In '85 inmate notes

12   that "he wanted me to hurt this guy."  Inmate

)   13   relates that he made an attempt but it's not

14   known how badly he actually hurt him.  You were

15   involved in a fistfight in 1987.  He also had

16   one in '86, violent offense, assault.

17         "Given the above history, the

18         fact that the inmate has

19         remained disciplinary free for

20         such an extended period of time,

21         it's likely that potential for

22         violence would be somewhat less

23         than the average level four

24         inmate, if released to a free

25         community.  It's felt that his

26         potential for violence would be

27   **LUIS CASTILLO C-73437 DECISION PAGE 8 11/17/05**

)

1           about average for a 43-year-old
2           male.  Certainly precursors of
3           that would be relapse into
4           substance abuse."
5   We all worry about that, stresses out in the
6   community.  But you've got some certainly
7   mitigating factors for that.
8           "Other potential factor would be
9           a loss of family support.  And
10          that doesn't appear to be a
11          problem at this point.  The
12          inmate's release plans appear
)   13          feasible.  His family support is
14          very strong, as described by the
15          inmate.  Subsequently, prognosis
16          for successful community living
17          would be considered good,
18          provided the inmate remain
19          substance free and continue to
20          have family support."
21  Those are your two strengths.  Those are your
22  two rocks.  Okay.  Substance free, family
23  support.  That's why it's important no matter
24  what you do in your self-help in the next two
25  years, so important that you show the next Panel
26  that you have a strong, substance-free support,
27  **LUIS CASTILLO C-73437 DECISION PAGE 9 11/17/05**

1    and you understand yourself and you understand

2    what lifelines may be out there in the community

3    for you as well, okay, in Mexicali, because more

4    than likely that's where you are going to end

5    up.  And I appreciated your comment in your

6    closing remarks that you felt that that might be

7    the best place for you and what you're doing, I

8    think, is two things.  One is you've probably

9    made a fair assessment of that and the second is

10   that's the reality.  Okay.  Suggest that the

11   inmate attend AA, NA.  That's coming from your

12   psychologist.  "He's reported to be on a waiting

13   list for these services.  No recommendations

14   made for any mental health services at this

15   time."  I think we are all on the same page,

16   quite frankly.  Parole plans, I agree with your

17   counsel.  Parole to Mexicali is the viable

18   choice with your father.  You've got a job offer

19   down there.  You've got a place to stay.  If you

20   wanted to, you could expand those in case that

21   job offer fell through for some reason or

22   another: You weren't making enough money, you

23   had an argument with Mr. Nunez.  I mean, there's

24   a lot of things that could happen.  If you want

25   to make God laugh, tell him what you are doing

26   tomorrow.  Right?  Okay.  So you do have a

27   **LUIS CASTILLO C-73437 DECISION PAGE 10 11/17/05**

)

1    marketable skill, sir, and you do have a

2    wonderful, supportive family.  And for them to

3    come here, and this is hard for them.  Very hard

4    for them to see you here and to have to -- it's

5    very emotional for them.  We understand that.

6    We do have a negative response from the district

7    attorney in the form of a letter opposing any

8    parole for you.  And he primarily based that on

9    the life crime, the commitment offense, and your

10   history.  All these factors I discussed here are

11   positive aspects, but it doesn't outweigh the

12   factors of unsuitable at this time.  And as I

)

13   said before, two years.  In a second finding, in

14   a separate decision, find that the -- even

15   though we're years away from the 115s, an

16   assaultive behavior, sir, we have to pay

17   attention to assaultive behavior, the substance

18   abuse involved, even though you said you were

19   doing pruno for other people, but still that

20   weighs heavily.  The weapons that you had, even

21   though you said that the razor blades were for

22   your sewing, they are still weapons and

23   violations of the prison rules.  And we look at

24   history to determine the future.  And even

25   though you separated yourself from those and

26   commendably, we still -- they still are there.

27   **LUIS CASTILLO C-73437 DECISION PAGE 11 11/17/05**

1   So when we take the scale and we pile all the

2   bad stuff on one side and all the good stuff on

3   the other, you're coming out almost even.  And

4   two-year denial on initial hearing usually, sir,

5   especially with a crime like this, is a pat on

6   the back to you, and we felt very strongly that

7   we didn't want to discourage you.  We didn't

8   want to give you a date, but we didn't want to

9   discourage you either and we want to give you

10  two years to strengthen your package.

11  Commissioner, do you have anything you would

12  like to say?

13          **DEPUTY COMMISSIONER BENTLEY:**  I just want

14  to point out we could have denied you for parole

15  up to five years, but we chose to let you know

16  that we feel that you are on the right track.

17          **INMATE CASTILLO:**  Thank you.

18          **DEPUTY COMMISSIONER BENTLEY:**  Okay.

19          **PRESIDING COMMISSIONER SAWYER:**  And

20  again, I thanked your father and your sister for

21  coming in, but you being here has a significant

22  effect because you're proving -- and we're not

23  just reading a letter -- we're seeing people

24  that are sincere in supporting their brother and

25  their son.  And we do appreciate you coming

26  here, and it's very valuable.  It's very **LUIS**

27  **LUIS CASTILLO C-73437 DECISION PAGE 12 11/17/05**

1  valuable and so you've done a very good thing

2  today.  No more 115s, 128s.  Work to reduce your

3  custody level.  Continue to do your self-help.

4  Stay discipline free.  Earn the positive

5  chronos, as you've been doing, and talk hard to

6  those kids.  Okay?  The time is 11:25.  That

7  concludes this hearing.  Good luck to you, sir.

8                          --o0o--

9

10

11

12

13

14

15

16

17

18

19

20

21

22                                              MAR 1 7 2006

23  **PAROLE DENIED TWO YEARS**

24  **THIS DECISION WILL BE FINAL ON:** _____

25  **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26  **DATE, THE DECISION IS MODIFIED.**

27  **LUIS CASTILLO C-73437 DECISION PAGE 13 11/17/05**

CERTIFICATE AND
DECLARATION OF TRANSCRIBER


I, KATHRYN KENYON, a duly designated

transcriber, PETERS SHORTHAND REPORTING, do hereby

declare and certify under penalty of perjury that I

have transcribed tape(s) which total two in number and

cover a total of pages numbered 1 - 108, and which

recording was duly recorded at CALIPATRIA STATE

PRISON, CALIPATRIA, CALIFORNIA, in the matter of the

INITIAL PAROLE CONSIDERATION HEARING OF LUIS CASTILLO,

CDC NO. C-73437, ON NOVEMBER 17, 2005, and that the

foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tape to

the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated December 11, 2005, at Sacramento,

California.


KATHRYN KENYON
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

# EXHIBITS B

(MENTAL HEALTH EVALUATION, 2004)

INMATE COPY

## MENTAL HEALTH EVALUATION
## BOARD OF PRISON TERMS

**NAME:**    **CASTILLO, LUIS**         CDC#:  C73437

**D.O.B.**    **07/19/1961**          **HOUSING:**  D4-246U

**DATE:**    **October 21, 2004**       **LOCATION:**  CAL

### PSYCHOSOCIAL ASSESSMENT

**I.  IDENTIFYING INFORMATION:**  The inmate is a forty-three year old Hispanic male who is interviewed this afternoon in the D-Facility Medical Clinic.  This evaluation included an interview with the inmate, review of the Central File and the Unit Health Record.  The inmate's marital status is single.  His religion is Christian.  No aliases.  No unusual physical characteristics.  The inmate reports tattoos on his chest and back and a Walt Disney character on his knee.

**II.  DEVELOPMENTAL HISTORY:**  The inmate was born in Mexicali, Mexico. As far as the inmate is aware, there were no prenatal concerns or birth defects. The usual developmental milestones were attained in a timely fashion.  In terms of socialization skills, the inmate notes that he played with a number of youngsters in the neighborhood. He would be involved in playing marbles, soccer kickball, baseball and some football.  The inmate notes that he played Pop Warner football for one year.  He relates that he had some very close friends growing up. Mr. Castillo denies history of cruelty to animals, enuresis and arson. There is no significant childhood medical history.  The inmate denies being a victim or a perpetrator of physical or sexual abuse.

**III.  EDUCATION:**  The inmate attended school through the eleventh grade. He left school because he, "went off to work." He is noted to have attained his GED on 05/13/02.  His T.A.B.E. measured a grade level on 05/02/2001 shows reading 9.4, math 7.1, language 10.6, total 9.1.  There is no history of special

SENT INMATE COPY _11 19 104_

INMATE COPY

education, academic or behavioral problems. The inmate has studied through a Christian Bible College. He would like to pursue a B.A. in theology.

**VI.    FAMILY HISTORY:**  The inmate's mother is deceased approximately two years ago due to cardiac problems. His father is seventy-seven. His father has no mental, or substance abuse problems. However, the inmate relates that his father underwent open heart surgery about a year and a half ago. His father graduated from high school, and currently does some work for his pastor, in the form of carpentry, odd jobs, etc. The inmate's father has no legal or criminal background.

The inmate has two brothers and three sisters. None of his siblings have any mental, medical or substance abuse problems. There is no history of any sibling with legal or criminal problems, as well, with the exception of Art, who is incarcerated for illegal entry into the United States. His oldest sister, Christina, is age fifty. She attended some college and works in a bank. Mark is age forty-six, and attended school until the tenth grade. He had been employed previously in auto body. His sister Terri is age forty-one is a high school graduate. She also works for a bank. John is thirty-nine years old and attended school until the eleventh grade. He is employed as a gardener. Claudia is thirty-five years old and is a high school graduate. Claudia owns her own diner. She also seems to sell some movies, as well.

The inmate notes that he has a great relationship with his family. This has been more so over the past ten years, since his family has been able to visit. His relationship has been very close both historically and currently. He notes that his family visits approximately once a month.

**V.    PSYCHOSEXUAL DEVELOPMENT & SEXUAL ORIENTATION:**  The inmate reached puberty at about age thirteen. He has no current relationship. Sexual orientation is heterosexual.   The inmate denies any disorders or dysfunction which are either ego syntonic or dystonic.  The inmate further denies high risk behavior, sexual aggression and fantasy.

**VI.    MARITAL HISTORY:**  The inmate has never been married. He does have one daughter who is twenty-four years old. He describes this as a very good relationship over the last six years. The inmate notes that when his daughter was younger, her mother kept her away from him.

INMATE COPY  11 9 104     INMATE COPY

INMATE COPY

VII.    **MILITARY HISTORY:**  Mr. Castillo has no history of military service.

VIII.    **EMPLOYMENT / INCOME HISTORY:**    The inmate notes that he has been working around auto body from age twelve.  He did have a job as a gardener for the school board for about one year in 1980.  His reason for termination was that he had failed the written test twice, which he attributed to his lack of formal education.  In terms of work skills, he describes auto body, gardening, carpentry and landscaping.  Mr. Castillo has never been involved in any government programs or on public assistance.  He has no money management skills.  His aptitudes would include carpentry.  In terms of other interests, he would like to learn more about the food industry, especially learn how to cook.  In terms of substance abuse history, the inmate notes "I am in prison because of cocaine."  The inmate is noted to have a number of laudatory chronos.

IX.  **SUBSTANCE ABUSE HISTORY:**  He denies any other substance abuse history.  The inmate has participated in the Life Skill program.  He reports that he has never used an illegal substance while incarcerated.  He relates that he last used alcohol in 1984.  The inmate does not feel he has any current problems in this area.

X.  **PSYCHIATRIC / MEDICAL HISTORY:**   The inmate denies history of major illness or hospitalizations.    There is no history of any significant injury or accident.  History of suicidal/homicidal or assaultive behavior is denied, with the exception of the instant offense noted.  History is negative for seizure disorder or other neurological conditions.  There are no disabilities, impairments or illnesses present.  The inmate is currently noted to be taking Lipitor 10mg for cholesterol. He is taking Lopressor 25mg bid for his blood pressure.

XI.    **PLANS IF RELEASED:**    The inmate actually has two potential plans should he be granted release.  This is due to the fact that he is on INS hold, and his status is unclear.  If the inmate is deported, he would plan to move to Mexicali.  The inmate's father currently owns his own home in San Diego, and would plan to sell this and move to Mexicali, as well.  The inmate hopes to be able to take care of his father.  If deported to Mexico, the inmate has a job waiting for him in the automotive service business.  In this regard he would be

INMATE COPY ___III 9 104___ PRISON COPY

INMATE COPY

doing light automotive work such as brakes, tune-ups and wheel alignment. He has this job available through a friend of his father's. If released in the United States, his father's pastor owns a construction company. This friend of his father would be willing to give him a job working in construction. In the future, the inmate aspires to open a small body shop. The inmate relates that his brother John and sister Claudia would help him financially, especially to help him start his own business. The inmate has never been on parole or had any outpatient treatment. The inmate is currently noted to be on a waiting list for AA/NA. The inmate does not envision any problem areas with regard to his potential release. His support relationships would include his father, brother John and sister Claudia. He also notes that his father's friend and his father's pastor would also be a significant source of support. Also noted are his daughter and a number of nephews and nieces. The prognosis for community living would be considered good, assuming the continued family support which the inmate describes as well as his ability to remain free from any substances.

## CLINICAL ASSESSMENT

**XII. CURRENT MENTAL HEALTH STATUS/NEEDS:** The inmate is noted to have presented on time for his ducated appointment in the Facility D Clinic. He is appropriately dressed in prison attire and is neatly groomed. The inmate is noted to make good eye contact throughout the course of this afternoon's interview. He sits in a relaxed manner in the chair with his legs crossed. He is noted to be alert and oriented in all spheres. His speech shows good flow and content. Mood is euthymic. Affect is appropriate to thought content. There are no vegetative symptoms present. Nor are there any features present which would be consistent with any type of psychotic disorder. Perceptual disturbances are denied. The inmate denies any suicidal or homicidal ideation or intention. The inmate's prognosis is considered good for continued good mental health function.

**DIAGNOSIS:**

| | |
|---|---|
| Axis I: | Cocaine dependence, in remission. |
| Axis II: | Deferred. |
| Axis III: | Deferred to Medical. |
| Axis IV : | Pending BPT. |
| Axis V: | The inmate has maintained a good level of adjustment in a controlled setting. |

INMATE COPY _11 / 9 /04_

INMATE COPY

INMATE COPY

**XIII.    REVIEW OF LIFE CRIME:**    In describing his version of the instant offense, the inmate notes that he and his co-defendants went in to "get some quick money that night." He states that he and his co-defendants thought that they could get in there and get some money, "and something went wrong. We stayed in there too long. At the point of exiting, the officers were already there." The inmate notes that he and his co-defendants ran out of the back and there were officers there. They then took off and went a few blocks, and eventually the car "spun out." The inmate notes that one of his co-defendants made the mistake of shooting [at the officers]. The inmate then notes that everyone ran out and was trying to get away. "I tried to get my brother out of the car. But he did not want to get out, he wanted to give up." The inmate then notes that he ran out, heard some shots, but did not turn around. "I was trying to get away. I fell over one of my co-defendants, because it was dark." The inmate notes that he then stopped to try and help his co-defendant, but was told to leave and keep running. The inmate then dragged him a little ways to an alley and left him there. "I was arrested the next morning."

With regard to his attitude towards the [victim], the inmate notes that they worked very hard for their money. "They were hurt by us coming in there and threatening them for their money and their jewelry. We were there taking their hard earned money." The inmate demonstrates some empathy and remorse. "I wish I could say I am sorry. How can you say you're sorry?" The inmate also notes that he is sorry that he kicked the officer in the side. "He was just trying to do his job. I am also sorry that I said the things that I said to him." In terms of causative factors, "I wanted to buy more cocaine." The inmate also notes that he had been drinking hard liquor that night, "but I cannot tell you how much." He is unsure of how much under the influence he may have been at that time. The inmate goes on to state that he is sorry that he put the officers through "what we put them through that night." He concludes with "we live with many regrets over the years for that day and the dumb things we did when we were young."

**XIV.    ASSESSMENT OF DANGEROUSNESS:** The inmate has demonstrated a good disciplinary history for the past seventeen years. There are two violent offenses noted, one in 1985 and one in 1987. Describing the stabbing in 1985, the inmate notes that "they wanted me to hurt this guy." The inmate relates that he made the attempt, but does not know how badly he actually hurt him. He was involved in a fist fight in 1987. Given the above history and the fact that the inmate has been disciplinary free for such an extended time, it is likely that his potential for violence would be somewhat less than an average Level IV inmate.

SENT INMATE COPY _11 / 9 /04_

**INMATE COPY**

If released to the free community, it is felt that his potential for violence would be about average for a forty-three year old male. Certainly, precursors to that would be relapse into substance abuse. Another potential factor would be loss of family support.

The inmates release plans appear feasible. His family support is very strong, as it is described by the inmate. Subsequently, prognosis for successful community living would be considered good, providing that the inmate remain substance free and continue to have family support.

## XV.    CLINICIAN OBSERVATIONS / COMMENTS / RECOMMENDATIONS:
I would suggest that the inmate attend AA/NA. He is reported to be on a waiting list for these services at this time. There are no recommendations made for any mental health services at this time.


JOHN R. MAGNER, PhD
PSYCHOLOGIST
CALIPATRIA STATE PRISON

INMATE COPY

SENT INMATE COPY _11 / 9 / 04_

# EXHIBITS C

(LIFE PRISONER EVALUATION REPORT, 2005)

LIFE PRISONER EVALUATION
INITIAL PAROLE CONSIDERATION HEARING
JANUARY 2005 CALENDAR

## I. COMMITMENT FACTORS:

A. **LIFE CRIME:** Castillo was convicted by Los Angeles County for the controlling offense of 1 count of PC 187 Murder 1st on Case #A375051 for which he received a sentence of thirty-five (35) Years to Life. The victim's name was his brother, Frank Castillo, twenty-eight (28) years old at the time of the crime. Castillo was transported to the California Department of Corrections (CDC) on 09/23/83 and his Minimum Eligible Parole Date (MEPD) was calculated to be 12/20/05

1. **SUMMARY OF CRIME:** On January 10, 1982, at approximately 1:15 a.m., defendants entered Rusty's Hacienda Restaurant, 1331 South Boyle Avenue, in Los Angeles, armed with handguns and a shotgun. Approximately one hundred and twenty five (125) customers were in the restaurant at the time. According to the testimony of Manuel Bendana (victim in count 19), who was working as the manager, when the three (3) defendants entered, they were not dressed in proper attire. They asked to use the bathroom. After what seemed an appropriate amount of time, he checked to see they had left and was confronted by all three defendants in possession of handguns. They checked the manager's jacket to see if he had a gun and told him they wanted money. Castillo then went to the bar and shot at the ceiling with the shotgun and robbed customers and employees of money and jewelry. One of the customers present at the time was Ramon Castillo, an off-duty Los Angeles Police Department (LAPD) Officer who was working as restaurant security officer (victim in count 11). When he heard the gunshot and saw people screaming and running, he drew his revolver and walked towards the end of the bar where he saw Inmate Castillo holding a shotgun. Officer Castillo put his gun in his waistband; and when questioned by Inmate Castillo, as to whether he had a gun, he said no and was ordered to lie face down on the floor with the barrel of the shotgun in his back. He was then searched, and the gun was found. Inmate Castillo then ordered him to stand up and at gun point, directed him to walk to the east end of the bar where he was handcuffed to victim Bendana. A few seconds later, he was ordered to lie down on the floor; and shortly after that heard one of the defendants yell, "La Placa (Spanish slang for police) coming". At approximately 1:30 a.m. on January 10, 1982, Patrol Officers J. Nuñez, (victim in counts two and three) and R. Argomaniz (victim in counts four and five) responded to a possible robbery in progress. Upon their arrival they were told by another officer standing outside that the robbery was in progress with suspects and possible hostages still inside. The two uniformed officers, driving a marked LAPD car went to the rear and saw three persons with bags in their hands, running across the parking lot to a parked, 1980 Chevrolet, in which a driver was waiting. They got in the car and sped away. As they approached the intersection of Santa Fe, shots were fired from suspects' vehicle at the patrol officers. The pursuit continued northbound Santa Fe toward Seventh Street, at which time Officer Mirabel (victim in counts six and seven) and Officer Lund (victim in counts twelve and thirteen) joined in the pursuit. Mirabel and Lund, also driving a marked patrol car, were driving Southbound on Santa Fe Street, when the defendants shot at them in their patrol car. The defendants' vehicle traveling at a high rate speed eventually spun out of control and stopped against a curb. The chase had covered a distance of 1.5 miles. As Officer Nuñez and Argomaniz got out of the car at the intersection at Seventh Street and Anderson, they observed the defendants with guns firing shots at them.

SENT INMATE COPY _11_ / _12_ / _04_

**CASTILLO, LUIS**                    C73437                    **CAL-IV**                    01/05

Lifer Prisoner Evaluation
Initial Parole Consideration Hearing
January 2005 Calendar
Page 2



The officers returned fire. Officer Mirabel arrived and took up a position at the southwest corner of the building and saw the three defendants exchanging gunfire with Officer Nuñez and Argomaniz. The defendants then observed Officer Mirabel at the time, and fired at him while they ran into a junkyard. An LAPD helicopter had arrived at the scene and illuminated the defendant's car and was also fired upon. Officers fired several rounds from their service revolvers at the suspects who had attempted to conceal themselves from both ground units and the helicopter. The Inmate's brother, Frank Castillo was pulled from the car. He had sustained gunshot wounds to the head and died at the scene. At about 4:00 a.m., co-defendants Ledesma and Prado emerged from the salvage yard where they had tried to hide and surrendered without incident. Both had been wounded by the gunfire and where taken by ambulance to White Memorial Hospital for treatment. Shortly thereafter, Luis Castillo was found in the salvage yard after a systematic search using a police dog. He was taken to White Memorial Hospital and treated for dog bite injuries. Officers later recovered several bags of money and jewelry taken in the robbery, as well as a sawed-off shotgun and several handguns. No officers were injured in the gun battle. The information used in portraying circumstances of the Commitment Offense was taken from the Probation Officer's Report (POR).

2. **PRISONER'S VERSION:** Going back to January 10, 1982 I remember sitting in a parking lot of one of my co-defendant's apartment buildings. As we sat there we thought on some quick money and the first thing that came across was the Restaurant. We made quick plans and went in to try and rob the place, unfortunately everything went wrong that night, the officers got there and we were trying to get away. Shots were fired and when everything was done and said, two (2) of my co-defendants were shot in the back and my brother Frank was killed in the back seat of the vehicle. I was later arrested from where I was hiding. I would like to express to the board that I was a 19 year old man that was uneducated, had a cocaine habit and made a lot of bad choices. The decisions I made as a young man cost my brother his life. I hurt my parents, my daughter, I lost my fiancé, my freedom my nephew grew up without a father and his wife became a young widow it is something I have to live with for the rest of my life. I am now a 43 year old man that has taken advantage of the self-help groups and has learned to read, write and spell. Because of hard work and a lot of help I got my General Education Diploma. (GED) and took a 4 year Christian college course from which I graduated. I've learned that the decisions and choices I made were all wrong and have repented and regretted all the things I did as a young man. I would like the opportunity to get out and look after my father and help my daughter raise my grandkids.

SENT INMATE COPY 11 / 12 / 04

CASTILLO, LUIS                    C74347                    CAL-IV          01/05

Lifer Prisoner Evaluation
Initial Parole Consideration Hearing
January 2005 Calendar
Page 3



B.   **AGGRAVATING CIRCUMSTANCES:**

  1.   **AGGRAVATING FACTORS:**

    a.   Inmate had opportunity to cease but continued with crime.
    b.   Circumstances of crime created potential for serious indurate to others.
    c.   Multiple Victims
    d.   Past criminal history.
    e.   Use of weapon.
    f.   Use of Alcohol or drugs in crime.
    g.   Actively planned conspiracy or induced others to participate.
    h.   Nature of crime exhibited viciousness, cruelty, or callousness.

  2.   **MITIGATING FACTORS:**

    NONE

C.   **MULTIPLE CRIME(S):**

  1.   **SUMMARY OF CRIME:**

    Castillo was convicted by Los Angeles County for the following non-controlling offenses: 8 counts of PC 187/664 Attempted Murder, 8 counts of PC 245(b) Assault with Great Bodily Injury (GBI) with a Deadly Weapon, 14 counts of PC 182/211 Conspiracy to Commit Robbery on Case # A375051 sentence of thirty five (35) years to Life. The victims were various officers of the Los Angeles Police Department and various customers at the restaurant.

  2.   **PRISONER'S VERSION:**

    Remains the same as in previous prisoner's version.

II.   **PRECONVICTION FACTORS**

A.   **JUVENILE RECORD:**

Probation files note that the defendant has three juvenile probation files, which have been destroyed. CII showed two arrests as a juvenile; age 16 for Assault with a Deadly Weapon (nun-chuck sticks) in which he was released for insufficient evidence (no date). Second arrest on 06/14/79 for 12020 PC (Possession/Manufacturing /Selling Dangerous Weapon) in which he was released to parent or guardian. When interviewed, the defendant said that he was arrested when he was about 16 or 17 for an open container, placed on probation, fined and denied any other arrests as a juvenile. This information was obtained from the CI&I report

SENT INMATE COPY 11 / 12 / 04

CASTILLO, LUIS                 C73437                 CAL-IV                 01/05

Lifer Prisoner Evaluation
Initial Parole Consideration Hearing
January 2005 Calendar
Page 4



**B.    ADULT CONVICTIONS AND ARRESTS:**

10/14/81 LAPD – 211 PC (ROBBERY) – A149652, charged with 211PC (Robbery with use of a Firearm), CTS. 1 through 20; 245(A) PC, CT; 236PC (False Imprisonment); CTS. 22 through 24 Use of a Firearm and Great Bodily Injury Allegation as to CT. 21; convicted of all counts and all allegations; 07/06/83, Dept. NW-R, sentenced to state prison for a total of 23 years and 8 months.

(The Defendant and two crime partners were charged with a series of robberies which occurred in Aug. Sept., and Oct. of 1981 at various markets and drugstores in which the safes were forcibly opened at gunpoint.    Various customers in the store, mostly employees, were also robbed.   The victims were threatened and intimidated; and in one of the robberies at a Ralph's the Defendant shot one of the victims in the stomach, resulting in removal of part of his intestine and loss of his spleen while he was kicked on the ground.   During the pre-sentence investigations, the defendant said that he might have done about four of the robberies with which he was charged for but denied shooting anyone and claimed that he was involved because of his hanging around with the wrong people.)

01/10/82 LAPD – 187 PC (Murder) – Refers to the present offense.

Castillo was on bail from his previous arrest in case A149652 when he committed the Commitment Offense and his release on bail is deemed poor since he now has another commitment.

**C.    PERSONAL FACTORS:**

The defendant was born in Mexico, one of eight children, raised by his parents Jose and Dolores Castillo. He says that he came to this country legally in 1964 with his family and has resided here ever since, but there is a USINS hold/detainer in his C-File for violation of immigration laws.   He attended school until the ninth grade, dropped out at age 17, and started working, although his work history is sketchy.   In a previous investigation, defendant said that he had worked as a security guard for a couple of years and quit over a pay dispute.   He also claims to have worked as a gardener for about a year for the Los Angeles City School Board in 1980 and 1981 and to have been laid off when he failed to pass his probationary term.    He has never married but had a sporadic off-and-on relationship with Yolanda Onteberos.   The couple has one child, who is now 24 years of age.   According to the defendant, he had been injecting cocaine three years, every other day and had a $200.00 a week habit. He denies the use of other narcotics or drugs. During the investigation in his prior Commitment, the defendant acknowledged the use of Marijuana and said that he had tried Cocaine a couple of times.   Castillo denied any gang affiliation.   Records indicate that he was a past member of Clanton Street Gang of North Hollywood, but there is no evidence of current affiliation.   One of the defendant's brothers, Frank Castillo, was the victim in count one in the present offense.
The source of information for the above description is taken from the POR dated 06/09/83.

SENT INMATE COPY 11/13/04

Lifer Prisoner Evaluation
Initial Parole Consideration Hearing
January 2005 Calendar
Page 5



### III.   POSTCONVICTION FACTORS

#### A.   SPECIAL ACCOMMODATIONS/DISABILITY:

The Inmate claims no disability and none were noted by this Counselor.

#### B.   CUSTODY HISTORY:

Inmate Castillo was admitted to CDC at California Institution for Men Reception Center (CIM-RCC) on 09/23/83 and transferred on an non adverse to Folsom State Prison (FOL) on 10/28/83 where his custody was set at Close A (CLO-A), Work Group/Privilege Group (WG/PG) A2-B, and placed on a Waiting List (W/L). On 05/14/85, Castillo was assigned to Education, CLO-A custody and WG/PG A1-A. On 05/24/85, CDC 128-G notes CLO-A custody and WG/PG A1, however Inmate was housed in Security Housing Unit (SHU) due to CDC 115 dated 05/20/85 for Assault/Stabbing of Inmate (Inmate was found guilty on 06/10/85). On 06/25/85, Inmate continued to be house in SHU, Custody Max-A and WG/PG D-2. Inmate was given a 24-month term with a controlling Minimum Eligible Release Date (MERD) of 11/20/86. On 08/19/86, Inmate continued to be housed in SHU, Max-A custody, WG/PG D-2. Inmate was originally placed SHU on 05/20/8 for Stabbing Assault and received a MERD of 11/20/86.  This MERD was enhanced for Possession of Dangerous Contraband and Assault on Inmate with his current MERD of 08/07/88.  On 08/30/86, inmate's case had been screened for an emergency transfer to CCI-IV SHU from FOL SHU to facilitate closure of FOL SHU.  On 10/24/86, Inmate was transferred on an adverse transfer to CCI-IC SHU, his Custody was set at Max-A and WG/PG A-1. On 01/29/87, classification changed his work group status to D-1 pursuant to a court decision and CDC Administrative Bill 87/3, his Custody was retained at Max-A. On 10/08/87, Initial Classification Committee (ICC) held his Annual Review, his custody remained at Max-A and WG/PG D-1, his classification score increased due to the following CDC 115's, Possession of Dangerous Contraband Assault on Inmate dated 02/23/86, being involved in a Fist Fight with an Inmate dated 05/26/87, Inmate Manufactured Alcohol dated 08/23/87, Possession of an Inmate Manufactured Sewing Needle & State Issued Razor Blade date 08/23/87.  On 12/03/87, Custody remains at Max-A WG/PG D-1, ICC confirmed the adjusted MERD of 02/07/89 based on the following CDC 115's Destruction of State Property, Dangerous Property, Fighting, (2) for Possession of Razor Blades. On 09/08/88, ICC held his Annual Review, his custody remained at Max-A and WG/PG at D-1.  On 10/19/88, ICC assigned inmate as a Tier Tender.  His WG/PG changed from D-1 to B and Custody remained at Max-A.  On 11/16/88 Unit Classification Committee (UCC) removed inmate from his Tier Tender assignment due to problems encountered with other inmates and change WG/PG from B to D-1, his custody remained at Max-A.  On 02/10/89, ICC released Inmate to CCI-IV General Population (GP) after his MERD of 02/07/89.  His Custody remained at Max-A and WG/PG D-1. On 02/23/89, Classification Services Representative (CSR) endorsed

SENT INMATE COPY  11 / 12 /04

CASTILLO, LUIS                    C73437                    CAL-IV                    01/05

Lifer Prisoner Evaluation
Initial Parole Consideration Hearing
January 2005 Calendar
Page 6

inmate to CCI-IV FP at completion of MERD. On 03/01/89, UCC changed his status from D/D-1 to PG: B  WG: A-2 effective 03/01/04 and maintain CLO-A custody. On 03/24/89 inmate was assigned and his WG changed from A-2 to A-1. On 10/20/89, UCC elected to reduce inmate's custody from CLO-A to CLO-B. His PG a WG: A-1 remains the same. On 03/14/90, at his Annual Review his Custody remains at CLO-B and PG: A  WG: A-1. On 03/27/91, at his Annual Review his Custody remains at CLO-B and PG: A  WG: A-1. On 02/05/92, at inmate's Annual Review his Custody remains at CLO-B and PG: A  WG: A-1. On10/29/05, Inmate's Custody changed from CLO-B to Max-A and PG: D-1 due to being placed in Administrative Segregation (Ad-Seg) on 10/23/92 being involved in a physical altercation on the Level IV "A" yard between a large group of Hispanic inmates during which one was shot in the leg. On 11/17/92, UCC elected to remove inmate from Ad-Seg and place in Orientation. Change his WG/PG from DD-1 to BA-2 effective 11/17/92 and refer Orientation counselor for presentation before UCC for program review. On 11/19/92 UCC elects to reduce Custody from CLO-A to CLO-B and place him on a W/L. On 12/16/92, UCC notes that inmate received a CDC 115 which reduced to a CDC 128-B. Due to the reduction, committee elected to institute the following changes, Change WG/PG BA-2 to AA-1 effective 10/23/92, grant Work Group Change at AA-1 from 10/23/92 through date of hire and place on the Industry D Priority W/L. On 10/06/93, at his Annual Review, Custody remains at CLO-B and WG/PG A-A1. ON 09/28/94, at his Annual Review, Custody remains at CLO-B and WG/PG A-A1. On 10/25/95, at UCC committee elects to reduce inmate's custody from CLO-B to Med-A due to subject being over half way to the MEPD. His WG/PG remains at A1-A. On 10/30/96 at his Annual, Custody remains at Med-A and WG/PG A1-A. On 03/26/97, UCC elects to change Custody from Med-A to CLO-B due to the Department's new guidelines. WG/PG remains at A1-A. On 10/22/97, Annual Review his Custody remains at CLO_B and WG/PG A1-A. On 12/16/98, UCC at his Annual Review his Custody was reduced to Med-A and WG/PG remains at A1-A. On 07/07/99, UCC elects to refer CSR RX/TX to CAL-IV (270) due to CCI-IVA mission change in preparation for activation of SHU Facility. His Custody remains at Med-A and WG/PG A1-A. On 07/22/99, CSR endorsed inmate to CAL-IV. On 08/19/99, UCC of CAL-IV elects to maintain Custody at Med-A and WG/PG A1-A effective 10/23/92 and place on ABE-? And Support Services (SS) W/L. On 02/01/00, at his Annual Review UCC elects to continue present program, Custody remains at Med-A and WG/PG A1-A effective 10/23/92. Inmate is currently assigned as Clerk/Porter. On 06/15/00, ICC Ad-Seg notes that on 05/10/00 inmate was placed in Ad-Seg as a result of housing concerns. His Custody is MAX and WG/PG: D1/D effective 05/10/00. On 06/22/00, ICC Ad-Seg elects to release inmate to Facility "D" Sensitive Needs Yard (SNY), Grant Med-A custody and WG/PG A1-A effective 10/23/92. Grant "S" time from 05/10/00 until rehire. Place on the SS and Voc W/L. On 10/17/00, at his Annual Review, inmate's custody remains at Med-A and WG/PG A1-A effective 10/23/92. On 06/13/02, UCC elects to remove inmate from "D" Vocational Education Office due to completion of program and place him on the SS and Clerks W/L. Custody remains at Med-A and WG/PG A1-A effective 10/23/92 and continue present program. On 10/28/03 at his Annual Review his Custody remains at Med-A and WG/PG A1-A effective 10/23/92.

INMATE COPY  11/12/04

CASTILLO, LUIS                    C74347                    CAL-IV            01/05

Lifer Prisoner Evaluation
Initial Parole Consideration Hearing
January 2005 Calendar
Page 7



Castillo completed the following educational/vocational programs:  He completed the Auto Body and Fender program on 06/24/02.  He also completed the following components of the Vocational Printing programs:

| | |
|---|---|
| 11/06/97 | Business Management V09.03.14 |
| 10/31/97 | Basic Camera Operation C09.0311 |
| 10/31/97 | Process Ink and Color Mixing V09.03.12 |
| 10/31/97 | Art and Copy Preparation V09.03.13 |
| 10/30/97 | Press Print V09.03.08 |
| 10/30/98 | Hand Printing V09.03.06 |
| 10/27/97 | Shop and or Site Safety V09.03.02 |
| 10/10/97 | Orientation V09.03.01 |

He did not complete the program due to mission change in preparation for activation of SHU Facility.

On 02/06/04 Castillo received a Degree of Graduate Theology from the Gulf Coast Bible Institute.

**C.**    **THERAPY & SELF-HELP ACTIVITIES:**

There is no evidence of participation in psychological therapy or Narcotics/Alcoholics Anonymous (NA/AA) self-help groups.

**D.**    **DISCIPLINARY HISTORY:**

| | |
|---|---|
| 08/21/84 | Contraband Cigarettes on Person; Guilty, Reduced to Administrative |
| 09/05/84 | Out of Bounds; Guilty |
| 05/20/85 | Assault/Stabbing of Inmate; Guilty |
| 12/16/85 | Hype-Kit in Cell; Guilty |
| 02/23/86 | Possession of Dangerous Contraband Assault on Inmate; Guilty |
| 04/29/87 | Destruction of State Property; Guilty |
| 05/26/87 | Being Involved in a Fist Fight; Guilty |
| 08/23/87 | Possession of Inmate Manufactured Alcohol; Guilty |
| 08/23/87 | Possession of an Inmate Manufactured Sewing Needle and State Issued Razor Blade; Guilty |
| 10/10/87 | Possession of a Razor Blade; Guilty |
| 10/22/87 | Control of an Inmate Manufactured Alcoholic Beverage; Guilty |
| 10/29/87 | Control of an Inmate Manufactured Alcoholic Beverage (Pruno); Guilty |
| 11/25/87 | Dangerous Property; Guilty |
| 12/27/87 | Control of Dangerous Contraband; Guilty |





**CASTILLO, LUIS**              C73437                  CAL-IV                  01/05

Lifer Prisoner Evaluation
Initial Parole Consideration Hearing
January 2005 Calendar
Page 8



**E.    OTHER:**

On 05/10/01 Inmate Castillo appeared before Board of Prison Terms (BPT) for a Documentation (DOC) #4 hearing and the Board recommended that the inmate complete the Voc Auto Body and Fender program, obtain his GED and remain disciplinary free. Inmate Castillo has remained disciplinary free, received a Vocational Education Certificate of Completion on 06/24/02 and received his GED on 05/13/02.

**IV.    FUTURE PLANS**

When I parole I plan to make my home in Mexicali, B.C. where I can pursue the trades I've been certified in, I'll have a job the day I get out at Nuñez Mechanic Shop in Mexicali.  I plan to save enough money to get my own little body shop, I have some money saved up from the years I worked at CCI, PIA.  I also plan to help preach on Sundays at Centro De Alabanza in Mexicali, comunidad Christiana (686) 839-0242 and help the pastor out in whatever I can.  I would also like to continue to share my life experience with the youth in Mexicali.  Many of the counselors that have visited the prison through the Straight Life Youth Diversion Program have expressed this, so if given the chance I will be there for the youths.  I plan to take care of my father and spend the last years of his life with him, I lost my mom in April of 2002.

**A.    RESIDENCE:**

If unable to reside in the United States I plan to reside with my father Jose Carillo and family friend Marco Antonio Aguilar at the following address:
Avenida De La Jolla 2310, Frac: Villa Colonial, Mexicali Baja California.

If I am able to stay in the United States I plan to reside with my father Jose Castillo at the following address: 10707 Jamacha Blvd. Space #169, Spring Valley, CA 91978, (619) 421-6681.

Inmate Castillo's parole plans are supported by letters of support in the BPT section in the miscellaneous area.

**B.    EMPLOYMENT:**

**Taller Nuñez Mechanic Shop**
Sergio Nuñez (Owner)
Avenida Violetas #95
Col. Alamitos
Mexicali, B.C. 21210

At this time the counselor notes that Inmate Castillo's employment plans are not supported by a letter of employment, however inmate stated that the letter is in route.

SENT INMATE COPY 11 /13 04

Lifer Prisoner Evaluation
Initial Parole Consideration Hearing
January 2005 Calendar
Page 9



### C.    ASSESSMENT:

Inmate Castillo was calm, polite and courteous during his interview. He has positive support from his family members, father and family friend as per his letters of support. His employment does not seem sustainable at this time due to unable to verify letter of employment.

## V.    USINS STATUS

Castillo has a USINS hold # A17175321, located in the Detainers section of his C-File and which is recorded on the CDC-112.

## VI.    SUMMARY

**A.**    TEMPORARY ELIMINATION OF THE RISK OF THREAT ASSESSMENT IN THE MODEL BOARD REPORT FORMAT AS PER STATE MEMORANDUM DATED AUGUST 5, 2004.

**B.**    Prior to release, the prisoner could benefit from:

    1.    Establish and maintain a disciplinary free record.
    2.    Participate in Self-Help groups.

*how can this be on ... time to ... go through ... r files ... inmate o*

**C.**    This report is based on an interview with the inmate on 09/23/04 lasting approximately 50 minutes and a complete review of the Central File lasting 20 hours..

**D.**    Inmate Castillo was afforded an opportunity to review his Central File and elected not to review it on 09/23/04.

**E.**    No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan for effective communication

Prepared by: N. Delgado                    Reviewed by: G.R. Chavarria

_N. Delgado, CCI_                          _G. Chavarria, CCII_

INMATE COPY  11/12/04

# PROOF OF SERVICE

Case Name: In Re __LUIS COSTILLO V. L.SMALL, WARDENT (A)__

I, _____TERESA CASTILLO_____, declare that I am a citizen of the United

States; I am over the age of eighteen (18), and I am / am not a party to the within titled cause;

my address is: __295 C.ST. CHULAVISTA, CALIFORNIA, 91910__

On ___JULY 31, 2008___, I served the attached:

PETITION FOR WRIT OF HABEAS CORPUS; MEMORANDUM OF POINTS AND AUTHORITIES

on the parties listed below by enclosing same in an envelope to which adequate postage, i.e.,

first class/certified mail, was affixed and deposited same in the box for United States

Mail at ____CHULAVISTA____, ____CALIFORNIA____:

ATTORNEY GENERAL
300 SO. SPRING STREET, 5TH FL.
LOS ANGELES, CA 90013

UNITED STATES COURTHOUSE
ATTN: INTAKE/DOCKET SECTION
312 NORTH SPRING STREET
LOS ANGELES, CA 90012

I declare, under penalty of perjury, that the facts stated above are true and correct.

Date: ___JULY 31, 2008___, 2008, at __CHULAVISTA__, CALIFORNIA__.

_Theresa Castillo_
TERESA CASTILLO, DECLARES
(Declarant)

1



**SHERRI R. CARTER**
District Court Executive
and Clerk of Court

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**
312 North Spring Street, Room G-8 Los
Angeles, CA 90012
Tel: (213) 894-7984

**SOUTHERN DIVISION**
411 West Fourth Street, Suite 1053
Santa Ana, CA 92701-4516
(714) 338-4570


**EASTERN DIVISION**
3470 Twelfth Street, Room 134
Riverside, CA 92501
(951) 328-4450

Monday, August 04, 2008

**LUIS COSTILLO**
**C-73437**
**P.O. BOX 5002**
**CALIPATRIA, CA 92233**


Dear Sir/Madam:

A [X] Petition for Writ of Habeas Corpus was filed today on your behalf and assigned civil case number CV08- 5082 VBF (FMO)

A [ ] Motion pursuant to Title 28, United States Code, Section 2255, was filed today in criminal case number _____ and also assigned the civil case number _____

Please refer to these case numbers in all future communications.

Please Address all correspondence to the attention of the Courtroom Deputy for:

[ ] District Court Judge _____

[X] Magistrate Judge      **Fernando M. Olguin**_____

at the following address:

[X] U.S. District Court          [ ] Ronald Reagan Federal          [ ] U.S. District Court
    312 N. Spring Street              Building and U.S. Courthouse         3470 Twelfth Street
    Civil Section, Room G-8          411 West Fourth St., Suite 1053      Room 134
    Los Angeles, CA 90012            Santa Ana, CA 92701-4516             Riverside, CA 92501
                                     (714) 338-4750

The Court must be notified within fifteen (15) days of any address change.  If mail directed to your address of record is returned undelivered by the Post Office, and if the Court and opposing counsel are not notified in writing within fifteen (15) days thereafter of your current address, the Court may dismiss the case with or without prejudice for want of prosecution.

Very truly yours,

Clerk, U.S. District Court

By: _____
       CPOWERS

       Deputy Clerk

---

CV-17 (01/01)          **LETTER re FILING H/C PETITION or 28/2255 MOTION**



Teresa Castillo
295 C. St #106
Chula Vista Ca.
91910



7007 2680 0002 0264 6408

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

CERTIFIED MAIL



RECEIVED
CLERK, U.S. DISTRICT COURT

AUG - 1 2008

CENTRAL DISTRICT OF CALIFORNIA
DEPUTY